## Docket No. 2016-2520

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

---

FINJAN, INC.,

*Plaintiff-Appellee,*

v.

BLUE COAT SYSTEMS, INC.,

*Defendant-Appellant.*

---

*Appeal from the United States District Court for the Northern District of California
in Case No. 5:13-cv-03999-BLF · United States District Judge Beth Labson Freeman*

## NON-CONFIDENTIAL BRIEF OF APPELLANT

MARK A. LEMLEY, ESQ.
mlemley@durietangri.com
CLEMENT ROBERTS, ESQ.
croberts@durietangri.com
SONAL N. MEHTA, ESQ.
smehta@durietangri.com
SONALI D. MAITRA, ESQ.
smaitra@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, California 94111
(415) 362-6666 Telephone
(415) 236-6300 Facsimile

*Attorneys for Defendant-Appellant,
Blue Coat Systems, Inc.*

December 20, 2016



## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate

Procedure 26.1, counsel for Defendant-Appellant Blue Coat Systems, Inc. certifies

the following:

1.     The full name of every party represented by us is:

       Blue Coat Systems, Inc.

2.     The name of the real party in interest (if the party named in the caption is not
       the real party in interest) represented by us is:

       Blue Coat Systems, LLC.

3.     All parent corporations and any publicly held companies that own 10 percent
       or more of the stock of the party represented by us are:

       Symantec Corporation

4.     The names of all law firms and the partners or associates that appeared for
       the party now represented by me in the trial court or agency or are expected
       to appear in this court are:

       Wilson Sonsini Goodrich & Rosati: Edward G. Poplawski, Brian Lam,
       Christopher Don Mays, Gina H. Cremona, Laura Elizabeth Evans, Olivia M.
       Kim, Paul Morley McAdams, S. Ferrell Alman, Jr., Vera M. Elson

       Durie Tangri LLP: Mark A. Lemley, Clement S. Roberts, Sonal N.
       Mehta, Sonali D. Maitra

DATED:  December 20, 2016          DURIE TANGRI LLP


                          By    _/s/ Mark A. Lemley_____


                                *Attorneys for Defendant-Appellant*
                                *Blue Coat Systems, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................i

TABLE OF CONTENTS...................................................................ii

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF RELATED CASES ................................................1

JURISDICATIONAL STATEMENT ...................................................2

STATEMENT OF ISSUES ................................................................3

STATEMENT OF FACTS ................................................................4

    I.     Finjan and the Asserted Patents.....................................4

    II.    Blue Coat and the Accused Products..............................4

    III.   Relevant Procedural History..........................................5

SUMMARY OF THE ARGUMENT ..................................................8

ARGUMENT .................................................................................11

    I.     THE '844 IS DIRECTED TO INELLIGIBLE
          SUBJECT MATTER ..................................................11

          A.   The '844 Patent is Directed to Flagging
               Suspicious Messages .........................................12

          B.   The Claims Do Not Add an Inventive Concept .................16

          C.   The District Court Erred in Relying on the PTO
               Guidelines and in Failing to Apply This Court's
               Precedent ..........................................................20

    II.    BLUE COAT DOES NOT INFRINGE THE '844
          PATENT ...................................................................22

          A.   WebPulse Acts on Files That Have Already Been
               Published ...........................................................24

           B.   Finjan Offered No Substantial Evidence of
               Infringement ......................................................26

III.   BLUE COAT DOES NOT INFRINGE THE '731
       PATENT .................................................................31

IV.    BLUE COAT DOES NOT INFRINGE THE '968
       PATENT .................................................................36

       A.   The   Claim   Requires   Storing   a   Policy
            Determination ..................................................37

       B.   Proxy SG Does Not Implement the Claimed
            Policy Index .....................................................39

V.     THE DAMAGES AWARD IS NOT SUPPORTED BY
       SUBSTANTIAL EVIDENCE .......................................41

       A.   Standard of Review ...........................................42

       B.   The Damages Award on the '844 Patent Is Not
            Supported by Substantial Evidence....................42

            1.   Finjan's Damages Model on the '844
                 Patent Was Inconsistent With This Court's
                 Precedent on Apportionment ...................43

            2.   Finjan Did Not Present Substantial
                 Evidence to Support the Proposed Royalty
                 Rate for the '844 Patent ..........................47

       C.   The Damages Award on the '731, '968 and '633
            Patents Is Not Supported by Substantial Evidence ...........51

CONCLUSION .................................................................56

ADDENDUM

ADDENDUM TABLE OF CONTENTS

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIALS OMITTED

The materials omitted from this addendum reflect an order of the district court that the district court issued under seal

# TABLE OF AUTHORITIES

**Page**

## Cases

*Accenture Global Servs. v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013) ............................................................. 15, 16, 17

*Affinity Labs of Tex. v. DirecTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ............................................................. 15, 16, 19

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ............................................................................. *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   No. 2015-1180, __ F.3d __, slip op.(Fed. Cir. Nov. 1, 2016) ...................... 18, 20

*Apple, Inc. v. Ameranth, Inc.*,
   No. 2015-1703, __ F. 3d __, slip op. (Fed. Cir. Nov. 29, 2016) .........................14

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015) ..................................................................... 20, 21

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ............................................................. 13, 14, 18

*buySAFE, Inc. v. Google Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) ...........................................................................16

*Carnegie Mellon University. v. Marvell Technology Group*,
   807 F. 3d 1283 (Fed. Cir. 2015) ..........................................................................43

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) ...........................................................................13

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ..................................................................... 14, 16

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) ..................................................................... 18, 20

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ............................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ............................................................44

*Finjan Inv. v. Secure Computing Corp.*,
  626 F. 3d 1197 (Fed. Cir. 2010) ................................................... 47, 49

*Fort Props., Inc. v. Am. Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012) ............................................................11

*Garretson v. Clark*,
  111 U.S. 120 (1884)); ...........................................................................44

*Grain Processing Corp. v. Am. Maize–Products Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ............................................................43

*Gustafson, Inc. v. Intersystems Indus. Prods.*,
  897 F.2d 508 (Fed. Cir. 1990) ..............................................................55

*In re Smith*,
  815 F.3d 816 (Fed. Cir. 2016) ..............................................................21

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) ....................................... 13, 16, 17, 19

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015) ............................................................17

*Intellectual Ventures I LLC v. Symantec Corp.*,
  100 F. Supp. 3d 371 (D. Del. 2015) ....................................................21

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) .................................................. *passim*

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015) .................................................. 17, 20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................................51

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ....................................................... 22, 44

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  132 S. Ct. 1289 (2012) ........................................................... 11, 12, 21

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ................................................................18

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
  811 F.3d 1314 (Fed. Cir. 2016 ................................................................17

*Pavao v. Pagay*,
  307 F.3d 915 (9th Cir. 2002) ....................................................... 22, 42

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ....................................................... 44, 51

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) ....................................................... 44, 45

*Trading Techs. Int'l, Inc. v. Lee*,
  __ S. Ct. __, 2016 WL 5816725 (U.S. Nov. 7, 2016) ........................................21

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ................................................................17

*Ultramerical, LLC v. Wildtangent, Inc.*,
  135 S. Ct. 2907 (2015) ........................................................... 17, 20

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ................................................................50

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ....................................................... 47, 51

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ....................................................... 42, 50

**Statutes**

28 U.S.C. § 1295(a)(1) .............................................................................2

28 U.S.C. § 1331 ......................................................................................2

28 U.S.C. § 1338 ......................................................................................2

35 U.S.C. § 101 ............................................................................. *passim*

**Rules**

Federal Circuit Rule 47.5 .........................................................................1

Federal Rule of Appellate Procedure 4 ....................................................2

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellants provide as follows:

(a)      There have been no previous appeals in this case

(b)      The following cases known to counsel will be directly affected by this

Court's decision in the pending appeal:

*Finjan, Inc. v. Blue Coat Systems, Inc.*, 5:13-cv-03295-BLF (N.D. Cal.)

*Finjan, Inc. v. Symantec Corp.*, 3:14-cv-02998 (N.D. Cal.)

*Finjan, Inc. v. Palo Alto Networks, Inc.*, 4:14-cv-04908 (N.D. Cal.)

*Finjan, Inc. v. ESET, LLC et al.*, 3:16-cv-03731 (N.D. Cal.)

*Finjan, Inc. v. Sophos, Inc.*, 3:14-cv-01197 (N.D. Cal.)

1

# JURISDICATIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 because this action arose under the Patent Act 35 U.S.C. § 101 *et seq.* The district court issued an initial Judgment on November 20, 2015, and a Final Judgment on August 19, 2016.  Blue Coat timely filed a Notice of Appeal on August 17, 2016 pursuant to Federal Rule of Appellate Procedure 4(a)(2) and then filed an Amended Notice of Appeal on August 23, 2016.  This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.      Whether Claims 1, 7, 11, 15, and 41 of U.S. Patent 6,154,844 are directed to patent ineligible subject matter in violation of 35 U.S.C. § 101.

2.      Whether Blue Coat's accused product satisfies the limitation in Claims 1, 7, 11, 15, and 41 of U.S. Patent 6,154,844 that requires linking a security profile to a downloadable before a web server makes that downloadable available to web clients.

3.      Whether Blue Coat's accused products satisfy the limitations in Claims 1 and 17 of U.S. Patent 7,418,731 that require the creation of a security profile that includes a list of computer commands an incoming file is programmed to perform.

4.      Whether Blue Coat's accused products satisfy the limitation in Claim 1 of U.S. Patent 6,965,968 that requires caching the results of a decision about whether a given piece of digital content is allowable relative to a policy.

5.      Whether the jury's damages award on the 6,154,844, 7,418,731, 6,965,968 and 7,647,633 patents complies with this Circuit's precedent or was based on an improper calculation advanced by Finjan.

## STATEMENT OF FACTS

### I.    FINJAN AND THE ASSERTED PATENTS

Finjan was formed in January, 1996.  Appx39500:21-22.  At the outset, Finjan was intended to be both a product company and a patent licensing entity. Appx39502:20-24.  But Finjan's products did not fare well in the marketplace, and Finjan discontinued them to focus on licensing.  Appx39502:9-22.

Finjan accused Blue Coat of infringing six U.S. patents: 6,154,844 ('844 patent); 6,804,780 ('780 patent); 6,965,968 ('968 patent); 7,058,822 ('822 patent); 7,418,731 ('731 patent); and 7,647,633 ('633 patent).  Three of these patents (the '844, '822 and '633) are directed to identifying or dealing with communications that may contain malware.  Appx39495:14-19.  The others (the '731, '968 and '780) are directed to categorizing and/or caching information about websites. Appx39498:3-12.

### II.    BLUE COAT AND THE ACCUSED PRODUCTS

Blue Coat is a leading networking company whose products are used by 97 of the Fortune Global 100, and most of the defense and intelligence arms of the U.S. Government.  Appx40679:10-25, Appx40680:1-16

Blue Coat was founded (as "CacheFlow") in 1996 by Dr. Michael Malcom, a professor at the University of Waterloo.  Appx40668:17-21.  The company's initial product was a caching engine that sat between a user and the internet and

sped up the delivery of content to users.  Appx40670:24-25, Appx40671:1-2.  In 2002, the company changed its name to Blue Coat (invoking the coats worn by police officers) as part of a push into network security.  Appx40671:22-25, Appx40672:1-16.  To that end, Blue Coat invented a "policy engine" that allowed network administrators to set policies to control the content that end users could obtain.  Appx40671:17-20.  The product that resulted from combining the caching and policy engines was named ProxySG.  Appx40672:19-25, Appx40673:1-7.

ProxySG is a secure gateway that acts as a proxy server to provide, among other things, web security for a set of end users.  ProxySG also can be integrated with other accused Blue Coat products.  One such product, Blue Coat's WebPulse, is a cloud-based infrastructure that categorizes web pages, and looks for evidence of malware.  WebPulse is accused of infringing the '844 patent and the combination of Webpulse and ProxySG is accused of infringing the '731 and '968 patents.

## III.   RELEVANT PROCEDURAL HISTORY

Finjan filed the original complaint on August 28, 2013.  Appx281.  The court held a claim construction hearing on August 22, 2014 for the purpose of construing ten disputed terms in the '822, '633, '844, and '731 patents.  *See* Appx1.

Blue Coat and Finjan each moved for summary judgment.  The court granted Blue Coat's motion for noninfringement as to certain accused products not at issue in this appeal, and denied all other motions, including Blue Coat's motion for noninfringement of the '844, '968 and '731 patents.  Appx50.

Prior to trial, the court excluded many of the Plaintiff's damages theories as they related to the '844 patent.  Appx96.  As a result, Finjan presented no expert testimony at trial on damages for the '844 patent.

From July 20, 2015 to August 3, 2015, the district court held a jury trial.  At the close of Finjan's case, Blue Coat moved for judgment as a matter of law on all claims of infringement, and on damages.  Appx40682:4-18.  At the close of all evidence, Blue Coat renewed those motions, and moved for judgment as a matter of law as to invalidity of all asserted claims.  Appx41484:15-21.  The court denied those motions and allowed all asserted claims to reach the jury.

The Jury returned a verdict (*see* Appx162-170) with the following findings—the first four of which are at issue in this appeal:

| Patent | Claims Infringed | Literal/DOE | Accused Products | Damages |
|--------|------------------|-------------|------------------|---------|
| '844 | 1, 7, 11, 15, 41 | Both | WebPulse | $24M |
| '968 | 1 | Both | Proxy SG + Webpulse | $7.75M |
| '731 | 1, 17 | Both | Proxy SG + Webpulse | $6M |
| '633 | 14 | DOE | ProxySG, CAS + MAA | $1,666,700 |
| '780 | 9, 13 | Both | ProxySG + ProxyAV | $111,787 |
| '822 | None | Neither | ProxySG | -- |

The court then held a bench trial (starting September 9, 2015) on priority for the '844 and '731 patents, prosecution history estoppel, subject matter eligibility of the '844, and laches. On November 20, 2015, the court issued its findings of facts and conclusions of law establishing the priority dates for the '844 and '731 patents, denying Blue Coat's prosecution history estoppel argument and declining to find the '844 patent ineligible. *See* Appx116-117.

Both parties filed post-trial motions in December, 2015. Appx45842, Appx45969, Appx45984, Appx46015, Appx46076. The court rejected each of Blue Coat's arguments for judgment as a matter of law and for a new trial. Appx157. In each instance, the court used similar language to describe its substantive evaluation of the Rule 59 standard. Appx139:12-17, Appx141:4-8, Appx141:28, Appx142:1-3, Appx142:27-28, Appx:1-2, Appx143:27-28, Appx144:1-2, Appx145:8-11, Appx146:12-16. The court also found that because "[t]he verdict form instructed the jury to analyze infringement under the doctrine of equivalents only if the patent was not literally infringed . . . . the judgment should be amended to reflect that infringement under the doctrine of equivalents is moot for the '844, '968, '780 patents . . . ." Appx149.

In this appeal, Blue Coat is pursuing only a small subset of the arguments made below. Thus, Blue Coat is not appealing the prior art determinations, the decisions in the court's claim construction order, or the '780 jury verdict.

## SUMMARY OF THE ARGUMENT

The '844 Patent is directed to an abstract idea: flagging messages as suspicious. While the claimed invention is intended to flag suspicious computer messages, the limitations of the claimed method do not require a computer, and could be performed with a pencil and paper. Nor is there anything that might act as an "inventive concept" sufficient to transform the asserted claims under the second prong of *Alice*. Indeed, aside from abstract ideas, the claims contain only conventional computer components of the kind this Court and the Supreme Court have consistently found insufficient to establish an inventive concept.

Blue Coat also does not infringe the '844 patent. Every asserted claim of that patent requires an accused device to create and link a security profile to a downloadable "before a web server makes the Downloadable available to web clients." Appx185:19-20. But Blue Coat's products cannot take any action on a downloadable until after a web server has made that downloadable available to web clients by publishing it to the internet. At trial Finjan argued that Blue Coat's products infringed because they acted on content before certain end users received it. But the claim, on its face, requires acting before the downloadable is *made available* to web clients—which Blue Coat's products cannot do.

Nor does Blue Coat infringe the '731 patent. Both asserted claims of the '731 patent require an accused product to create a security profile that "comprises a

list of computer commands that . . . one of the incoming files is programmed to perform." Appx252-253. The accused products contain no such list. At trial, Finjan pointed to a file that contains a set of *numbers* which signify how many times the accused product found a particular *kind* of command in a given file. But just as a document stating that there are 12 active Circuit Judges and 6 senior Circuit Judges on this Court is not a list of the judges of this Court, a count of various types of commands in a given file is not a list of the commands that "file is programmed to perform."

Additionally, Blue Coat does not infringe the '968 patent. The sole asserted claim of the '968 requires a policy index that stores decisions about whether content is allowable *relative to* a given policy. As the district court noted "[t]here is no dispute that to the extent ProxySG stores any determinations as 'entries,' it stores only the results of condition evaluations; *that is, whether certain conditions referenced in a policy* are satisfied." Appx42 (emphasis added). The district court did not grant summary judgment to Blue Coat because it left open the possibility that Finjan could prove that Blue Coat's products had one or more "single-condition policies." Appx42. But Finjan made no such showing. Instead, Finjan's expert testified that Blue Coat infringed when it stored the results of individual rules *within* a policy—and introduced no evidence of any single-condition policies.

Finally, even if the Court were to affirm the district court's judgment on liability, the Court should order a remittitur to zero or nominal damages or, at a minimum, order a new trial on damages. Finjan presented—and the district court permitted—a damages case that compounded numerous legal and factual errors including a royalty rate that was not supported by any of the evidence in the record, and a failure to apportion damages to the infringing functionality with reliable and tangible evidence.

# ARGUMENT

## I.    THE '844 IS DIRECTED TO INELLIGIBLE SUBJECT MATTER

Section 101 excludes certain subject matter from patent eligibility to prevent "monopolization" of "the basic tools of scientific and technological work[,]" which "might tend to impede innovation . . . thereby thwarting the primary objective of the patent laws." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations omitted). *Alice* confirmed that the two-part *Mayo* test for subject matter eligibility applies to determine whether challenged claims cover an unpatentable "abstract idea." *Id.* at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294-97 (2012)). Patentable subject matter is a question of law reviewed *de novo*. *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1320 (Fed. Cir. 2012).

The first step of the *Alice/Mayo* test asks whether the claims "are directed to a patent-ineligible concept" such as an abstract idea. *Alice*, 134 S. Ct. at 2350. If so, in the second step the Court must "search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. at 2355 (internal quotation marks omitted) (quoting *Mayo*, 132 S. Ct. at 1294). An "inventive concept," must do "more than simply stat[e] an abstract idea" and "add[] the words 'apply it.'" *Id*. at 2357 (citation omitted). Generic

11

computer implementations are insufficient. *Id*. at 2357-58.

### A.    The '844 Patent is Directed to Flagging Suspicious Messages

The asserted claims of the '844 patent are directed to the abstract idea of flagging messages as suspicious. Claim 1, which the district court found "representative for § 101 purposes," Appx110, reads:

> 1.    A method comprising:
>
>   receiving by an inspector a Downloadable;
>
>   generating by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable; and
>
>   linking by the inspector the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients.

Thus, Claim 1 covers attaching a warning to a suspicious file. It does not specify the nature of the warning or how the suspicious file is identified.

Identifying a suspicious file is something people have done for centuries. Post offices do it while delivering the mail. Security guards at buildings and airports do it while inspecting packages. When they identify a suspicious package, they tag it to alert another actor who can take action to address any danger. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) ("[I]t was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, . . . based on characteristics of the mail."). And in the computer environment, mail servers have

long identified messages as potentially containing spam or a virus by looking at the content of the message. *Id*. at 1319; *see also* '844 Patent at Appx172 (citing as prior art U.S. Patent 5,832,208 to Chen, which claims "a system and method for detecting and removing computer viruses in . . . e-mail attachments" and describes TrendMicro's existing "ScanMail" product).

In *Intellectual Ventures*, this Court held that a similar claim was directed to an unpatentable abstract idea. The claim there, like the claims here, covered "a method for identifying characteristics of data files" and was "used to address the problems of spam e-mail and the use of e-mail to deliver computer viruses." 838 F.3d at 1313. And, like the '844 patent, the claim there included receiving data files, generating identifiers linked to those files, determining whether each file met certain characteristics, and tagging the file with a result. *Id*.

This Court also has held other claims directed to identifying or characterizing digital information to be abstract ideas. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (claims directed to classifying a digital image and storing the image based on its classification); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015) ("[D]ata collection, recognition, and storage is undisputedly well-known" and an abstract concept); *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341,

13

1348 (Fed. Cir. 2016) (holding abstract a claim to a "content filtering system for filtering content retrieved from an Internet computer network" to prevent users accessing certain sites). Similarly, in *Apple, Inc. v. Ameranth, Inc.*, No. 2015-1703, __ F. 3d __, slip op. at 18-19 (Fed. Cir. Nov. 29, 2016), the Court invalidated a claim that included much more detail than the claims here, noting that while the claimed systems covered "menus with particular features . . . . [t]hey do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems." *Id.* at 19. That fact made them abstract ideas under step one of *Alice*.

While Claim 1 is designed to affect computer files, the recited steps of the patented method do not require a computer, and could be performed with a pencil and paper. As this Court noted in *Intellectual Ventures* in invalidating a second patent, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper." 838 F.3d at 1318; *accord Ameranth*, slip op. at 20; *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371-72 (Fed. Cir. 2011). So too here. An "inspector" is not a specific type of computer or program, and could be a person looking at the code of the file. And the act of "linking" does not require any automation or technology. True, the *subject* of the actions is a "Downloadable" that will eventually appear on a web server, but none

of the claimed actions require automation. Rather, as in *Intellectual Ventures*, the patent "is directed to a conventional business practice—the screening of messages by corporate organizations—in the context of electronic communications." *Intellectual Ventures*, 838 F.3d at 1318.

The other asserted claims of the '844 patent reinforce the conclusion that the patent is directed to an abstract idea. At most, some of those claims add off-the-shelf technology to implement the same basic steps recited in Claim 1. Claim 15 adds a computer memory and a "content inspection engine" applying an unspecified "rule set." Appx185. Claim 7 requires that the file being evaluated— *not* the process of evaluation—include JavaScript. *Id.* Claim 11 says that the security profile "includes a list of operations deemed suspicious . . . ." *Id.* Claim 41 recasts the method of Claims 1 and 15 as a "computer-readable storage medium" but is directed to the same abstract content. Appx110, Appx186; *see also Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (implementing an abstract idea in a computer-readable medium does not make it patentable).

While some of these claims do indicate that the invention is intended to be performed in a computer, they do not change the nature of the underlying idea, and limiting an abstract idea to an existing technological environment does not make it patentable. *Affinity Labs of Tex. v. DirecTV, LLC*, 838 F.3d 1253, 1258-59 (Fed.

Cir. 2016); *buySAFE, Inc. v. Google Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). Similarly, the use of a generic software "engine" to perform an action that could otherwise be done with a pen and paper does not prevent a claim from being abstract. *Accenture*, 728 F.3d at 1342; *CyberSource*, 654 F.3d at 1372.

The idea of identifying and flagging suspicious files or packages is "a broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it." *Affinity Labs*, 838 F.3d at 1258. "There is nothing in claim 1 that is directed to *how* to implement" the idea of identifying and flagging suspicious files. "Rather, the claim is drawn to the idea itself." *Id*. It is accordingly an abstract idea.

## B.    The Claims Do Not Add an Inventive Concept

A claim directed to an abstract idea is patentable only if it adds a specific "inventive concept," separate and apart from that idea. Both the Supreme Court and this Court have made clear that implementation of an idea using generic computer technology does not satisfy this requirement.

The claims of the '844 patent add no such inventive concept. Claim 1 does not contain much in the way of computer hardware. It does refer to a "web server" and "web clients," but Finjan cannot, and thus does not attempt to claim that those are its invention. And this Court repeatedly has held that the use of the Internet and web servers does not save a claim to an otherwise-abstract idea. *See*, *e.g.*, *TLI*

16

*Commc'ns*, 823 F.3d at 613-14; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-15 (Fed. Cir. 2014), *cert. denied sub nom.  Ultramerical, LLC v. Wildtangent, Inc.*, 135 S. Ct. 2907 (2015); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015); *Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016).  Nor is there any suggestion that the order of the steps in the claim somehow transforms the thoroughly conventional hardware into an inventive concept.

The other asserted claims are no better.  A computer-readable medium, a memory, and an "engine" have all been held not to add a new inventive concept in similar circumstances.  *Accenture*, 728 F.3d at 1342-44; *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370-71 (Fed. Cir. 2015) ("interactive interface" is a "generic computer element"); *Intellectual Ventures*, 838 F.3d at 1318 (rejecting the argument that "rule engines" are inventive).

There is also nothing inventive about using an undefined "rule set" in an "engine," as Claim 15 requires, just as there was nothing inventive about the idea of using a "rule engine" in *Intellectual Ventures* or *Accenture*.  And while there are, of course, efficiency advantages to using computers to process data, "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" is not sufficient to establish an inventive concept.  *Capital One Bank*, 792 F.3d at 1367.

The contrast with the few cases in which this Court has found a claim to survive step two is instructive.  In each of those cases, the invention was directed to a specific computer algorithm or approach that improved the functioning of the computer itself.  *DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245, 1257 (Fed. Cir. 2014) (finding patent-eligible a claim that changed the way the Internet itself worked); *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1336 (Fed. Cir. 2016) (finding patent-eligible "an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity."); *McRO, Inc. v. Bandai Namco Games Am., Inc*., 837 F.3d 1299, 1314 (Fed. Cir. 2016) (holding patent-eligible claims that made "a specific asserted improvement in computer animation" tied to a particular way of synchronizing 3D computer graphics to sounds); *BASCOM*, 827 F.3d at 1350, 1351 (finding patent-eligible a "technology-based solution" limited to a "particular arrangement of elements" customized for each end user that changed the technical way information was filtered through the Internet).  And in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 2015-1180, __ F.3d __, slip op. at 22 (Fed. Cir. Nov. 1, 2016), this Court held the claims survived *Alice* only because it had previously construed the term "enhance" to be "dependent upon the invention's distributed architecture," a process this Court expressly admitted involved "reading the 'in a distributed fashion' and the 'close to the source' of network information

requirements into the term enhance." *Id*. (citation omitted).  In other words, the Court found the invention patentable only because it expressly "read in" from the specification limitations that restricted the claim to "an unconventional technological solution . . . to a technological problem" that "was a critical advancement over the prior art[.]" *Id*.

In sharp contrast, there is no indication of any new technology in the claims of the '844 patent.  The claims are written in broad functional language.  They define the "steps" of the method by the result to be achieved—generating a "security profile that identifies suspicious code" and linking that profile to the Downloadable.  While Claim 15 adds the concept of a "rule set," it gives no information about what is in that rule set, nor limits it to any particular way of parsing and assessing threats.  Appx185.  When claims are written in such broad functional language, this Court has found that they are drawn to the abstract idea itself rather than to a particular inventive implementation of that idea.  *See TLI*, 823 F.3d at 612-13 (a claim that "does not describe a new telephone, a new server, or a new physical combination of the two . . . . but instead . . . describes the system and methods in purely functional terms . . . ." is "not directed to a solution to a technological problem") (internal quotation marks omitted); *Affinity Labs*, 838 F.3d at 1258 (rejecting the claimed invention because it "is entirely functional in nature . . . .  There is nothing in Claim 1 that is directed to *how* to implement [the

idea].  Rather, the claim is drawn to the idea alone."); *Intellectual Ventures*, 838

F.3d at 1317 (claims ineligible where there is "no restriction on how the result is

accomplished and the mechanism is not described."); *Internet Patents*, 790 F.3d at

1348 (same).  And unlike *Amdocs*, Finjan has made no effort to read in limitations

that would constrain the claims to new and unconventional technology.

### C.    The District Court Erred in Relying on the PTO Guidelines and in Failing to Apply This Court's Precedent

The district court issued its opinion nearly 18 months after *Alice*, and after

this Court had decided more than a dozen precedential decisions concerning

patentable subject matter.  Yet, the district court cited only two of this Court's

precedents—*Ultramercial* and *DDR*—and it cited them only for the narrow

purpose of identifying what the parties had argued.

In place of reviewing and applying this Court's precedent, the district court

based its ruling on: (1) its interpretation of an Interim Guidance memorandum

from the PTO, (2) a district court decision that was later reversed, and (3) its

analysis of the scope of the patents' preemption.  Appx112-114.  The district court

erred in each respect.

First, while a concern over preemption is part of what motivates the

patentable subject matter inquiry, it is not the inquiry itself and "the absence of

complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics,*

*Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 136 S.

Ct. 2511 (2016) ("Where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework . . . preemption concerns are fully addressed and made moot.").

Second, the district court decision on which the trial court placed significant reliance, *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371 (D. Del. 2015), was reversed by this Court in 2016 on the very issue for which the district court cited it. *See Intellectual Ventures*, 838 F.3d at 1320-22.

Third, the district court erred in relying on an example from the PTO's 2014 Interim Guidance on Patentable Subject Matter Eligibility. The PTO Guidance is intended to explain to examiners the law as set forth by courts, not the other way around. *See In re Smith*, 815 F.3d 816, 820 (Fed. Cir. 2016), *cert. denied sub nom. Trading Techs. Int'l, Inc. v. Lee*, __ S. Ct. __, 2016 WL 5816725 (U.S. Nov. 7, 2016) (Guidance has no legal significance.). And the Guidance cited by the trial court is an especially poor statement of the law because it was issued in the immediate wake of *Alice*, at a time when the PTO did not have the benefit of any of this Court's decisions interpreting that case. Moreover, even if the Guidance's example was eligible under current law, it is distinguishable. The Guidance's exemplary claims physically isolate a communication and extract code from it, changing the nature of the executable file and removing the virus. The claims of the '844 patent do no such thing. The Court should, therefore, find the asserted

claims of the '844 patent to be ineligible.

## II.     BLUE COAT DOES NOT INFRINGE THE '844 PATENT

When reviewing the denial of a motion for judgment as a matter of law after a jury verdict, this Court "'applies the same standard of review as that applied by the trial court.'" *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009) (citation omitted).   In the Ninth Circuit, a district court grants JMOL only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

The jury found that Blue Coat infringed Claims 1, 7, 11, 15, and 41 of the '844 patent.   The verdict is legally incorrect and is not supported by substantial evidence.   Each of the asserted claims of the '844 patent describes a system directed to inspecting a downloadable data object, creating a security profile for it, and linking the downloadable to the profile *before* a web server makes the downloadable available to web clients.   Exemplary Claim 1 recites:

> 1.  A method comprising:
>
> receiving by an inspector a Downloadable;
>
> generating by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable; and
>
> linking by the inspector the first Downloadable security profile to the Downloadable ***before a web server makes the Downloadable available to web clients***.

Appx185 (emphasis added).  *See also* '844 Claims 7, 11, 15, and 41, Appx185-186.[1]

The highlighted requirement is no drafting artifact, but instead implements a key feature of the invention.  The '844 was directed to two different embodiments which work together to provide network security: (1) an embodiment that inspects downloadable content and creates an associated security profile *before* the content is published to the internet, and (2) an embodiment that *receives* and evaluates those security profiles to determine whether the end user should be allowed to access the downloadable.  As the specification explains:

> The present invention provides a method in ***a first embodiment*** comprising the steps of receiving a Downloadable, generating a first Downloadable security profile for the received Downloadable, and linking the first Downloadable security profile to the Downloadable. The present invention further provides a method in ***a second embodiment*** comprising the steps of receiving a Downloadable with a linked first Downloadable security profile, determining whether to trust the first Downloadable security profile, and comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy.

Appx180 (2:49-60) (emphases added).  The claims reflect this distinction.  Indeed, all of the asserted claims are directed to the first embodiment while most of the

---

[1] The parties stipulated that a "downloadable" is "an executable application program, which is downloaded from a source computer and run on the destination computer."  Appx4.

unasserted claims are directed to the second.  *See*, *e.g.*, Claims 23, 32, and 44, Appx185-186.

Thus, the invention of the '844 patent has two parts.  The asserted claims are directed to a system and method for creating and linking a security profile to a downloadable before the downloadable is made publically available over the internet.  The second part (not at issue in this case) is directed to receiving and evaluating the security profile to determine whether specific end-users should receive the downloadable.[2]

### A.  WebPulse Acts on Files That Have Already Been Published

The accused "WebPulse" product is not a server-side engine that evaluates and profiles downloadable content before it is made available to web clients over the internet.  Instead, WebPulse is a cloud-based service that provides information to a customer's on-premise network gateway to help it determine whether a specific end user may receive a particular file.  Appx39469:19-22, Appx39793:5-25, Appx39794:1-11, Appx40270:22-25, Appx40271:1-8, Appx53137.    As Finjan's expert explained on direct:

> Q.  And you have helped us create an animation showing
> how WebPulse works; is that correct?

---

[2] This distinction is also reflected in the district court's claim construction, which clarified that the claimed "web server" was different from and could not be implemented on a customer's "network gateway."  *See* Appx18-19.

A. That's correct.

Q. And could we run through that animation very quickly and you can describe what is happening here?

A. In the bottom we have the user which would be any one of you when you surf the web. So if you're at work or you're at home and you start up your computer, you open up your browser, and you type in www.cnn.com, that's the user, and the user would make a request to a website that would be intercepted by ProxySG.

You've heard a lot about Gateways that sit in between an interface. ProxySG is a gateway. The SG actually stands for Secure Gateway and that would intercept the request from the user. It would then Pass that request to WebPulse where WebPulse would perform some initial analysis against that to see does WebPulse currently know about this URL because Webpulse does a lot of analysis and it has a database and so it's going to check and see do I already have information about this downloadable?

If it does it will make a decision. ***If there's not a match, as in this case, then WebPulse would go out to the internet and would receive the downloadable from that Website.***

***So if we're talking about CNN.com, Webpulse would actually go out to that CNN.com and they would pull out that download.***

Appx39798:2-25, Appx39799:1 (emphases added). As Finjan's expert explains in this passage, WebPulse acts on a downloadable after a webserver (e.g., operated by CNN) has made it available to web clients by publishing it to the internet. There is no factual dispute that this is how WebPulse operates. *See also* Appx39821:1-25,

25

Appx39822:1-23, Appx53137.

The fact that WebPulse provides services to a customer's on-premise gateway (and not to content providers such as CNN, Yahoo and Google) is fatal to Finjan's infringement claims.  Why?  Because it means that WebPulse can only evaluate downloadable content after that content has been "made available to web clients" via publication to the internet.  Put differently, because WebPulse has no special, pre-publication access to CNN's downloadable content, it can only work on content that CNN's web servers have already made available to web clients all over the internet.  WebPulse cannot, therefore, act "*before* a web server makes the Downloadable available to web clients" as each of the asserted claims requires.

### B.    Finjan Offered No Substantial Evidence of Infringement

Finjan has offered several arguments to defend its claim of infringement but all of them are demonstrably incorrect.

In its post-trial briefing, Finjan's main argument has been that it "presented substantial evidence that WebPulse's analysis occurred before the web client (i.e. the user) receives the webpage."  Appx47508.  As Finjan's expert explained on redirect:

> Q. What does it mean, Dr. Cole, that before the web server makes the downloadable available to the client with respect to the '844 patent --
>
> A. That is referring to the real-time analysis in which the analysis will be performed to determine whether there is

26

anything suspicious and that analysis is done ***before the client ever receives that information***.

And if you remember in one of the exhibits from my direct, it clearly states in a document from Blue Coat where it says while the client waits.  That means the analysis is done by WebPulse before the client ever ***receives it*** or which the client waits for that analysis to be performed.

Appx40233:24-25, Appx40234:1-12 (emphases added), Appx39854:6-18 (the claimed "association was made before the client ever received the content."), Appx39854:19-25, Appx39855:1-15 ("[T]hat analysis is done before the client receives the information."), Appx39856:2-20 ("WebPulse has the ability in real time, which is before the client is able to receive the information . . . .").

Finjan's argument is predicated on a deliberate misreading of the claims. The asserted claims do not contain a timing requirement relative to when a particular end user ***receives*** the downloadable.  Instead, the claims require the profile creation and linking to occur "before a web server makes the Downloadable ***available*** to web clients."  Just as a library book is "made available" to borrowers when it is placed on the shelf (and before any individual takes it home), a data file is made available to web clients when it is published to the internet (and regardless of whether it has been received by any specific web client).

Indeed, the non-asserted claims of the '844 patent (those directed to the second embodiment) clearly show that the security profile and its associated

27

downloadable are made available before the invention even *decides* whether a downloadable can safely be given to a user, and well before the user actually receives that downloadable.  For example, Claim 23 recites:

> 23. A method performed by a network gateway comprising:
>
> receiving a Downloadable with a linked first Downloadable security profile that identifies suspicious code in the Downloadable, ***the Downloadable security profile being linked to the Downloadable before the web server make the Downloadable available to the web client***:
>
> determining whether to trust the first Downloadable security profile; and
>
> comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy.

Appx185 (emphasis added).  As this claim provides, the security profile and its associated downloadable are: (a) linked, and then (b) made available, and then (c) received by the gateway, and then (d) the profile is evaluated for trustworthiness, and then (e) the profile is compared to the end user's security policy.  And all of this happens before the end-user actually receives the downloadable.  *See* Appx183 (8:13-16) ("If the received Downloadable passes all the local security policies 535, a retransmission engine 540 passes the Downloadable onward to the intended recipient . . . ."), Appx178 at Fig. 7.  Thus, a web server makes the downloadable

available many steps before it is received by the end user. Finjan is, therefore, misreading the claims when it argues that the limitation requiring the linking to be done "before a web server makes the Downloadable available to web clients" can be satisfied by evidence "that WebPulse's analysis occurred before the web client (i.e. the user) receives the webpage." Appx47508.

Finjan attempted to argue that WebPulse infringes because it acts before the specific web clients it protects can obtain a downloadable. *See* Appx39829:14-24, Appx47144, Appx47508. But this argument cannot help Finjan. The asserted claims require the linking to happen "before a web server makes the Downloadable available to web clients." Appx185. By the time WebPulse receives a given downloadable, "a web server" has already made that downloadable available "to web clients"—i.e., by publishing it to the internet. Indeed, according to Finjan's own expert, WebPulse only goes out and obtains the downloadable (e.g., from CNN) after one of the web clients that it protects has requested a copy of the downloadable. *See*, *e.g.*, Appx39807:23-25, Appx39809:1-16. At the moment the end user's web client makes that request, the downloadable must already be available. If it weren't, there would be nothing for the user's web client to request or for WebPulse to download. Thus, by the time WebPulse receives the file and starts to act, the deadline for the claimed steps of creating and linking the security profile to the downloadable already has passed.

29

Third, Finjan argued that Blue Coat was wrong to assert that WebPulse is a web client and that the "real" web clients were the end users. *See* Appx47508. This argument is both irrelevant and wrong. Blue Coat argued that WebPulse was a web client to illustrate the structural problem with Finjan's infringement theory. More specifically, Blue Coat used the fact that WebPulse is itself a web client to show that WebPulse must be acting on a downloadable after it has been made available to web clients. *See* Appx40956:21-25, Appx40957:1-17, Appx41632:7-22. But that underlying structural issue does not turn on whether or not WebPulse is properly labeled a web client. Instead, the claims' timing requirement turns on whether a web server has made the downloadable available for web clients to download. And it must have because, for WebPulse to get a downloadable, that downloadable must have been published to the internet and requested by at least one of the end-user-web-clients that WebPulse protects.

Finjan's argument is also wrong because WebPulse is a web client. Neither party asked for a definition of "web client," although they did ask for a construction of the overall limitation. Appx18-19. Thus, the question is whether the ordinary meaning of "web client" includes a device which, like WebPulse, requests and receives downloadable content from a web server. It does. Indeed, the '844 patent repeatedly refers to 'web clients' as devices which perform this function. *See* Appx180 (1:47-49), Appx182 (5:6-10). And both experts

30

acknowledged that WebPulse requests and receives the recited downloadables from web servers.    *See* Appx39798:2-25, Appx39799:1, Appx40921:6-25, Appx40922:1-25, Appx40923:1-9.   Thus, whatever else it may be, WebPulse is a web client relative to CNN's website.

Because the undisputed evidence shows that WebPulse acts on content **after** it has been published to the internet, it cannot act **before** that content has been made available to web clients by a web server.   The Court should, therefore, reverse the verdict of infringement as to the asserted claims of the '844 patent.

## III.    BLUE COAT DOES NOT INFRINGE THE '731 PATENT

The '731 patent is directed to a gateway that protects a private intranet from malicious software embedded in webpages on the public internet.   The claimed gateway operates by scanning potentially malicious files and creating "security profiles" that comprise "lists of computer commands that the files are programmed to perform . . . ."   Appx248 (4:47-48).   Once these security profiles have been generated, they can be compared with a policy associated with a user in order to decide whether the file should be provided to that user.   Appx250 (7:52-58).

Finjan asserted Claims 1 and 17.   Both claims contain a limitation requiring an accused device to create a security profile that includes a list of computer commands an incoming file is programmed to perform.   Thus, Claim 1 calls for a security profile that "comprises a list of computer commands that a corresponding

31

one of the incoming files is programmed to perform" while Claim 17 calls for a security profile including "a list of at least one computer command that the retrieved file is programmed to perform . . . ." Appx252, Appx253.

The accused products do not create or contain any list of commands that an incoming file is programmed to perform. Neither party asked the district court to construe any portion of this limitation. *See* Appx24-25. The limitation should therefore be given its plain meaning. Thus, the accused security profile must contain a list of commands that can be carried out by a computer. *See also* Appx251 ('731 at 9:32-36) ("[T]he scans operate to identify ***computer commands that a file is programmed to carry out***, and record potentially malicious commands in a list that serves as a security profile.") (emphasis added).[3]

Finjan can point to no such list. At trial, the only specific data structure Finjan identified is a file called "Cookie2." *See* Appx40296:6-23 ("Cookie2 contained some of that information that we've been talking about, that list of computer commands."). Joint Trial Exhibit 2018, Appx52936-52943, which Finjan introduced into evidence, shows the contents of Cookie2. *See*

---

[3] There are good reasons for a security profile to contain a list of the actual commands a file is programmed to perform. The claimed gateway is designed to allow for different security policies to be applied to different end users. *See* Appx250 ('731 at 7:50-52). Having the security profile include the file's actual commands allows for the use of more granular security policies as compared to a system that (like Blue Coat's) only stores information about the number of commands of a given type.

Appx39826:22-25, Appx39827:1-25, Appx40397:4-17.    As set forth in that exhibit, Cookie2 consists of a set of fields, each of which is described by a row in a table.

At trial, Finjan primarily pointed to fields 78 through 80 to satisfy the claims' required "list of commands."     Appx40274:9-25, Appx40275:1-4, Appx40381:8-24, Appx40383:18-25, Appx40384:1-6.    But the document belies Finjan's assertion that this is a list of commands:

| 78 | eval()<br>calls | Integer | How many 'eval()' calls did we find? |
|----|-----------------|---------|--------------------------------------|
| 79 | unescape()<br>calls | Integer | How many 'unescape()' calls did we find? |
| 80 | document<br>.write()<br>calls | Integer | How many 'document.write()' calls did we find? |

Appx52942-52943.  As the document shows, the accused Cookie2 fields contain a set of ***integers*** which represent the number of times the accused product found a particular ***kind*** of command in a given file.  It does not contain a list of the actual commands the "file is programmed to perform."

The difference between these two things is not subject to reasonable debate. A document with two fields: [12:6] which signify the number of active Circuit Judges and senior Circuit Judges on this Court is not a *list of the judges* of this Court.  A document with three fields [298,407:25,986:1,074] representing the

33

number of utility, design and plant patents issued by the U.S.P.T.O. in 2015 is not a *list of the patents* issued in 2015.  And a document containing three numbers [3:5:0] representing the number of eval() calls, unescape() calls, and document.write() calls in a file is not a *list of commands that file is programed to perform*.  In each example the list is a list of numbers which represent the number of items in various categories of things, not a list of the things themselves.

Finjan also argued that the "list of commands" was satisfied by field 29.  *See* Appx40283:20-25, Appx40284:1-13.  Not so.  Field 29 contains a label which indicates what type of commands the computer should be on the lookout for in a given file, not a list of the actual commands "the file is programmed to perform."  Even Finjan's expert acknowledged this point on direct and in response to a question attempting to lead him to the opposite conclusion:

> Q. And this will be the actual suspicious command itself?  It's not a number, right?
>
> A. What it will return actually here, this, if you look here, the metarule label will correspond to a string.  It will actually be a string of characters.  And the string of characters will serve as an identifier for what type of, you know, bad command you need to be on the watch for.

Appx40276:3-10.  A string of characters which serves as an ***identifier*** of a ***type*** of command the system should watch for is not the same thing as a list of the actual commands a particular file is programmed to carry out, and cannot satisfy the

claim limitation.

This result is reinforced by the testimony regarding the source code that places the accused string in field 29. That code shows, for example, that the string "PDF-LAUNCH1" is placed in field 29 when the file in question is a PDF file that has a small file size but includes JavaScript code that can launch external files. Appx56070. "PDF-LAUNCH1" is not a command that appears in the PDF file in question; it is an indication that the file includes one or more pieces of JavaScript code that have the result of launching external files, and that the file is small in size. Appx40943:14-25, Appx40944:1-5. Blue Coat's expert gave unrebutted testimony that the data in field 29 is "a label," rather than "computer code." Appx40944:3-5. According to that testimony, the "label" represents a "combined condition"—an indication that several things are true about the file in question. Appx40943:14-20. Again, a label signaling that a file satisfies multiple conditions is not a list of commands that file is programed to perform.

In its post-trial briefing, Finjan also asserted that its expert "proved that the security profile was in the source code, denoted as an "R" that stands for the DRTR response, and showed exactly how the profile is generated and that it contained a list of detected suspicious computer commands. Ex. 1, Trial Tr. at 771:18-775:7." Appx47509.

This argument also cannot help Finjan. The asserted claim requires the

accused product to create a profile which includes a list of suspicious commands *in an incoming file*. Thus, Blue Coat's code cannot *itself* be the security profile, and a list of commands in that code (i.e., the commands that Blue Coat's product is programed to detect) is not a list of commands stored in a profile of a suspicious file. Nor can Finjan transmute Blue Coat's code into such a profile by asserting that the response of the Dynamic Real Time Rating ("DRTR") engine is the profile. Among other things, Finjan failed to provide any evidence pointing to any portion of the "response" as containing a list of commands the incoming file is programmed to perform. And because Finjan introduced *no* evidence whatsoever that any portion of the DTDR response (other than Cookie2) was cached, it cannot point to any other portion of the DTDR response to satisfy the requirement of "storing the security profiles." The Court should, therefore, overturn the judgment of infringement of the '731 patent.

## IV. BLUE COAT DOES NOT INFRINGE THE '968 PATENT

At trial, the jury found that Blue Coat infringed Claim 1 of the '968 patent. The jury's verdict is incorrect as a matter of law because Blue Coat's accused product does not contain or implement the claimed "policy index" and because Finjan's claims were not supported by any evidence.

### A.    The Claim Requires Storing a Policy Determination

The sole asserted claim of the '968 patent (Claim 1) is directed to a policy-based cache manager.  Appx214.  The patent explains that "conventional caching" has been used in many contexts "to avoid repeating the same computations or the same data transmissions."  Appx210 (1:10-11).  According to the '968 patent, "conventional" caching suffers from a defect, namely that "once content gets through a first policy, it is cached, and then it is readily available to users governed by a second policy, even if the second policy would not have allowed the content to pass through the filter."  Appx210 (1:51-54).

To solve this problem, "the present invention" of the '968 patent provides for "a policy-based index, which is a data structure indicating allowability of cached content relative to a plurality of policies."  Appx210 (2:3-6).[4]  This index stores the results of decisions about whether a given piece of digital content is allowable *relative to* a policy.  As Claim 1 recites:

> 1. A policy-based cache manager, comprising:
>
> a memory storing a cache of digital content, a plurality of policies, and a policy index to the cache contents, *the policy index including entries that relate cache content and policies by indicating cache content*

---

[4] Mirroring this language, the parties stipulated that "policy index" means "a data structure indicating allowability of cached content relative to a plurality of policies."  Appx4.

> *that is known to be allowable relative to a given policy*, for each of a plurality of policies;
>
> a content scanner, communicatively coupled with said memory, for scanning a digital content received, to derive a corresponding content profile; and
>
> a content evaluator, communicatively coupled with said memory, for *determining whether a given digital content is allowable relative to a given policy, based on the content profile, the results of which are saved as entries in the policy index*.

Appx214 (emphases added). As the bolded text in the first limitation indicates, an infringing device must contain a policy index that includes entries, each of which indicate that some piece of digital content "is known to be allowable relative to a given policy." The final limitation makes clear that these entries are the "results" of the system's having "determined" that a piece of digital content satisfies "a given policy." Thus, the claim requires the policy-based index to store a set of decisions about whether a given piece of digital content is allowable *relative to* a given policy.

Storing the results of a policy determination (rather than, say, information on whether one or more of the criteria within a policy has been satisfied) is a sensible technical choice. As the '968 patent explains, the purpose of the invention is to speed up the delivery of information by avoiding the need to "repeat[] the same computations or the same data transmission." *See* Appx210 (1:10-11). A system that caches the results of a policy determination advances this goal by avoiding the

need to re-make the policy decision for subsequent users who are subject to the same policy. *See* Appx210 (2:6-9) ("Using the policy-based index of the present invention, a cache manager can check whether cached content is allowable for a different user than the original user who requested it . . . .").

The patent's drawings reflect this concept. For example, the flow chart in Figure 2 shows that the result of an affirmative answer to the question "Is content #1 permitted under Policy A?" (245) is to "Set allowability pointer from Policy A to content #1" (250) and to "Send Content #1 from Cache to User" (255). Thereafter, if a user requests the previously cached content (205, 210) the system will send that content to the user (255) based only on the existence of the pointer (280) and without the need to make the policy determination a second time (*i.e.* without needing to pass through box 240). Appx209.

## B. Proxy SG Does Not Implement the Claimed Policy Index

Finjan failed to provide evidence, much less substantial evidence, to support a finding that the accused Blue Coat product stores the result of a decision about whether a given piece of digital content is allowable *relative to* a given policy.

During the summary judgment proceedings, the district court noted that "[t]here is no dispute that to the extent ProxySG stores any determinations as 'entries,' it stores only the results of condition evaluations; *that is, whether certain conditions referenced in a policy* are satisfied." Appx42 (emphasis added). The

39

Court went on to note that "[a]lthough Defendant's argument would likely prevail if all policies consist of multiple rules or conditions, the '968 Patent specifically provides that a policy can be just one rule." *Id*. The Court therefore denied Blue Coat's motion and gave Finjan the chance to prove that "the ProxySG policy cache contains a number of condition evaluations, each of which is determinative of whether a file is allowable relative to one of a plurality of single condition policies." *Id*.

But Finjan introduced no such evidence at trial. To the contrary, Finjan's expert testified only that Blue Coat's products cache the results of individual rules *within* a policy and use that information to speed up the process of making a policy decision the next time a piece of content is requested. Appx47145 (citing Appx40336:25, Appx40337:1-23 and Appx40401:425, Appx40402:1-6). This fact was made clear during the cross-examination of Finjan's expert:

> Q. Well, ProxySG does not save the final decision as to whether the web page, like the ESPN Web Page that you've used in your testimony, was allowed or not; right?

> A. So I think you have to be careful with the language you're using. ***So I was talking about the decisions that are made in the course of the process as the page is analyzed***.

> ***So the final decision I'm not sure*** and it wouldn't impact my analysis one way or the other.

> Q. Well, the reason why ProxySG doesn't do that saving is because ProxySG checks the policy every time; right?

40

> A. ***It checks the policy every time*** and indeed as I showed multiple times throughout the process and that's one of the reasons that you want to save this sort of information ***to make it more efficient as you're going through the policy evaluation process***.

Appx40387:16-25, Appx40388:1-5 (emphases added).   As this passage shows, Finjan's theory is that the results of individual decisions made "in the course of the process as the page is analyzed" are saved in order to "make it more efficient as you're going through the policy evaluation process."   That is a different approach than the one claimed by the patent.   Finjan's expert did not purport to identify or provide evidence for any single-condition policies, and did not opine that the final decision on allowability relative to any access policy was saved.   Indeed, he acknowledged, to the contrary that he "was not sure" if ProxySG cached any "final decisions" about allowability relative to a policy and that the answer to that question was irrelevant to his analysis.

Finjan proceed on a theory that the evaluation of individual conditions made in the course of analyzing a web page pursuant to a policy were sufficient to satisfy the claims.   Because the ordinary language of the claims forecloses such a theory, the Court should reverse the judgment of infringement as to the '968 patent.

## V.   THE DAMAGES AWARD IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Finjan presented—and the district court permitted—a damages case with numerous, compounding errors.   These errors included both Finjan's presentation

41

of a royalty base unsupported by substantial evidence and Finjan's consistent refusal to apportion damages to the infringing functionality with reliable and tangible evidence. Individually and together, these errors warrant a determination that Finjan failed to carry its burden of proof on damages, or at a minimum, granting a new trial on damages.

## A.    Standard of Review

"When reviewing damages in patent cases, [this Court applies] regional circuit law to procedural issues and Federal Circuit law to substantive and procedural issues pertaining to patent law." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1318 (Fed. Cir. 2010) (internal quotation marks omitted) (citation omitted). In the Ninth Circuit, a district court grants JMOL only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). A district court "may grant a new trial only if the verdict is against the clear weight of the evidence . . . ." *Id.*

## B.    The Damages Award on the '844 Patent Is Not Supported By Substantial Evidence

Finjan's damages expert, Dr. Layne-Farrar provided no opinion at trial on the ultimate damages award for the '844 patent. Appx40610:2-4, Appx40629:2-25, Appx406301-4, Appx40629:14-16, Appx40644:2-5. Instead, in closing

argument, Finjan's counsel asked the jury to award $24 million in damages for that patent. Finjan's counsel asked the jury to use a universe of 75 million *worldwide* users of WebPulse as its starting point,[5] multiply that number by 4% (representing the alleged portion of web requests processed by the DRTR function of WebPulse), and then multiply that number by an alleged $8 per user royalty. Appx41592:6-25, Appx41593:1-6. The jury awarded Finjan the requested $24 million. Appx168. This damages award must be rejected for two independent reasons.

### 1.     Finjan's Damages Model on the '844 Patent Was Inconsistent With This Court's Precedent on Apportionment

Proof of damages must be carefully tied to the claimed invention's footprint in the marketplace. *See Grain Processing Corp. v. Am. Maize–Products Co*., 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic

---

[5] It is undisputed that the 75 million number includes all WebPulse users worldwide. Appx41592:6-25, 6-41593:1-66, Appx52787. Finjan did not introduce any evidence by which the jury could have determined the number of U.S. users. Instead, it relied on conclusory testimony from its damages expert that that the accused products were "made in the U.S." and that a different product (called WebFilter) was "pushed out of Utah." Appx40609:11-15; *see also* Appx136-137. Thus, Finjan's royalty base improperly includes foreign users. Blue Coat recognizes, however, that this panel may be constrained by the decision in *Carnegie Mellon University. v. Marvell Technology Group*, 807 F. 3d 1283 (Fed. Cir. 2015).

picture."); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("[The patentee's damages] model [does not support the award because it] does not associate [the] proposed royalty with the value of the patented method at all, but with the unrelated cost of the entire Spirit platform.").

For this reason, both the Supreme Court and this Court have held that a patentee's damages claim must be apportioned—with reliable and tangible evidence—to the patented features:

> "The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative . . . ."

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (the damages "must reflect the value attributable to the infringing features of the product, and no more.").

"Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). And proper calculation of apportioned patent damages requires "sound economic and factual predicates" coupled with a "careful tie [of] proof of damages to the claimed invention's footprint in the marketplace." *Id.*; *see also Riles v. Shell Exploration &*

44

*Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

Finjan presented—and the district court allowed—a damages theory that falls far short of the standards this Court has established for reliable and tangible evidence of apportionment for a multi-function product. To be sure, Finjan's damages presentation took one step towards satisfying the apportionment requirement by arguing that damages should be apportioned to the DRTR engine within the accused WebPulse product. The evidence presented at trial showed that on an exemplary day, the DRTR engine processed 40 million out of 1 billion WebPulse web requests. On that basis, Finjan argued that the royalty should be apportioned to 4%.

But the fact that ***DRTR*** processed 4% of web requests does not mean that ***the value of the patented technology*** was 4% of the whole value of WebPulse. Among other things, the undisputed evidence showed that the DRTR engine includes many functions that Finjan did not accuse of infringing the '844 patent. Finjan failed to address the relative value of those features and/or analyze which DTDR features have a nexus to the asserted patent. For example, one primary feature of DRTR is to analyze web content across more than ***80 categories*** (*i.e.*, gambling, news, pornography, *etc.*). *See* Appx40739:2-4 ("Q. And just give me a rough count, how many categories are there in WebPulse? A. There's 80 something. I think there's 85 or 86."). Only one of these categories (i.e.,

"suspicious") actually relates to the infringement allegations for the '844 patent. Appx40282:23-25, Appx40283:1-14, Appx40340:4-25, Appx40841:1-23, Appx39804::14-23, Appx39854:19-25, Appx39855:1-15, Appx39961:15-24, Appx53137. Thus, most of DRTR's categorization functionality is not relevant to the alleged infringement. Similarly, the underlying software analytics responsible for DRTR's categorizations were not charged with infringing the '844 patent. Appx39981:6-15, Appx39982:17-25, Appx39983:1-17, Appx39984:15-25, Appx39985:1-15, Appx40491:6-25, Appx40492:1-9, Appx50254 (47:21-48:2). Thus, the value of DRTR is not, as a whole, attributable to the patented technology under Finjan's infringement theory.

Yet Finjan failed to provide any evidence of the apportioned value of the specifically-accused aspects of DRTR relative to the value of the DRTR engine as a whole. Finjan argued below—and the district court agreed—that Finjan's infringement theory is not limited to the Cookie2 logs because other aspects of WebPulse were relied upon to satisfy other limitations of the claim. Appx47139. But even accepting this argument would not absolve Finjan from the requirement to apportion damages to the value contributed by the invention as opposed to DRTR as a whole. Yet, Finjan's damages theory sought to capture the value of *all* of the transactions that go through DRTR irrespective of their (lack of) relationship to the asserted claims. Finjan "must do more to estimate what portion of the value

46

of that product is attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). Just as the inventor of an intermittent windshield wiper cannot claim the value of a car merely by including standard elements of a car in its claim, Finjan cannot expand the value of its patent merely by adding standard claim elements that read on other aspects of WebPulse.

### 2. Finjan Did Not Present Substantial Evidence to Support the Proposed Royalty Rate for the '844 Patent

Finjan urged the jury to adopt a royalty rate of $8 per unit based on the testimony of Finjan's Vice President of IP Licensing, Ivan Chaperot. Mr. Chaperot testified that Finjan's ***current*** starting point in license negotiations is 8 to 16 percent, or a "different structure like $8 per user fee." Appx40409:10-25, Appx40410:1. Mr. Chaperot explained that this negotiating position was based on a verdict Finjan obtained in 2008 against a company called Secure Computing. That verdict involved patents other than the '844, and, according to Mr. Chaperot involved a royalty in the range of 8-16%. *Id.*; *see also Finjan Inv. v. Secure Computing Corp.*, 626 F. 3d 1197, 1200 (Fed. Cir. 2010) (noting case involved U.S. Patents Nos. 6,092,194, 6,804,780, and 7,058,822). Finjan argued—and the district court found—that Mr. Chaperot's testimony supported Finjan's damages theory because Mr. Chaperot testified that $8 per user was "consistent" with the 8-16% rate Finjan sought in licensing negotiations following the *Secure Computing* verdict. Appx137. This conclusion does not withstand scrutiny.

At the outset, Finjan's $8 per unit fee is not supported by the evidence. There was no direct evidence of an $8 per unit fee. Finjan failed to produce any evidence that it has actually licensed—or even offered to license—its patents at an $8 per user fee. Dr. Layne-Farrar testified that she reviewed Finjan's licenses and prior negotiations, and yet she did not identify a single license or negotiation mentioning an $8 per user fee. Similarly, the Court's instructions to the jury listed all licenses to be considered, and did not include any licensing documents with such a fee. Appx41521:15-21. Indeed, Finjan could not identify a single licensing proposal or term sheet (even one generated for litigation purposes) that listed an $8 per user fee. Simply put, $8 per unit is not a number that appears in any proposal, agreement, or document in the record.

Instead, Finjan relies primarily on Mr. Chaperot's testimony to support its $8 per unit proposal.[6] Mr. Chaperot testified that Finjan currently uses an 8-16% range of royalty rates for unidentified hardware and software revenues respectively in its license negotiation. Appx40409:10-25, Appx40410:1. That testimony is not

---

[6] Finjan also relied on evidence as to a Blue Coat OEM license agreement with a $14-35 per user fee and evidence that WebPulse software was licensed a rate of $18 per user a year. Appx47139-47140. But these are software licenses—not patent licenses—and thus not reflective of the structure or amount that Blue Coat might pay in a hypothetical negotiation. And in any case, even if they were accepted as relevant, they would go only to the structure of the agreement (a per unit fee) not the amount.

sufficient to support the $8 per user fee.

As a threshold matter, Mr. Chaperot's testimony was limited to what Finjan purportedly uses as a starting point for its license negotiations ***now***, not what it would have done at the time of the hypothetical negotiation (April 30, 2008). Finjan provided no testimony from Mr. Chaperot (and no other evidence) as to Finjan's past licenses or licensing practices, let alone at the time of the hypothetical negotiation. Appx41519:2-9. Indeed, it affirmatively blocked Blue Coat's efforts to cross examine Mr. Chaperot on Finjan's past practices as outside the scope of his testimony. Appx40405:14-15, Appx40413:11-25, Appx40414:1-3. Despite its failure to introduce evidence relating to the relevant time frame, Finjan's closing argument urged the jury to adopt the $8 starting point for the hypothetical negotiation because "that's what Finjan would have asked for at the time." Appx41654:2-6. Mr. Chaperot's testimony—Finjan's only evidence on this subject—falls far short of substantial evidence supporting the $8 per user fee which Finjan's counsel requested and which the jury awarded.

Moreover, Mr. Chaperot did not provide any evidence of the technological or economic comparability of the 8-16% rate to the $8 user fee or otherwise show how the $8 fee is linked with an 8-16% royalty rate from *Secure Computing*. And he did not explain how the patents or products at issue in *Secure Computing* are comparable to the accused functionalities here, or even attempt to account for the

different patents at issue in *Secure Computing*. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."); *Wordtech*, 609 F.3d at 1320 (rejecting proffered licenses as "[n]either license describe[d] how the parties calculated each lump sum, the licensees' intended products, or how many products each license expected to produce."). None of this is surprising given that Mr. Chaperot is a lay witness. But it is surprising that Finjan failed to introduce any *other* evidence or testimony to support its $8 per user fee.

Even if Finjan had introduced evidence to support an $8 per unit fee, it failed to establish a nexus between that fee and any individual patent—much less the '844 patent. The evidence reflected that Finjan only had licenses for its entire portfolio of patents, and that Finjan believes that none of its patents is any more valuable than any other. Appx39651:21-25, Appx39652:1-3, Appx39652:15-20, Appx39653:24-25, Appx39654:1; Appx40639:14-25, Appx40640:1, Appx40640: 2-22. Despite this, and the fact that Finjan has approximately twenty-two U.S. patents, the jury adopted the $8 per user royalty as the proper rate for Blue Coat's infringement of the '844 patent standing alone. Appx39651:21-25, Appx39652:1-3, Appx39652:15-20, Appx39653:5-16.

Finjan's damages presentation for the '844 patent failed to establish the

sound economic and factual predicates required by Federal Circuit precedent both in Finjan's incomplete effort to apportion the damages base to the patented technology and in its inability to support the proffered royalty rate of $8 per unit with reliable evidence. *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 67 (Fed. Cir. 2012); *ResQNet.com*, 594 F.3d at 869. Thus, the damages awarded for the ' 844 patent cannot be sustained.

### C.   The Damages Award on the '731, '968 and '633 Patents Is Not Supported by Substantial Evidence

The jury awarded Appellee $6,000,000, $7,750,000 and $1,666,700 for the '731, '968 and '633 patents respectively. Appx168-169. Those awards must be rejected because Finjan failed to properly apportion damages to the infringing functionality.

As with the '844 patent, Finjan went through the motions of performing an apportionment analysis. And as with the '844, Finjan's damages presentation on the '731, '968 and '633 patents failed to properly apportion the value of the infringing and non-infringing features.

A proper apportionment methodology should have calculated the value of the claimed invention isolated within the accused product without looking at the non-accused functions or at the functions made available by other non-accused products and services. *VirnetX*, 767 F.3d. at 1326-27. But for the '731 and '968, patents, Finjan's attempt at apportionment began and ended with a single trial

exhibit: JTX-2013, Appx52745-52839. JTX-2013 is a presentation that includes a slide titled "Secure Web Gateway Function" with 24 boxes:



Appx52838.

In her "apportionment analysis," Dr. Layne-Farrar assumed that the accused product had 24 "functions" because there were 24 boxes on this slide, and purported to treat each of these "24 functions" as equally valuable. But there was no evidence to support either her assumption that each box represented one function, or to treat the 24 boxes as equally valuable. Indeed, Dr. Layne-Farrar admitted that she had no understanding as to the non-accused "functions" listed in the chart. Appx40655:16-25, Appx40656:1-24. Instead, she testified that she treated the 24 functions "equally" based on (i) the document JTX-2013 itself, (ii) a conversation with Finjan's technical expert, Dr. Medvidovic, and (iii) the deposition testimony of Blue Coat witness John Ahlander, who purportedly

testified that JTX-2013 "captures all of the functionality in Blue Coat's Secure Web Gateway." Appx40620:2-25, Appx40621:1-12. This approach cannot be sustained. First, JTX-2013 does not purport to list all the features of the accused product and says nothing about their relative value. Second, Mr. Medvidovic provided no opinion as to any of the non-accused "functions" listed in the boxes in the chart on JTX-2013. Appx40501:8-25, Appx40508:1-18. Thus, there was nothing in his testimony on which Dr. Layne-Farrar could rely to support her assumption that each box represented one function or that the boxes represented functions of equal value. Third, even accepting Dr. Layne-Farrar's characterization of Mr. Ahlander's deposition testimony, Mr. Ahlander testified only that the full scope of Secure Web Gateway functionality appeared to be covered by the 24 boxes on JTX-2013, not that each box represented a single function, or functions of equal value. In short, Dr. Layne-Farrar did no analysis and had no evidentiary basis to opine that there were 24 features in the product or that they were all of equal value.

In contrast, Blue Coat's Senior Vice President of Products, Mr. Steve Schoenfeld, testified that, with the exception of "Security Analytics Platform," each of the "24 functions" contained in JTX2013 represented more than one feature or product. Appx40751:3-25, Appx40756:1-25, Appx40757:14-23. Mr. Schoenfeld also testified that, based on his knowledge of the product line and

services, it is not possible to equate any of the "24 functions" contained in JTX-2013.  Appx40757:14-23.

The result is that there is insufficient evidence to support the jury's verdict as to the '731, '968 and '633 patents.  Indeed, the only evidence in the record cuts against Dr. Layne-Farrar's conclusion that the 24 boxes in JTX2013 should be valued equally.  Because a damages analysis must attempt to determine the value of individually accused functions based on reliable and tangible evidence, Finjan has come nowhere close to meeting its burden on damages.

On their own, these flaws in the apportionment methodology warrant a judgment that Finjan has failed to meet its burden on damages.  But these errors were compounded by Finjan's entreaty to the jury to award damages in excess of even the inflated numbers that Finjan's expert had proposed. Indeed, although it presented no other theory for damages, Finjan started from the premise that reasonable royalty damages were only a floor to the jury's damages award and that they could award damages in excess of a reasonable royalty.  As it argued to the jury in closing:

> One, you have to give a reasonable royalty.  In no event less than a reasonable royalty. That's the floor.  Based on the facts it can be higher than that, but no less than that, that's the floor, not the ceiling.

Appx41589:15-19.  Then, after introducing superficial evidence of apportionment based on the 24-functions analysis, Finjan appealed to the jury to disregard that

apportionment and instead to double the figure introduced by its damages expert:

> It's 2 [out of] 11 are the infringing functionalities not 2 [out of] 24. So her numbers are halved. ***It should be twice as much as what she recommended*** because this is the actual infringing functionality for the proxysg. Those are the facts in the case.

Appx41591:5-25, Appx41592:1-5, Appx41594:16-25, Appx41595:1, Appx41656:21-25, Appx41657:1-2. The jury complied. *Compare* Appx168-169 (awarding $6,000,000, $7,750,000 and 1,666,700 for the '731, '968 and '633 patents respectively) *with* Appx41591:13-20 (closing argument explaining that Dr. Layne-Farrar's numbers were $2.9 million to "almost $4 million" for the '731 patent, $3.9 million to $5.1-5.2 million for the '968 patent and $833k to $1.1M for the '633). Even if the apportionment to 24 functions were adequate (it is not), the apportionment to 11 functions is based only on unsupported attorney argument. There was no reliable or tangible evidence presented that could support the jury's award on the '731, '968 and '633 patents.

The Court should, therefore, order a remittitur to zero or nominal damages based on Finjan's failure to bear its burden on damages or, at a minimum, order a new damages trial. *See*, *e.g.*, *Gustafson, Inc. v. Intersystems Indus. Prods.*, 897 F.2d 508, 509-10 (Fed. Cir. 1990) (finding that the district court had not erred in awarding "no damages to [Plaintiff] because none were proven.").

## CONCLUSION

For the foregoing reasons, Blue Coat respectfully requests the Court: (1) find the '844 patent invalid under 35 U.S.C. § 101, (2) find that Blue Coat has not infringed the '844, '731 and '968 patents or, (3) insofar as the judgment is not otherwise overturned, award no or nominal damages, or remand for a new trial on damages as to the '844, '731, '968 and '633 patents.


Dated: December 20, 2016                  Respectfully submitted,

                                          DURIE TANGRI LLP

                              By:  */s/ Mark A. Lemley*

                                          *Attorneys for Defendant-Appellant*
                                          *Blue Coat Systems, Inc.*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|
| 118 | Order Construing Claims in U.S. Patent Nos. 6,154,844; 7,058,822; 7,418,731; 7,647,633, Filed October 20, 2014 | Appx0000001 |
| 256 | Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, Denying Plaintiff's Motion for Summary Judgment, Filed June 2, 2015 | Appx0000026 |
| 271 | Order Grating in Part Defendant's Motion to Strike Infringement Theories;; Denying Plaintiff's Motion to Strike Invalidity Theories, Filed June 11, 2015 | Appx0000051 |
| 367 | Order on Parties' Motion *In Limine* and Pretrial Order, Filed July 8, 2015 | Appx0000065 |
| 378 | Order of *Daubert* Motions, Filed July 14, 2015 | Appx0000079 |
| 486 | Order Regarding Non-Jury Legal Issues, Filed November 20, 2015 | Appx0000097 |
| 487 | Judgment in a Civil Case, Filed November 20, 2015 | Appx0000118 |
| 487-1 | Verdict Form, Filed November 20, 2015 | Appx0000119 |
| 543 | Order Regarding Post-Judgment Motions, Filed July 18, 2016 | Appx0000128 |
| 555 | Order Regarding Judgment, Filed August 19, 2016 | Appx0000158 |
| 556 | Corrected Judgment, Filed August 19, 2016 | Appx0000161 |
| 556-1 | Verdict Form, Filed August 19, 2016 | Appx0000162 |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| FINJAN, INC., | Case No.  13-cv-03999-BLF |
| Plaintiff, | |
| v. | **ORDER CONSTRUING CLAIMS IN U.S. PATENT NOS. 6,154,844; 7,058,822; 7,418,731; 7,647,633** |
| BLUE COAT SYSTEMS, INC., | |
| Defendant. | [Re:  ECF 65-67] |

Plaintiff Finjan, Inc. brings this patent infringement lawsuit against defendant Blue Coat Systems, Inc., alleging infringement of six of Finjan's patents directed at computer and network security: U.S. Patent Nos. 6,154,844 ('844 Patent); 6,804,780 ('780 Patent); 6,965,968 ('968 Patent); 7,058,822 ('822 Patent); 7,418,731 ('731 Patent); and 7,647,633 ('633 Patent) (collectively, "Asserted Patents").  The Court held a tutorial on August 15, 2014 and a *Markman* hearing[1] on August 22, 2014 for the purpose of construing ten disputed terms in the '822, '633, '844, and '731 Patents.  The parties do not presently dispute the proper construction of terms in the '780 and '968 Patents.

## I.    BACKGROUND

All of the Asserted Patents are directed toward behavior-based Internet security.  That is, rather than scanning and maintaining a list of known viruses and malicious code signatures, the Asserted Patents provide a system and methods for identify, isolating, and neutralizing potentially malicious code based on the behavior of that code.  Pl.'s Br. 3, ECF 65.  Finjan does not practice the Asserted Patents, but accuses Blue Coat's computer network and network security products of

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

infringing each.  Def.'s Br. 1, ECF 66; *see also* Compl., ECF 1.

The '822 and '633 Patents, both titled "Malicious Mobile Code Runtime Monitoring System and Methods," are related and share the same specification.  The '822 Patent issued on June 6, 2006 and lists Yigal Mordechai Edery, Nimrod Itzhak Vered, and David R. Kroll as inventors.  Decl. of James Hannah Exh. 1 ('822 Patent), ECF 65-3.  The '633 Patent is a continuation of the '822 Patent, and issued on January 12, 2010.  The '633 Patent lists Yigal Mordechai Edery, Nimrod Itzhak Vered, David R. Kroll, and Shlomo Touboul as inventors.  Hannah Decl. Exh. 2 ('633 Patent), ECF 65-4.  These patents provide systems and methods for protecting devices on an internal network from code, applications, and/or information downloaded from the Internet that performs malicious operations.  *Id.* at Abstract.  At a high level, the disclosed embodiments describe a protection engine that generally resides on a network server and inspects incoming downloads for executable code.  *Id.* col. 2:20-3:4.  Upon detection of executable code, the protection engine deploys "mobile protection code" and protection policies to the download destination.  *Id.* col. 3:5-21.  At the destination, the downloadable-information is executed, typically within a sandboxed environment, and malicious or potentially malicious operations that run or attempt to run are intercepted and neutralized by the mobile protection code according to set protection policies.  *Id.* col. 3:22-40.

The '844 Patent, titled "System and Method for Attaching a Downloadable Security Profile to a Downloadable," issued on November 28, 2000 and lists Shlomo Touboul and Nachshon Gal as inventors.  Hannah Decl. Exh. 3 ('844 Patent), ECF 65-5.  This patent claims a system and methods of network protection wherein an inspector reviews a piece of downloadable-information for suspicious code or behavior according to a set of rules.  *Id.* col. 2:3-19.  The inspector generates a profile characterizing the areas of suspicion and then attaches that profile to the downloadable-information.  *Id.*  The profile can include other unique identifiers and certificates that are later read by a protection engine to determine whether or not to trust the profile.  *Id.* col. 20-48.  By providing verifiable profiles, the object of the invention is to provide flexible, efficient protection against known and unknown hostile downloadable information without having to re-inspect the same piece of downloadable-information each time.  *Id.* col. 2:61-3:7.

2

United States District Court
Northern District of California

1    The '731 Patent, titled "Method and System for Caching at Secure Gateways," issued on

2    August 26, 2008 and lists Shlomo Touboul as the sole inventor.  Hannah Decl. Exh. 4 ('731

3    Patent), ECF 65-6.  This patent describes systems and methods of operating computer and network

4    gateways that protect an intranet of computers.  The claimed inventions provide for caching of

5    security information and policies at the gateway.  *Id.* at Abstract.  This caching mitigates network

6    latency—delay in the transmission of data—caused when the gateway processes downloadable

7    information to protect intranet devices.  *Id.* col. 1:55-67.

8    ## II.    LEGAL STANDARD

9    Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S.

10   370, 387 (1996).  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the

11   invention to which the patentee is entitled the right to exclude," *Phillips v. AWH Corp.*, 415 F.3d

12   1303, 1312 (Fed. Cir. 2005) (en banc) (internal citation omitted), and, as such, "[t]he appropriate

13   starting point . . . is always with the language of the asserted claim itself," *Comark Commc'ns, Inc.*

14   *v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

15   Claim terms "are generally given their ordinary and customary meaning," defined as "the

16   meaning . . . the term would have to a person of ordinary skill in the art in question . . . as of the

17   effective filing date of the patent application."  *Phillips*, 415 F.3d at 1313 (internal citation

18   omitted).  The court reads claims in light of the specification, which is "the single best guide to the

19   meaning of a disputed term."  *Id.* at 1315; *see also Lighting Ballast Control LLC v. Philips Elecs.*

20   *N. Am. Corp.*, 744 F.3d 1272, 1284-85 (Fed. Cir. 2014) (en banc).  Furthermore, "the

21   interpretation to be given a term can only be determined and confirmed with a full understanding

22   of what the inventors actually invented and intended to envelop with the claim."  *Phillips*, 415

23   F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.

24   Cir. 1998)).  The words of the claims must therefore be understood as the inventor used them, as

25   such understanding is revealed by the patent and prosecution history.  *Id.*  The claim language,

26   written description, and patent prosecution history thus form the intrinsic record that is most

27   significant when determining the proper meaning of a disputed claim limitation.  *Id.* at 1315-17;

28   *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    Evidence external to the patent is less significant than the intrinsic record, but the court

2    may also consider such extrinsic evidence as expert and inventor testimony, dictionaries, and

3    learned treatises "if the court deems it helpful in determining 'the true meaning of language used

4    in the patent claims.'"  *Philips,* 415 F.3d at 1318 (quoting *Markman,* 52 F.3d at 980).  However,

5    extrinsic evidence may not be used to contradict or change the meaning of claims "in derogation

6    of the 'indisputable public records consisting of the claims, the specification and the prosecution

7    history,' thereby undermining the public notice function of patents."  *Id.* at 1319 (quoting

8    *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

### III.    AGREED CONSTRUCTIONS

10    The parties agree on the construction for five terms.  Joint Claim Construction Statement,

11    ECF 59.  The Court accordingly adopts and approves the following constructions:

| Patent | Term | Construction |
|---|---|---|
| 6,804,780: all asserted claims | Downloadable | an executable application program, which is downloaded from a source computer and run on the destination computer |
| 6,804,780: claims 1, 9, 17, 18 | performing a hashing function on the Downloadable and the fetched software components | performing a hashing function on the Downloadable together with its fetched software components |
| 6,804,780: claims 4, 12 | plugin | software component that adds to the functionality of an already existing application program |
| 6,965,968: claims 1, 13, 23, 26, 32-33 | policy index | a data structure indicating allowability of cached content relative to a plurality of policies |
| 6,154,844: claims 1, 3-8, 11-12, 15, 19, 21-23, 41-44 | Downloadable | an executable application program, which is downloaded from a source computer and run on the destination computer |

24    Furthermore, Blue Coat requested construction of two other terms—"information-

25    destination" and "Downloadable-information destination"—from the '822 and '633 Patents that

26    Finjan contended do not require construction.  *Id.* at 8, 11, ECF 59.  In its responsive claim

27    construction brief, Blue Coat indicated that it agreed with Finjan that those terms do not require

28    construction.  Def.'s Br. 24.  As such, the Court will not construe those terms in this order.

4

## IV.    CONSTRUCTION OF DISPUTED TERMS IN THE '633 AND '822 PATENTS

### A.    "mobile protection code"

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| code capable of monitoring or intercepting [actually or][2] potentially malicious code | runtime code for monitoring for an actually or potentially malicious executable code operation or an attempt of an actually or potentially malicious executable code operation, and for causing an operation to occur in response to the attempt or the executable code operation | code that, at runtime, monitors or intercepts actually or potentially malicious code operations |

This disputed term appears in independent claim 1 and dependent claim 19 of the '822 Patent, as well as in independent claims 1, 8, 13, and 14 of the '633 Patent.  Claim 1 of the '633 Patent is representative of how the term is used in the claim language:

> 1. A computer processor-based method, comprising:
> receiving, by a computer, downloadable-information;
> determining, by the computer, whether the downloadable-information includes executable code; and
> based upon the determination, transmitting from the computer **mobile protection code** to at least one information-destination of the downloadable-information, if the downloadable-information is determined to include executable code.

The parties agree that mobile protection code ("MPC") is not a term known in the art.  Pl.'s Br. 7; Def.'s Br. 15.  As such, the intrinsic record is the best evidence of the patentee's understanding of the term.  For its construction, Finjan relies on a passage from the specification, which indicates that "[t]he sandboxed package includes mobile protection code ("MPC") for causing one or more predetermined malicious operations or operation combinations of a Downloadable to be monitored or otherwise intercepted." '822 Patent col. 3:6-10.[3]  Based on this evidence from the intrinsic record, Finjan argues that the MPC must merely be capable of

---

[2] Finjan indicated at the *Markman* hearing that it does not oppose modifying its construction to include "actually or" potentially malicious code.  Hr'g Tr. 28:6-21, ECF 86.

[3] The '822 and '633 Patents share the same specification.

United States District Court
Northern District of California

1    monitoring or intercepting malicious code.[4]  Pl.'s Br. 7-8; Pl.'s Reply 2, ECF 67.

2          By contrast, Blue Coat's construction seeks to add two limitations.  First, Blue Coat

3    contends that the MPC must be "runtime code" because the title and purpose of the '822 and '633

4    inventions is for "malicious mobile code *runtime* monitoring systems and methods."  '822 Patent,

5    col. 5:30-31 (emphasis added); Def.'s Br. 16-17.  Finjan responds that the specification does not

6    so limit the MPC because there are embodiments describing static code and the Court should not

7    place undue emphasis on the word "runtime," which appears only twice in the patent.  Pl.'s Br. 8-

8    9; Pl.'s Reply 3.

9          The trouble with the "runtime code" limitation is that there does not appear to be a well-

10   understood definition of that term in the art, and the Court is not convinced that using such a

11   vague and undefined term would be helpful to a jury.  For example, in Blue Coat's estimation,

12   runtime code is code that is always running and never static.  *See* Hr'g Tr. 64:18-20; 65:11-13,

13   ECF 86.  It is not clear that this interpretation of "runtime code" is even supported by Blue Coat's

14   expert, who describes the operation of the MPC as "running (executing) while the mobile code is

15   running (executing)," Decl. of Dr. Peter Reiher ¶ 19, ECF 66-1, implying that there are instances

16   when both the MPC and the mobile code are static or inactive.  As such, the Court declines to

17   adopt the "runtime code" limitation.  It would, however, be potentially helpful—and consistent

18   with the patent—to clarify that the MPC operates at runtime, as indicated by the title of the '822

19   and '633 Patents, and by the testimony of Blue Coat's expert that the MPC runs when the

20   downloadable-information is running.  *See also* '822 Patent col. 5:30-34.  As such, the Court's

21   construction clarifies that MPC is code that, at runtime, performs the specified functions.

22          Blue Coat's second limitation requires that the MPC actually provide protection—beyond

23   monitoring—by causing operations to occur in response to malicious executable code operations.

24

25   ---

[4] Finjan also argues that its proposed construction is appropriate because it was adopted in a
26   different lawsuit involving the same patent resulting in a verdict that was upheld by the Federal
     Circuit on appeal.  Pl.'s Br. 8.  This is not persuasive because the parties in that action stipulated to
27   the construction and, accordingly, that construction was not before the Federal Circuit on appeal.
     *See* Def.'s Br. 15 n.11; *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir.
28   2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Def.'s Br. 17-18.  Finjan argues that this requirement conflates the operation of the MPC with the

2    operation of protection policies.  Pl.'s Br. 8-9; Pl.'s Reply 3-4.

3            The specification appears to support Finjan's interpretation, as the patent discloses

4    protection policies "(operable alone or in conjunction with further Downloadable-destination

5    stored or received policies/MPCs) *for causing one or more predetermined operations to be*

6    *performed* if one or more undesirable operations of the Downloadable is/are intercepted."  '822

7    Patent col. 3:10-15.  More problematically, and as noted by Blue Coat, the specification also

8    frequently groups the MPC and the protection policies together by referring to them collectively as

9    the "MPC/policies."  *See, e.g., id.* cols. 3:18-20, 58:62, 10:61-65.  The only description of the

10   interaction between the MPC and the protection policies is set forth in the following passage:

11           If, in step 1107, the MPC determines, from monitored/intercepted
             information, that the Downloadable is attempting or has attempted a
12           destination device access considered undesirable or otherwise
             malicious, then the MPC performs steps 1109 and 1111 . . . . In step
13           1109, the MPC determines protection policies in accordance with
             the access attempt by the Downloadable, and in step 1111, *the MPC*
14           *executes the protection policies.*

15   *Id.* col. 20:10-19 (emphasis added); *see also id.* col. 9:66-10:4.  Based on this description, it would

16   not be inaccurate to describe the MPC as "invoking" the protection policies to cause

17   predetermined operations in response to malicious code.  *See* Def.'s Br. 17.  However, the

18   interpretation that better comports with the disclosures in the patent is that the protection policies

19   cause responsive operations when executed by the MPC, thus including instances where the

20   protection policies, "operable alone," cause those predetermined operations.  '822 Patent col. 3:10-

21   15.  As such, the Court declines to adopt Blue Coat's proposed limitation and agrees with Finjan

22   that the MPC, as expressly disclosed in the patent, monitors or intercepts malicious code.

23           Finally, the parties at the *Markman* hearing identified a further dispute not previously

24   briefed over whether the MPC intercepts code or operations.  *See* Hr'g Tr. 60:20-61:18, 73:19-

25   75:22.  Finjan argued that "code" is the appropriate word to use in this construction because the

26   patentee was concerned with Javascript, a dynamic computer programming language where the

27   code (or script) and operations are one and the same.  *Id.* at 74:14-75:21.  This does not mean that

28   it would be inaccurate to describe the MPC as intercepting code *operations*.  In fact, the portion of

7

United States District Court
Northern District of California

1  the specification on which Finjan relies for its construction describes intercepting operations and

2  not code.  *See* '822 Patent col. 3:6-10.  Because Blue Coat makes a compelling argument for

3  precise wording in this context, the Court accordingly construes "mobile protection code" as "code

4  that, at runtime, monitors or intercepts actually or potentially malicious code operations."

5      **B.**   **"means for causing mobile protection code to be communicated to at least one**
       **information-destination of the downloadable-information, if the downloadable-**
6      **information is determined to include executable code"**

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| Function: causing mobile protection code to be communicated to at least one information-destination of the downloadable-information, if the downloadable-information is determined to include executable code<br><br>Structure: re-communicating device | Function: if the downloadable-information is determined to include executable code, transferring mobile protection code with the downloadable-information to at least one information destination of the downloadable information without modifying the executable code<br><br>Structure: re-communicating device | Function: if the downloadable-information is determined to include executable code, causing mobile protection code to be communicated to at least one information-destination of the downloadable-information without modifying the executable code<br><br>Structure: re-communicating device |

15      This phrase appears in independent claim 13 of the '633 Patent,[5] which reads:

16          13. A processor-based system for computer security, the system
            comprising:
17                means for receiving downloadable-information;
                  means for determining whether the downloadable-information
18          includes executable code; and
19                **means for causing mobile protection code to be**
            **communicated to at least one information-destination of**
20          **the downloadable-information, if the downloadable-**
            **information is determined to include executable code.**

21      The parties agree that this limitation is a means-plus-function term subject to the

22  requirements of 35 U.S.C. § 112, ¶ 6.[6]  Under § 112, ¶ 6, a means-plus-function claim "shall be

23  construed to cover the corresponding structure, material, or acts described in the specification of

---

[5] A variation of this term, the step or element of "causing mobile protection code to be communicated . . .", also appears in claims 1 and 9 of the '822 Patent.

[6] Paragraph 6 of 35 U.S.C. § 112 was replaced with newly designated § 112(f) when the America Invents Act ("AIA"), Pub. L. No. 112–29, took effect on September 16, 2012.  Because the applications resulting in the patents at issue in this case were filed before that date, the Court will refer to the pre-AIA version of § 112.

8

Case: 16-2520      Document: 35      Page: 75      Filed: 12/20/2016

Case5:13-cv-03999-BLF   Document118   Filed10/20/14   Page9 of 25

1    equivalents thereof." 35 U.S.C. § 112, ¶ 6. In construing a means-plus-function claim term, the

2    Court must first determine the claimed function then identify the "corresponding" structure that is

3    necessary to performing the claimed function. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424

4    F.3d 1324, 1330 (Fed. Cir. 2005).

5         Here, the parties agree on the corresponding structure but disagree on the proper

6    construction of the claimed function. The dispute is over whether, after determining that a piece

7    of downloadable-information contains executable code, "causing mobile protection code to be

8    communicated . . ." requires that the MPC be transmitted *with* the downloadable-information and

9    without modifying the executable code in the downloadable-information.

10        Finjan argues that these two limitations should not be read into the claimed function

11   because the language of the claim is sufficient, and because the '633 Patent discloses examples

12   wherein the MPC is transmitted separately from the downloadable-information and wherein the

13   executable code is modified. Pl.'s Br. 12-13; Pl.'s Reply 6-9. Blue Coat relies on disclosures in

14   the specification and statements in the prosecution history to contend that the patentee

15   distinguished the present invention over the prior art by arguing that the MPC is "packaged" with

16   the downloadable-information and communicated to the destination without modifying the

17   executable code. Def.'s Br. 18-21.

18        It is clear from the specification that the MPC does not modify executable code. At

19   separate points, embodiments are described as advantageously enabling "potentially damaging,

20   undesirable or otherwise malicious operations by even unknown mobile code to be detected,

21   prevented, modified and/or otherwise protected against without modifying the mobile code." '633

22   Patent col. 4:12-16; *see also id.* col. 10:39-44 (apparent that claimed invention is "more accurate

23   and far less resource intensive than, for example . . . modifying a Downloadable"). Finjan's

24   arguments to the contrary are not persuasive. The examples that Finjan provides of modification

25   to the executable code show modifications to code operations or other portions of the

26   downloadable-information, not the problematic executable *code*. Pl.'s Br. 12 (citing '633 Patent

27   col. 13:28-41); Pl.'s Reply (citing '822 Patent col. 4:4-10). Moreover, while the patentee may

28   have also distinguished the prior art on other grounds, *see* Pl.'s Reply 7-8, the public is entitled to

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    rely on all of the grounds on which a piece of prior art is distinguished, *Andersen Corp. v. Fiber*

2    *Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007), particularly where those statements are

3    made in the specification itself.  Absent examples of modifications to executable code, the Court is

4    left with the inescapable conclusion that the disclosed advantages over the prior art are an essential

5    part of the claimed invention.  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242

6    F.3d 1337, 1342–45 (Fed. Cir. 2001); *but see i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844

7    (Fed. Cir. 2010) *aff'd on other grounds*, 131 S. Ct. 2238 (U.S. 2011) (finding no disclaimer based

8    on "permissive" language about benefits of system).  Accordingly, the Court finds that the MPC

9    does not modify executable code found in the downloadable-information.

10   Whether the MPC must be transmitted *with* the downloadable-information presents a

11   closer question.  Here, numerous disclosures in the specification suggest that the MPC may be

12   transmitted separately from the downloadable-information.  *See, e.g.*, '633 Patent cols. 9:58-63,

13   12:38-43, 16:1-15.  Blue Coat's argument for inclusion of this limitation is thus based entirely on

14   prosecution history disclaimer.  Def.'s Br. 20-21.  "Where an applicant argues that a claim

15   possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the

16   argument may serve to narrow the scope of otherwise broad claim language."  *Seachange Int'l,*

17   *Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005) (citing *Rheox, Inc. v. Entact, Inc.*,

18   276 F.3d 1319, 1325 (Fed. Cir. 2002)).  However, such disavowal of claim scope must be clear

19   and unambiguous, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–25 (Fed. Cir. 2003),

20   and not "subject to more than one reasonable interpretation," *SanDisk Corp. v. Memorex Prods.,*

21   *Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

22   Blue Coat relies on a 2005 Preliminary Response and 2009 Amendment and Response

23   from the '633 Patent prosecution history, wherein the patentee distinguishes over a prior art

24   reference, *Golan*.  The pertinent passage states:

25       In distinction with the present invention, Golan does not describe the
         packaging of protection code.  Instead, Golan discusses a situation
26       whereby a security monitor is already resident on a client computer,
         as illustrated in FIGS. 2, 5 and 9 of Golan, without concerning itself
27       as to how the security monitor is installed.  *In fact, prima facie the
         methodology of the present invention, of packaging mobile*
28       *protection code with downloadable information*, seems wasteful and

10

United States District Court
Northern District of California

1   counter-intuitive, since such protection code is typically re-
2   transmitted to the client computer many times—in particular, each
    time a downloadable with executable code is downloaded.
3   However, the advantage of this methodology is control over the
    ability to customize the mobile protection code and to update it as
4   necessary, thus obviating the need for a user to be responsible for
    ensuring that his security code be appropriate to his computer and up
    to date.

5   Decl. of Olivia Kim Exh. G at 2 (ECF 66-12), Exh. H at 14 (ECF 66-13) (emphasis added).  Blue

6   Coat interprets the emphasized sentence to require that the MPC be literally packaged and

7   transmitted in conjunction with the downloadable-information.  Finjan argues that this passage is

8   not a clear disavowal of claim scope because later in the same responses, within the specific

9   context of the claims, the patentee distinguishes Golan on the ground that it "does not describe

10  causing mobile protection code, which corresponds to Golan's security monitor, to be

11  communicated."  Pl.'s Reply 8 (citing Kim Decl. Exh. G at 2).  Thus, the patentee distinguished

12  Golan on the ground that it did not provide for any communication of MPC to the destination.  *Id.*

13      Both parties' interpretations are reasonable.  Read plainly, the feature that the patentee was

14  distinguishing over Golan was the communication of MPC, as opposed to having it "already

15  resident on a client computer . . . without concerning itself as to how the [MPC] was installed."

16  Kim Decl. Exh. G at 2.  Although the patentee indicates that the methodology of the present

17  invention is the "packaging [of] mobile protection code with downloadable information," *id.*, it

18  would be reading too much into a single word to interpret that as an express requirement that the

19  MPC always be transmitted in conjunction with the downloadable-information.  Because the

20  patentee's statements in distinguishing Golan are subject to multiple reasonable interpretations,[7]

21  the Court therefore agrees with Finjan that the prosecution history does not evince a clear

22  disavowal of embodiments in which the MPC is communicated separately from the downloadable-

23  information and declines to adopt such a limitation.

24      Based on the foregoing, the Court construes "means for causing mobile protection code to

25  be communicated to at least one information-destination of the downloadable-information, if the

26

27  [7] In contrast to the "without modifying the executable code" limitation discussed above, the
    patentee did not offer multiple grounds for distinguishing the prior art.  Rather, the same argument
28  by the patentee is susceptible to multiple interpretations.

11

downloadable-information is determined to include executable code" to be a means-plus-function term wherein the claimed function is "if the downloadable-information is determined to include executable code, causing mobile protection code to be communicated to at least one information-destination of the downloadable-information without modifying the executable code," and the corresponding structure is a "re-communicating device."

## C.    Disputed Terms in Claim 14 of the '633 Patent

The parties dispute the meaning of two phrases in independent claim 14 of the '633 Patent, which reads:

> 14. **A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, the method comprising:**
> providing a system, wherein the system comprises distinct software modules, and wherein the distinct software modules comprise an information re-communicator and a mobile code executor;
> receiving, at the information re-communicator, downloadable-information including executable code; and
> **causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code.**

The Court addresses each disputed phrase in turn.

> **i. "A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, the method comprising: providing a system, . . ."**

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, comprising: providing a system, . . . | Indefinite | A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, comprising: providing a system, . . . |

The sole controversy over this preamble is whether it is sufficiently definite to "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.*

12

*v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  Finjan acknowledges that the disputed phrase contains a drafting error but urges that the Court can correct the problem by simply striking the words "the method" from this phrase.  As corrected, Finjan argues that Claim 14 sets forth a *Beauregard* claim that is understandable to one of ordinary skill in the art.[8]  Pl.'s Br. 20; Pl.'s Reply 11-12.  Blue Coat contends that the error in Claim 14 is not merely typographical because simply removing "the method" fails to inform "what provides the system, and how the system is provided."  Def.'s Br. 22-23.  The Court disagrees because, as noted by Finjan, the corrected preamble can be reasonably interpreted to set forth a computer readable program code that, when executed, performs the limitations of the claim.  *See* Pl.'s Reply 11.

Blue Coat further argues that the claim is indefinite regardless of Finjan's proposed correction because one skilled in the art would have difficulty understanding whether the claimed invention is an apparatus or a method.  Def.'s Br. 22-23.  At the *Markman*, Blue Coat further elaborated on this argument by citing to *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005), in which the Federal Circuit invalidated a similar *Beauregard* style claim for improperly including both method and apparatus limitations in the same claim.  *Id.* at 1383-84; *but see Convolve, Inc. v. Dell, Inc.*, No. 2:08-CV-244-CE, 2011 WL 31792, at *17-18 (E.D. Tex. Jan. 5, 2011) (distinguishing *IPXL* because accused infringer would know at time of sale whether device would meet the additional step-wise limitations of computer code claim); *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 904 (Fed. Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2120 (2014) (distinguishing *IPXL* and characterizing patent at issue as reciting "apparatus claims with functional limitations").

The Court declines to rule at this time that this preamble renders the entire claim indefinite.  While it appears that this claim is susceptible to the problem identified in *IPXL*, Blue Coat did not cite that case in its claim construction brief and did not raise the issue until the *Markman* hearing.  Moreover, the testimony of both experts on this issue is too conclusory for the Court to determine,

---

[8] Named after *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995), a *Beauregard* claim is "a claim to a computer readable medium (e.g., a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process."  *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).

13

United States District Court
Northern District of California

1    at this stage, that the claim is indefinite under *IPXL*.  *Compare* Decl. of Nenad Medvidovic ¶ 20,

2    ECF 65-1 *to* Reiher Decl. ¶ 25.  Notably, Blue Coat's expert declaration does not even address the

3    *IPXL* issue in light of Finjan's proposed removal of the words "the method," instead testifying that

4    with the correction one of ordinary skill in the art would not understand "(1) what provides the

5    system, and (2) how the system is provided."  Reiher Decl. ¶ 25.  As such, Blue Coat has not

6    satisfied its burden of proving by clear and convincing evidence that one with ordinary skill in the

7    art would not, with reasonable certainty, be able to discern whether the corrected Claim 14 covers

8    a method or apparatus or know when the claim is infringed.  *Microsoft Corp. v. i4i Ltd. P'ship*,

9    131 S. Ct. 2238, 2243 (2011) (invalidity defense must be proven by clear and convincing

10   evidence).

11          For the foregoing reasons, the Court accepts Finjan's proposal to correct the typographical

12   error in the preamble to Claim 14 of the '633 Patent so that it shall read: "A computer program

13   product, comprising a computer usable medium having a computer readable program code therein,

14   the computer readable program code adapted to be executed for computer security, comprising:

15   providing a system, . . .".  Decision on Blue Coat's indefiniteness argument will be deferred until

16   summary judgment, where Finjan can be afforded an opportunity to respond to Blue Coat's

17   challenge based on *IPXL*, and both parties can more fulsomely brief the issue.

            **ii.  "causing mobile protection code to be executed by the mobile code executor
18              at a downloadable-information destination such that one or more operations
19              of the executable code at the destination, if attempted, will be processed by
                the mobile protection code"**

20

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| No construction necessary – Plain and ordinary meaning. | running, at a downloadable-information destination, mobile protection code which was transmitted with the downloadable-information without modifying the executable code, such that one or more operations of the executable code will be processed by the mobile protection code if attempted at the downloadable-information destination | Plain and ordinary meaning, wherein the mobile protection code was communicated to the downloadable-information destination without modifying the executable code |

14

United States District Court
Northern District of California

1    Blue Coat's rather cumbersome proposal seeks only to maintain its proposed limitation

2  that the MPC be "transmitted with the downloadable-information without modifying the

3  executable code."  As discussed above, the intrinsic evidence does not support a limitation

4  requiring that the MPC be transmitted with the downloadable-information but does indicate that

5  the MPC travels to the destination without modifying executable code in the downloadable-

6  information.  The disputed phrase moreover presumes that the MPC has already arrived at the

7  downloadable-information and, as such, the construction of this phrase need not expressly contain

8  limitations on the manner in which the MPC is communicated.  The Court therefore construes the

9  disputed phrase "causing mobile protection code to be executed by the mobile code executor at a

10  downloadable-information destination such that one or more operations of the executable code at

11  the destination, if attempted, will be processed by the mobile protection code" to have its plain and

12  ordinary meaning, but with the understanding—for purposes of clarification—that the mobile

13  protection code was communicated to the downloadable-information destination without

14  modifying the executable code.

## V.    CONSTRUCTION OF DISPUTED TERMS IN THE '844 PATENT

### A.    Disputed Terms in Claims 1, 15, 22, 23, 41-44 of the '844 Patent

17    The parties dispute the meaning of two phrases that appear in independent claims 1, 15, 22,

18  23, 41-44 of the '844 Patent.  Claim 1 is representative of how the disputed terms are used in the

19  claim language:

> 1. A method comprising:
>   receiving by an inspector a Downloadable;
>   generating by the inspector a first **Downloadable security
>     profile that identifies suspicious code in the received
>     Downloadable**; and
>   linking by the inspector the first Downloadable security profile to
>     the Downloadable **before a web server makes the
>     Downloadable available to web clients.**

25  Both of these terms are used consistently throughout the claims, but do not appear anywhere else

26  in the specification of the '844 Patent.  The Court addresses each in turn.

15

### i.   "Downloadable security profile that identifies suspicious code in the received Downloadable"

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| a profile that identifies hostile or potentially hostile operations in the Downloadable | a profile that specifies code contained in the received Downloadable that is hostile or potentially hostile, including code that performs file operations, network operations, registry operations, or operations system operations | a profile that identifies code in the received Downloadable that performs hostile or potentially hostile operations |

The competing proposals expose two disputes: the meaning of "suspicious code" and the meaning of "identifies." Taking the easier dispute first, the Court finds that "identifies" does not require further construction. At the *Markman* hearing, Blue Coat expressed concern that "identifies" is too vague and could be interpreted to permit the downloadable security profile to simply detect the presence of suspicious code without further specifying its location or characteristics. Hr'g Tr. 101:19-103:17. This concern is well taken, and the Court agrees with Blue Coat that the patent requires the downloadable security profile ("DSP") to include details about the suspicious code in the received downloadable, such as by listing "all potentially hostile or suspicious code operations that may be attempted by the Downloadable," or "the respective arguments of these operations." '844 Patent col. 4:4-7; *see* Def.'s Br. 7-9 (citing '844 Patent cols. 4:4-7, 8:55-60, and U.S. Pat. No. 6,092,194, cols. 4:33-37, 4:59-64, 5:43-57, 9:24-29 (incorporated by reference into the '844 Patent)). However, "identifies" is sufficiently precise to convey this meaning without resorting to a different word that does not appear in the specification.

The term "suspicious code" does not appear anywhere in the specification other than the claims. Finjan argues that this is because the patent uses "code" and "operations" interchangeably so that "suspicious code" is best construed as "hostile or potentially hostile operations." Pl.'s Reply 4-5. Finjan provides no support for this interpretation other than examples from the specification describing the DSP "preferably" listing suspicious operations. *See, e.g.*, '844 Patent col. 4:4-7. To be sure, the '844 Patent specification is not a model of consistency or even of clarity. As argued by Blue Coat, however, Finjan's conflation of "code" with "operations" ignores

16

United States District Court
Northern District of California

1  the consistent use of "operations" elsewhere in the specification and particularly in the claim

2  language.  Def.'s Br. 6-7.  The Court agrees.

3       There is no expert testimony on what "code" and "operations" mean to one of skill in the

4  art.  The specification of the '844 Patent consistently distinguishes between "operations" and

5  "code patterns," while also referring to "code" and "executable code," to describe the

6  Downloadable.  *See, e.g.*, '844 Patent col. 4:7-10, 5:63-65, 8:51-55.  This suggests that the

7  patentee understood there to be a difference between "code and "operations."  Most notably,

8  dependent claim 11 provides "[t]he method of claim 1, wherein the first Downloadable security

9  profile includes a list of operations deemed suspicious by the inspector."  The patentee therefore

10  maintained a distinction between "code" and "operations" throughout the '844 Patent.  Moreover,

11  the term "suspicious code" does not appear to have been added later by amendment, as an Office

12  Action from 1999 suggests that the term was used very early in the prosecution history.[9]  Kim

13  Decl. Exh. B at 6.  As such, construing "suspicious code" in claim 1 to mean, essentially,

14  suspicious "operations" would impermissibly render claim 11 superfluous.  *Aspex Eyewear, Inc. v.*

15  *Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *Comark*, 156 F.3d at 1187.  Finjan

16  has not identified any evidence in the intrinsic record to overcome this strong presumption of

17  claim differentiation.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)

18  (presumption of claim differentiation is at "its strongest" when redundancy appears between

19  independent and dependent claims).

20       Finally, while in some instances there may not be a meaningful distinction between

21  "operations" and "code that performs operations," *see* Pl.'s Reply 5, maintaining that distinction

22  comports with the patentee's own usage of "code" to describe the Downloadable and "operations"

23  to describe suspicious behavior, *see* '844 Patent col. 4:7-34.  Based on the foregoing, the Court

24  rejects Finjan's proposal to construe "code" as "operations."  Blue Coat's construction, however,

25  is modified to eliminate the use of "specifies" and simplified to convey the distinction between

26

27  ---
[9] The parties did not provide the Court with a full prosecution history for the '844 Patent, and the Court therefore cannot conclusively determine when "suspicious code" first appeared in the claim

28  language.

17

1  code and operations without including a list of examples.[10]  As such, the Court construes

2  "Downloadable security profile that identifies suspicious code in the received Downloadable" to

3  mean "a profile that identifies code in the received Downloadable that performs hostile or

4  potentially hostile operations."

5      ii.  **"before [a/the] web server make[s] the Downloadable available to web clients"**

6

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| No construction necessary – Plain and ordinary meaning. | before [a/the] non-gateway server from which web pages originate allows a web client to access a Downloadable | before [a/the] non-network gateway web server make[s] the Downloadable available to web clients |

10      The dispute centers on whether patent requires that the web server be distinct from a

11  network gateway.  Noting that this phrase does not appear in the specification, Blue Coat contends

12  that the patent discloses embodiments where the web server and network gateway are distinct.

13  Def.'s Br. 9-10.  Moreover, the patentee distinguished the present invention over a prior art

14  reference, *Ji*, that disclosed inspection of Downloadables on a network gateway, thus disclaiming

15  embodiments where the web server and network gateway are one and the same.  *Id.* at 10-11.

16  Finjan, in turn, argues that the specification does not limit web servers to be distinct from gateway

17  servers and in fact discloses web servers that act as bi-directional gateways.  Pl.'s Reply 12 (citing

18  '844 Patent col. 10:51-56).

19      The intrinsic evidence favors Blue Coat's construction.  As identified by Blue Coat, Figure

20  1 of the '844 Patent shows a web server as a distinct entity from the network gateway.  Def.'s Br.

21  10; *see also* '844 Patent col. 5:12-13.  Although the specification specifically indicates that the

22  developer 120, inspector 125, and web server 185 can be configured in any number of ways, the

23  network gateway 110 is not mentioned in these alternative site combinations.  '844 Patent col.

24  3:47-52.  The claim language furthermore makes a clear distinction between network gateway and

25  web server, as illustrated, for example, in Claim 22, wherein the network gateway receives a

26  Downloadable with a linked DSP, the linking having occurred *before* the web server makes the

27  ───────────────

28  [10] Blue Coat indicated at the *Markman* hearing that it did not object to leaving exemplary operations out of the construction.  Hr'g Tr. 100:23-101:3.

United States District Court
Northern District of California

1    Downloadable available to the web client.  *Id.* cl. 22.  There are no disclosures or claims where the

2    network gateway and the web server are one and the same.

3            The patentee's statements in prosecution only serve to reinforce that conclusion.  *See*

4    Def.'s Br. 10 (quoting Kim Decl. Exh. D at 5).  One of the primary thrusts of the patentee's

5    argument of *Ji* is clearly that *Ji* "teaches a method performed on a network gateway" and "the

6    burden of examining a Downloadable for the suspicious code is always on the network gateway."

7    Kim Decl. Exh. D at 5.  By contrast, the patented invention includes an inspector that "generat[es]

8    and link[s] a Downloadable security profile to a Downloadable *before* a web server makes the

9    Downloadable available to web clients," and the network gateway then "examines the

10   Downloadable security profile for security policy violations."  *Id.* (emphasis added).  Thus, even

11   if, as Finjan argues, the patentee identified other features that were novel in light of *Ji* such that

12   there was not a clear disavowal of scope, *see* Pl.'s Reply 12-13, the patentee's own words

13   contrasting *Ji* with the present invention still bolster the conclusion, already reached from an

14   examination of the patent specification, that the '844 Patent contemplates a distinction between

15   web servers and network gateways, *800 Adept, Inc. v. Murex Securities, Ltd*, 539 F.3d 1354, 1364-

16   65 (Fed. Cir. 2008).  Acknowledging, however, that Blue Coat's use of the generic term

17   "gateway" appears to have introduced some ambiguity into its proposal, the Court will reword the

18   construction to clarify that a web server is not a network gateway.[11]

19           Blue Coat indicated at the *Markman* hearing that the second part of its construction that the

20   web server "allows a web client to access" a Downloadable is merely a clarifying proposal for

21   purposes of aiding the jury.  Hr'g Tr. 105:4-5; *see also* Def.'s Br. 9-10.  Because this part of Blue

22   Coat's construction does not affect claim scope, and because Finjan disputes the effectiveness of

23   this clarification, the Court will hew to the language of the claim.  Accordingly, the term "before

24   [a/the] web server make[s] the Downloadable available to web clients" is construed as "before

25   [a/the] non-network gateway web server make[s] the Downloadable available to web clients."

26

27   _____

28   [11] Blue Coat did not provide any evidence in support of the limitation that the web server be "from
     which web pages originate," nor is it clear that those words were merely included for clarification.
     The Court therefore declines to adopt that portion of Blue Coat's proposal.

**B.     Disputed Terms in Claim 44 of the '844 Patent**

The parties dispute two additional terms in independent Claim 44 of the '844 Patent, which reads:

> 44. A network gateway system comprising:
> means for receiving a Downloadable with a linked first
> Downloadable security profile that identifies suspicious code
> in the Downloadable, the Downloadable security profile being
> linked to the Downloadable before the web server make [sic]
> the Downloadable available to the web client:
> **means for determining whether to trust the first
> Downloadable security profile**; and
> **means for comparing the first Downloadable security profile
> against the security policy if the first Downloadable
> security profile is trustworthy**.

The parties agree that both of these terms are means-plus-function terms subject to the requirements of 35 U.S.C. § 112, ¶ 6, and they also agree on the function claimed in each term. The Court therefore addresses each only with respect to the disputed structural limitations.

| **"means for determining whether to trust the first Downloadable security profile"** | | |
|---|---|---|
| **Finjan's Proposal** | **Blue Coat's Proposal** | **Court's Construction** |
| Function: determining whether to trust the first Downloadable security profile | Function: determining whether to trust the first Downloadable security profile | Function: determining whether to trust the first Downloadable security profile |
| Structure: network protection engine or computer protection engine | Structure: certificate authenticator 515 and Downloadable ID verification engine 520 | Structure: certificate authenticator 515 and Downloadable ID verification engine 520 |

| **"means for comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy"** | | |
|---|---|---|
| **Finjan's Proposal** | **Blue Coat's Proposal** | **Court's Construction** |
| Function: comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy | Function: comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy | Function: comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy |
| Structure: network protection engine or computer protection engine | Structure: local security policy analysis engine 530 | Structure: local security policy analysis engine 530 |

As illustrated by the parties' proposals, the main dispute if over how narrowly or broadly to identify the corresponding structures for each term.  Here, the Court is mindful that the

20

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "structure disclosed in the specification is 'corresponding' structure *only* if the specification or

2   prosecution history clearly links or associates that structure to the function recited in the claim.

3   This duty to link or associate structure to function is the *quid pro quo* for the convenience of

4   employing § 112, ¶ 6." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir.

5   1997); *see also Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013). Moreover, the

6   corresponding structure must actually perform the claimed function, as "[f]eatures that do not

7   perform the recited function do not constitute corresponding structure and thus do not serve as

8   claim limitations." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir.

9   2003); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002);

10   *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

11          Finjan's broad identification of structure relies on the '844 Patent Abstract and a passage

12   that states "[b]oth the network protection engine 135 and the computer protection engine 180

13   examine all incoming Downloadables and stop all Downloadables deemed suspicious." Pl.'s Br.

14   15; Pl.'s Reply 9-10; *see* '844 Patent col. 5:14-19, 28:33. This proposal ignores the more detailed

15   description of "[c]omponents and operation of the network protection engine 135 and the

16   computer protection engine 180" described in columns 7 to 8 of the specification and depicted in

17   Figure 5, which illustrates "details of a generic protection engine 500, which exemplifies each of

18   the network protection engine 135 and the computer protection engine 180." '844 Patent col.

19   7:41-44. As made clear in those disclosures, not all components of the protection engine perform

20   the claimed functions. Instead, the specification specifically links certificate authenticator 515 and

21   Downloadable ID verification engine 520 with the function of determining whether to trust the

22   DSP, *id.* col. 7:51-60, and the local security policy analysis engine 530 with comparing the

23   attached or generated DSP against local security policies, *id.* col. 8:6-8.

24          None of the disclosures identified by Finjan demand a contrary construction. Because

25   Figure 5 depicts a generic protection engine in detail, the components that are identified as the

26   corresponding structure to each function are inherently part of the network and computer

27   protection engines discussed in the passages Finjan quotes in support of its broader construction.

28   *See* Pl.'s Reply 9 (citing '844 Patent col. 5:24-33). The generic must give way to the specific

<div align="center">21</div>

United States District Court
Northern District of California

1    where, as here, the specification discloses components of the generic protection engine that do not

2    perform the functions of the disputed terms.  Therefore, Blue Coat's proposed structures more

3    appropriately identify the specific structures that perform the recited function.

4        The Court accordingly construes "means for determining whether to trust the first

5    Downloadable security profile" as a means-plus-function term wherein the claimed function is

6    "determining whether to trust the first Downloadable security profile" and the corresponding

7    structure is "certificate authenticator 515 and Downloadable ID verification engine 520."  The

8    "means for comparing the first Downloadable security profile against the security policy if the first

9    Downloadable security profile is trustworthy" is construed as a means-plus-function term wherein

10   the claimed function is "comparing the first Downloadable security profile against the security

11   policy if the first Downloadable security profile is trustworthy" and the corresponding structure is

12   "local security policy analysis engine 530."

13   **VI.    CONSTRUCTION OF DISPUTED TERMS IN THE '731 PATENT**

14       The parties dispute the proper construction of "network gateway," which appears in claim

15   7 and dependent claims 13, 14, and 20 of the '731 Patent and "computer gateway," which appears

16   in independent claim 1 and dependent claims 4, 5, and 18 of the '731 Patent.  Claim 7 is an

17   exemplary use of "network gateway":

18       7. A method of operating a **network gateway** for an intranet of
         computers, the method comprising:
19           receiving a request from an intranet computer for a file;
             determining whether the requested file resides within a file cache
20               at the network gateway;
             if said determining is affirmative:
21           retrieving a security profile for the requested file from a security
                 profile cache at the network gateway . . . ;
22           if said determining is not affirmative:
             retrieving the requested file from the Internet;
23           scanning the retrieved file to derive a security profile including a
                 list of computer commands that the retrieved file is
24               programmed to perform;
             storing the retrieved file within the file cache for future access;
25               and
             storing the security profile for the retrieved file within the
26               security profile cache for future access.

27   Claim 1 exemplifies the use of "computer gateway":

28       1. A **computer gateway** for an intranet of computers, comprising:

1  a scanner for scanning incoming files from the Internet and
deriving security profiles for the incoming files, wherein each
of the security profiles comprises a list of computer commands
that a corresponding one of the incoming files is programmed
to perform;

3  a file cache . . . ; and
a security profile cache . . . ; and

4  a security policy cache . . . .

5  "Network gateway" appears only in method claims, and "computer gateway" appears only

6  in apparatus claims.  The Court construes these terms together.

**"network gateway"**

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| No construction necessary – Plain and ordinary meaning. | device(s) residing between two networks through which all incoming and outgoing network traffic passes | Plain and ordinary meaning. |

**"computer gateway"**

| Finjan's Proposal | Blue Coat's Proposal | Court's Construction |
|---|---|---|
| No construction necessary – Plain and ordinary meaning. | computer residing between two networks through which all incoming and outgoing network traffic passes | Plain and ordinary meaning. |

Blue Coat appears to be seeking construction of these terms for the primary purpose of

assisting jury understanding of the patents.  Def.'s Br. 24.  Blue Coat's constructions, however, do

not simply clarify the meaning of "gateway" or explain how one of ordinary skill in the art would

have understood the term.  Rather, Blue Coat seeks to include a limitation that all network traffic

must pass through the network or computer gateway.  As Finjan correctly argues, there is no

support in the intrinsic record for this limitation, Pl.'s Reply 14-15, and Blue Coat identifies only

"the '731 patent's goal of providing network security to an intranet of computers" in support of

reading this limitation into the claim, Def.'s Br. 25.  In fact, disclosures in the written description

and the claims themselves indicate that network gateways can be used to control only incoming

traffic or only outgoing traffic.  *See* '731 Patent col. 10:30-52; *compare id.* cl. 14 *with* cl. 22.

There being no express words of limitation or clear evidence that the '731 Patent addresses

network or computer gateways that are the *only* gateways for an intranet of computers through

United States District Court
Northern District of California

1  which all incoming and outgoing network traffic passes, the Court declines to adopt such a

2  limitation.

3       Blue Coat's proposal for "computer gateway" is even further restrictive in construing the

4  term to require a single computer. The specification indicates that "[t]he gateway computer

5  described hereinabove may be embodied by a plurality of computers. Thus, for purposes of load

6  balancing, a load balanced set of computers may serve as a gateway."[12] '731 Patent col. 10:58-61.

7  Blue Coat offers no explanation, other than emphasis on an indefinite article, for its construction

8  requiring that a "computer gateway" be a single computer.[13] Def.'s Br. 25. The Court therefore

9  also declines to adopt this limitation.

10      Based on the foregoing, the Court construes the terms "network gateway" and "computer

11  gateway" to have their plain and ordinary meanings.

12  **VII.    ORDER**

13      For the reasons set forth above, the Court construes the disputed terms as follows:

| Claim Terms | Court's Construction |
|---|---|
| mobile protection code | code that, at runtime, monitors or intercepts actually or potentially malicious code operations |
| means for causing mobile protection code to be communicated to at least one information-destination of the downloadable-information, if the downloadable-information is determined to include executable code | <u>Function</u>: if the downloadable-information is determined to include executable code, causing mobile protection code to be communicated to at least one information-destination of the downloadable-information without modifying the executable code<br><br><u>Structure</u>: re-communicating device |
| A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, the method comprising: providing a system, . . . | The typographical error in the preamble is corrected to read:<br><br>A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer |

---

[12] The '731 Patent also lacks consistency in its use of terms, referring to "gateway computer" and "computer gateway" in the specification. While the parties have not argued that these terms are used interchangeably, an examination of the specification suggests that they are. *See* '731 Patent col. 5:22-8:57, Fig. 1.

[13] Moreover, this interpretation of "computer" as a modifier to "gateway" is inconsistent with Blue Coat's interpretation of "network" as a modifier to "gateway."

24

| | readable program code adapted to be executed for computer security, comprising: providing a system, . . . |
|---|---|
| causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code | Plain and ordinary meaning, wherein the mobile protection code was communicated to the downloadable-information destination without modifying the executable code |
| Downloadable security profile that identifies suspicious code in the received Downloadable | a profile that identifies code in the received Downloadable that performs hostile or potentially hostile operations |
| before [a/the] web server make[s] the Downloadable available to web clients | before [a/the] non-network gateway web server make[s] the Downloadable available to web clients |
| means for determining whether to trust the first Downloadable security profile | <u>Function</u>: determining whether to trust the first Downloadable security profile <br><br> <u>Structure</u>: certificate authenticator 515 and Downloadable ID verification engine 520 |
| means for comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy | <u>Function</u>: comparing the first Downloadable security profile against the security policy if the first Downloadable security profile is trustworthy <br><br> <u>Structure</u>: local security policy analysis engine 530 |
| network gateway | Plain and ordinary meaning. |
| computer gateway | Plain and ordinary meaning. |

Dated: October 20, 2014

_BETH LABSON FREEMAN_
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

25

**DOCKET NO. 256**

**INTENTIONALLY OMITTED**

**FILED UNDER SEAL**

**CONTAINS CONFIDENTIAL MATERIAL**

1
2
3          **UNITED STATES DISTRICT COURT**
4          **NORTHERN DISTRICT OF CALIFORNIA**
5          **SAN JOSE DIVISION**
6

| | |
|---|---|
| FINJAN, INC., | Case No.  13-cv-03999-BLF |
| Plaintiff, | |
| | **ORDER GRANTING IN PART** |
| v. | **DEFENDANT'S MOTION TO STRIKE** |
| | **INFRINGEMENT THEORIES;** |
| BLUE COAT SYSTEMS, INC., | **DENYING PLAINTIFF'S MOTION TO** |
| | **STRIKE INVALIDITY THEORIES** |
| Defendant. | |
| | [Re:  ECF 216, 218] |

        Plaintiff Finjan, Inc. ("Plaintiff") accuses defendant Blue Coat Systems, Inc. ("Defendant")
of infringing six of Plaintiff's web security patents: U.S. Patent Nos. 6,804,780 (the '780 Patent);
6,154,844 (the '844 Patent); 7,418,731 (the '731 Patent); 7,058,822 (the '822 Patent); 7,647,633
(the '633 Patent); and 6,695,968 (the '968 Patent).  The Court assumes familiarity with the facts of
this case, including the asserted patents and accused products, as discussed in the Court's
summary judgment order of June 2, 2015.  Before the Court are the parties' respective motions to
strike infringement and invalidity theories that were not properly disclosed under the Patent Local
Rules.  Def.'s Mot., ECF 216; Pl.'s Mot., ECF 218.  For the reasons stated herein, Defendant's
Motion to Strike is GRANTED IN PART and DENIED IN PART.  Plaintiff's Motion to Strike is
DENIED.

## I.    LEGAL STANDARD

        This district's Patent Local Rules require both parties to provide early identification of
their respective infringement and invalidity theories.  *See* Patent L.R. 3-1, 3-3.  Once served, the
contentions constitute the universe of the parties' respective theories, and those contentions may
be amended only by order of the court and upon a showing of good cause.  Patent L.R. 3-6.

        As has been recognized by many courts, the purpose of these disclosures is to "require

United States District Court
Northern District of California

1    parties to crystallize their theories of the case early in the litigation," *O2 Micro Int'l Ltd. v.*

2    *Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (quoting *Atmel Corp. v. Info.*

3    *Storage Devices, Inc.*, No. C 95–1987 FMS, 1998 WL 775115, at *2 (N.D. Cal. 1998)), so as to

4    "further the goal of full, timely discovery and provide all parties with adequate notice of and

5    information with which to litigate their cases," *Genentech, Inc. v. Trustees of Univ. of*

6    *Pennsylvania*, Case No. 10–cv–2037, 2012 WL 424985, at *2 (N.D. Cal. Feb. 9, 2012) (citation

7    and internal quotation marks omitted).  "The rules thus seek to balance the right to develop new

8    information in discovery with the need for certainty as to the legal theories."  *O2 Micro*, 467 F.3d

9    at 1366.  A district court has wide discretion in enforcing the Patent Local Rules.  *Id.* at 1365-66;

10   *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).

11   **II.    DEFENDANT'S MOTION**

12          Defendant seeks to strike the following from Plaintiff's expert reports and assertions: (1)

13   infringement theories concerning features that were not previously accused or disclosed in

14   Plaintiff's Patent Local Rule infringement contentions; (2) infringement theories under the

15   doctrine of equivalents; and (3) willful infringement assertions.  Def.'s Mot. 1.  Plaintiff

16   acknowledged in its opposition brief that it "will not assert willful infringement against

17   [Defendant]," thus mooting the third part of Defendant's motion.[1]  Pl.'s Opp. 15, ECF 240.  The

18   Court will therefore only address Defendant's first two requests.

19          **A.    Accusation of Functions Not Disclosed In Infringement Contentions**

20          Patent Local Rule 3-1 provides that a party claiming patent infringement must serve a

21   disclosure of asserted claims and infringement contentions that addresses "[s]eparately for each

22   asserted claim, each accused apparatus, product, device, process, method, act, or other

23   instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware."

24   Patent L.R. 3-1(b).  "The identification shall be as specific as possible."  *Id.*  The patentee must

25   further provide "[a] chart identifying specifically where each limitation of each asserted claim is

26

---

27   [1] To the extent that the parties dispute the relevance of evidence of Defendant's pre-suit
     knowledge of the patents-in-suit, that is an evidentiary issue that the Court reserves for a later date.
28   *See* Pl.'s Opp. 15; Def.'s Reply 7 n.3, ECF 247.

1    found within each Accused Instrumentality." *Id.* at 3-1(c).

2         "[A]ll courts agree that the degree of specificity under Local Rule 3-1 must be sufficient to

3    provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of

4    proving infringement.'" *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022,

5    1025 (N.D. Cal. 2010) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986

6    (Fed. Cir. 2000)); *see also Blue Spike, LLC v. Adobe Sys., Inc.*, No. 14-CV-01647-YGR(JSC),

7    2015 WL 335842, at *4 (N.D. Cal. Jan. 26, 2015). While "[i]nfringement contentions serve as

8    substitutes for interrogatories, [] they also act as forms of pleading that disclose the parties'

9    theories of their case and thereby shape discovery and the issues to be determined at trial." *Apple*

10   *Inc. v. Samsung Electronics Co.*, No. 12-CV-0630-LHK PSG, 2013 WL 3246094, at *3 (N.D. Cal.

11   June 26, 2013). "Parties accordingly need not 'prove up' their theories by providing evidence

12   beyond the material they have at the time they make their contentions." *Id.*; *see also AntiCancer,*

13   *Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1338 (Fed. Cir. 2014) (a patentee's infringement contentions

14   "do not need to include proof or direct evidence of infringement"). The dispositive inquiry in a

15   motion to strike is thus whether the allegedly undisclosed "theory" is in fact a new theory or new

16   element of the accused product alleged to practice a particular claim that was not previously

17   identified in the plaintiff's contentions, or whether the "theory" is instead the identification of

18   additional evidentiary proof showing that the accused element did in fact practice the limitation.

19   *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 4479305, at *3 (N.D. Cal. Sept.

20   26, 2011); *see also Genentech*, 2012 WL 424985, at *2. If the theory is *new*, prejudice is

21   "inherent in the assertion of a new theory after discovery has closed." *Adobe Sys. Inc. v. Wowza*

22   *Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *15 n.7 (N.D. Cal. Feb. 23, 2014).

23        Defendant asserts that Plaintiff is advancing several theories of infringement that were not

24   identified in its Patent Local Rule infringement contentions served January 16, 2014 and were

25   instead disclosed for the first time in Plaintiff's expert reports served a year later. The Court

26   agrees, in part.

27

28

United States District Court
Northern District of California

3

### i. WebPulse Cookie2 ('844 and '731 Patents) and ProxySG URL Hash Index ('731 Patent)

Defendant contends that Plaintiff identified for the first time in its expert reports that Cookie2, a metadata generated by the accused Dynamic Real-Time Rating ("DRTR") feature of WebPulse, satisfies the "security profile" limitation for the '844 and '731 Patents. Def.'s Mot. 5. Plaintiff's infringement contentions do not mention Cookie2. *See generally* Decl. of Paul Andre, ECF 240-1 Exh. 6. Plaintiff acknowledges this but argues that Cookie2 is simply a part of DRTR, which was clearly disclosed as the feature accused of infringing, and that Plaintiff did not have information about this specific part until after Defendant produced confidential technical information relating to the accused product. Pl.'s Opp. 5-6.

Indeed, Plaintiff disclosed DRTR as the infringing functionality in its infringement contentions, citing publicly available documents indicating that DRTR provides "real-time rating" of new content wherein the feature "disassembles a web page and analyzes its components" to extract information such as language, document type, character set, content words, and scripts. *See, e.g.*, Andre Decl. Exh. 6 at 5. It is undisputed that Cookie2 is a metadata generated by DRTR that stores information from DRTR's analysis. Def.'s Reply 2, ECF 247. Defendant furthermore does not contest that Plaintiff would not have had access to more specific information about Cookie2 without discovery but rather appears to suggest that Plaintiff should have moved for leave to amend its contentions once it obtained that discovery. *Id.* at 2. While greater specificity is certainly preferable, the Patent Local Rules do not require perfect clarity, only reasonable notice that is "as specific as possible" given the information of which a plaintiff is aware. Patent L.R. 3-1(b). Plaintiff's contentions reasonably placed Defendant on notice that DRTR generates and stores information that meets the "security profile" limitation, and Plaintiff's expert report subsequently clarified that the information is stored in Cookie2.[2] As such, Plaintiff's expert report

---

[2] Defendant's assertion that the contentions "appeared" to be "accusing DRTR's ratings to satisfy the elements including the 'security profile' limitation" does make this a closer call. *See* Def.'s Reply 2. However, Defendant's interpretation of the theory identified in Plaintiff's contentions does not eliminate the evidence actually cited that gave reasonable notice of the accused feature and the manner in which it allegedly infringes the asserted claim.

4

United States District Court
Northern District of California

1  merely elaborates on the manner in which DRTR allegedly infringes and does not amount to a

2  last-minute disclosure of a new infringement theory.  Defendant's motion to strike Plaintiff's

3  evidence of infringement based upon Cookie2 is accordingly DENIED.

4      Defendant also argues that Plaintiff did not disclose in its infringement contentions the

5  assertion that the ProxySG functionality of indexing a file using the hash of the URL file satisfies

6  the "file cache . . . wherein each of the stored files is indexed by a file identifier" limitation of

7  Claim 1 of the '731 Patent.  Def.'s Mot. 5.  Plaintiff responds that it specifically identified "Object

8  Caching" in its infringement contentions and that it had to learn the manner in which the cache

9  was indexed through confidential information and review of Defendant's source code.  Pl.'s Opp.

10  6-7.  As with Cookie2, Plaintiff's assertion that the hashing of URL files to create an index of the

11  object cache satisfies claim element 1(c) of the '731 Patent is further explication of its theory that

12  the object caching feature infringes the asserted claim and not a new theory in its own right.

13  Defendant therefore had reasonable notice of Plaintiff's infringement theory on this claim element

14  and Defendant's motion to strike is accordingly DENIED.

15      **ii.  ProxySG Policy Cache ('968 Patent)**

16      Defendant contends that Plaintiff's infringement contentions do not articulate the theory—

17  drawn out in Plaintiff's expert reports—that ProxySG's policy cache meets the "policy index"

18  limitations of the '968 Patent.  Def.'s Mot. 5-6.  Plaintiff argues that it identified ProxySG's policy

19  *engine*, which generates a "categorized cache," as infringing the "policy index" element, and thus

20  provided sufficient notice of this theory.  Pl.'s Opp. 7; *see also* Andre Decl. Exh. 7 at 5 ("the Blue

21  Coat Products categorize a URL then pass it to a policy engine which determines if the URL is

22  allowable or not, the result of which is a categorized cache").

23      There is little dispute that the policy cache is *not* the categorized cache identified in

24  Plaintiff's contentions.  Plaintiff offers no evidence to suggest that the policy cache is merely an

25  internal name for the categorized cache, nor is there evidence that the policy cache is otherwise

26  part of or the same thing as the categorized cache.  *See* Pl.'s Opp. 8 (citing Tomic Dep. 151:8-17,

27  122:1-4; Andre Decl. Exh. 18 (Harrison Dep.) 74:15-76:18, 77:8-15, 138:6-139:17; and Andre

28  Decl. Exh. 24 (Ahlander Dep.) 50:6-17, 89:21-91:2, 115:5-25, 211:11-216:9).  Indeed, there are

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1  "multiple" caches in the ProxySG. *See* Tomic Dep. 106:6-10. To this, Plaintiff has two

2  responses. First, Plaintiff asserts that it could not identify the policy cache in ProxySG with

3  greater specificity because that specific term is used by Defendant only internally as part of its

4  "implementation detail" and "never outside of engineering." Pl.'s Opp. 8 (quoting Andre Decl.

5  Exh. 23 (Tomic Dep.) 106:11-15. While that may be the case, if the policy cache is qualitatively

6  different from the categorized cache identified in Plaintiff's contentions (and it appears that the

7  two are different), it was Plaintiff's duty to amend its contentions with the newly identified

8  information. Second, Plaintiff also contended at oral argument that the disclosure of the policy

9  *engine* afforded sufficient notice to Defendant, as both the categorized cache and the policy cache

10  are components of the policy engine. This argument has little force because Plaintiff's

11  infringement contentions more than "appeared" to identify a different theory; they affirmatively

12  identify a different component—the categorized (or categorization) cache—as an "[e]xample of

13  saving entries in the policy index (e.g. storing the category in cache)." Andre Decl. Exh. 7 at 7;

14  *see also id.* at 5. By doing so, Defendant had no notice that Plaintiff would rely on a different

15  cache in ProxySG to meet the "policy index" limitation.

16       As evinced in Plaintiff's expert report, Plaintiff now appears to be contending that the

17  categorization cache stores profiles of cached content that are *used* by ProxySG to determine

18  whether content is allowable, and that the determination of allowability is stored *elsewhere* (in the

19  policy cache):

> The profile from the content is received from the WebPulse Service
> and stored by the ProxySG Products in its memory in the dynamic
> categorization cache. The categorization, including a suspicious
> categorization, from the WebPulse Service is used by the ProxySG
> products to determine whether the content is allowable for a
> particular request, based on conditions for the rules. The ProxySG
> Products *saves the results of resolving the rule in a policy index*
> indicating if the content is allowable per the policy." (emphasis
> added)).

25  *See* Andre Decl. Exh. 13 (Expert Report of Dr. Michael Mitzenmacher) ¶ 415; *see also id.* ¶¶ 326,

26  351, 359 (identifying evidence showing that ProxySG saves decisions relating content to

27  allowability in the "policy index"). This is a new theory not previously disclosed in Plaintiff's

28  infringement contentions because Defendant had no way of knowing that Plaintiff's focus would

1  shift to the policy cache and away from the categorization cache identified in the contentions. As

2  this new theory was identified for the first time after the close of fact discovery, prejudice to

3  Defendant is inherent. The Court accordingly GRANTS Defendant's motion to strike Plaintiff's

4  theory that ProxySG's policy cache meets the "policy index" limitations of the '968 Patent.

5        **iii. Malware Analysis Appliance and Content Analysis System ('822 and '633**

6           **Patents)**

7        Defendant identifies four infringement theories allegedly advanced for the first time in

8  Plaintiff's expert reports pertaining to the '822 and '633 Patents. Defendant contends that

9  Plaintiff's infringement contentions never disclosed (1) ProxySG's ability to inject code as an

10  infringing feature; (2) the theory that the Content Analysis System ("CAS") and the Malware

11  Analysis Appliance ("MAA") communicate mobile protection code ("MPC") to infringe the

12  asserted claims of the '633 Patent; (3) the theory that the MAA constitutes an "information-

13  recommunicator" within the meaning of claim elements 14(b) and 14(c) of the '633 Patent; and (4)

14  that ProxySG sends MPC to the MAA for claim element 14(d) of the '633 Patent. Def.'s Mot. 6-

15  7. The fourth of these challenges is moot, as Plaintiff has clarified that it "does not assert that the

16  ProxySG directly sends mobile protection code to the MAA." Pl.'s Opp. 11; Def.'s Reply 4

17  (acknowledging mootness).

18        As to the first, the Court determined in its summary judgment order that even if the theory

19  was properly presented, ProxySG's Pop-Up Blocker feature does not infringe the asserted claims

20  of the '822 and '633 Patent as a matter of law. Summary Judgment Order at 18-21. The parties

21  agree that this moots *part* of Defendant's motion with respect to the code injection theory.

22  Plaintiff asserted at oral argument that its contentions disclose evidence of other script code

23  injection that is not mooted by the Court's ruling on Pop-Up Blocker. Be that as it may, the Court

24  finds that no theory of script code injection was properly disclosed in Plaintiff's infringement

25  contentions. Plaintiff, in arguing the contrary in its brief and at oral argument, relies unduly and

26  improperly on *proposed* amended contentions to make its point. *See* Pl.'s Opp. 8-9 (pointing to

27  contentions attached to its "Motion for Leave"). Magistrate Judge Grewal denied Plaintiff leave to

28  serve those contentions, finding that Plaintiff had access to the publicly available information that

United States District Court
Northern District of California

1   Plaintiff sought to add and failed to diligently seek amendment.  Order Granting-in-Part Motion

2   for Leave to Amend Infringement Contentions at 4, ECF 116; *see* Pl.'s Reply 3, ECF 246.  The

3   only disclosure that Plaintiff can point to in the operative contentions is a discussion of

4   "Removing Active Content from HTML Pages," wherein selective "de-fanging" of malicious code

5   is identified as a way in which active content can be removed.  *See, e.g.*, Andre Decl. Exh. 4 at 15,

6   41; *see* Pl.'s Opp. 9.  These disclosures themselves do *not* "discuss[] 'script injection' as a way of

7   'de-fanging' malicious code."  Pl.'s Opp. 9.  Instead, the disclosures quote from a document that

8   happens to discuss script injection *elsewhere*.  *See* Andre Decl. Exh. 25.  As such, the passing

9   reference to "de-fanging" in the context of active content transformation and "stripping and

10  replacing" active content is insufficient to place Defendant on reasonable notice that Plaintiff was

11  actually accusing script injection and not some other manner of content removal.  *See generally,*

12  *e.g.*, Andre Decl. Exh. 4 at 11-16.  Defendant's motion to strike is accordingly GRANTED with

13  respect to Plaintiff's infringement theory based upon ProxySG's ability to inject code.

14          With respect to the second and third of Defendant's challenges, the Court agrees with

15  Plaintiff that the CAS was clearly disclosed as the conduit through which information is

16  communicated to the MAA.  Pl.'s Opp. 11-12; *see, e.g.*, Andre Decl. Exh. 5 at 48, 55, 94, 96.  This

17  is sufficient notice that the CAS is accused of communicating MPC within the meaning of Claims

18  8 and 14 of the '633 Patent.  However, these same disclosures also suggest that the MAA is

19  merely the recipient of MPC and is the mobile code executor (as opposed to the information re-

20  communicator) described in claim elements 14(b) and 14(d) of the '633 Patent.  Andre Decl. Exh.

21  5 at 94 ("Information is sent from the ProxySG, *through* the Content [A]nalysis [S]ystem and *to*

22  the Malware Analysis Appliance *which is a mobile code executor*." (emphasis added)).  The

23  contentions thus ascribe different functions and different roles to the CAS and MAA respectively

24  within the accused system and affirmatively represents that these components satisfy *different*

25  elements of the asserted claims.  Absent further disclosure to dispel that notion, the theory that the

26  MAA communicates MPC and is an information re-communicator is incongruous with the

27  disclosures in Plaintiff's infringement contentions.  Defendant's motion is therefore GRANTED

28  as to the theories that (1) the MAA communicates MPC and (2) that the MAA is an "information

1    re-communicator," but DENIED as to the assertion that the CAS communicates MPC.

2    **B.    Doctrine of Equivalents Assertions**

3    Patent Local Rule 3-1(e) provides that a plaintiff's infringement contentions must indicate

4    "[w]hether each limitation of each asserted claim is alleged to be literally present or present under

5    the doctrine of equivalents in the Accused Instrumentality."  Courts in this district roundly agree

6    that a plaintiff asserting the doctrine of equivalents must provide a "limitation-by-limitation

7    analysis, not a boilerplate reservation."  *Rambus Inc. v. Hynix Semiconductor Inc.*, No. C-05-

8    00334 RMW, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008); *see also Blue Spike*, 2015 WL

9    335842, at *6; *Creagri, Inc. v. Pinnaclife Inc., LLC*, No. 11-CV-06635-LHK-PSG, 2012 WL

10   5389775, at *6 (N.D. Cal. Nov. 2, 2012).  "The doctrine of equivalents exists to prevent 'a fraud

11   on the patent.'"  *Rambus*, 2008 WL 5411564, at *3 (quoting *Graver Tank & Mfg. Co. v. Linde Air

12   Products Co.*, 339 U.S. 605, 608 (1950)).  "It is not designed to give a patentee a second shot at

13   proving infringement '[t]o the extent that any limitation is found to be not literally present.'"  *Id.*

14   Defendant here contends that the doctrine of equivalents disclosures in Plaintiff's

15   infringement contentions are precisely the type of boilerplate language that the courts in this

16   district routinely reject and urges that Court follow suit by striking the doctrine of equivalents

17   assertions from Plaintiff's expert reports and, effectively, this case.  Def.'s Mot. 8-10.  Plaintiff

18   argues that Defendant's motion to strike these theories is untimely because Defendant has been

19   aware of these theories since the contentions were served in January 2014 and never raised its

20   concerns with Plaintiff until now.  Pl.'s Opp. 13.  The Court agrees with Plaintiff.

21   On this issue, both sides have acted unreasonably.  Defendant is correct that Plaintiff's

22   doctrine of equivalents disclosures are boilerplate and generic.  These disclosures did not satisfy

23   Plaintiff's obligation to provide a limitation-by-limitation analysis of its theory of infringement.

24   Had Defendant earlier moved to strike those embryonic disclosures, they would likely have been

25   stricken as violative of the Patent Local Rules.  Of course, then Plaintiff would also have had the

26   opportunity to seek leave to re-assert the theory with proper factually-based contentions.  *See, e.g.*,

27   *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 WL 1517920, at *12 (N.D. Cal. Apr.

28   2, 2015).  As such, the Court cannot overlook the timing of Defendant's motion, which comes

United States District Court
Northern District of California

9

United States District Court
Northern District of California

after the close of discovery and summary judgment.  Defendant's only explanation for its belated

motion is that "because Finjan did not supplement its Infringement Contentions even after it

received Blue Coat's confidential information, it was understood that Finjan was not asserting

infringement under the doctrine of equivalents."  Def.'s Reply 7 (citing *Proofpoint*, 2015 WL

1517920, at *10, for the proposition that "a generic reservation of its right to argue the doctrine of

equivalents is not sufficient").  That such language may not be sufficient to survive a motion to

strike does not mean that Defendant could simply assume that Plaintiff had abandoned the theory.

While the Court declines to go so far as to say that Defendant should have filed a motion to

compel amendment to Plaintiff's inadequate disclosures, *some notice* of the deficiencies was still

required.  Had Defendant communicated to Plaintiff its belief that Plaintiff's doctrine of

equivalents disclosures were so deficient as to be no disclosure at all, Plaintiff would be on notice

of the deficiency and would fail to supplement at its own risk.  Instead, Defendant played the

(apocryphal) ostrich, burying its head in the sand until it was safe to raise the issue.[3]

In the present posture, Defendant's motion to strike Plaintiff's doctrine of equivalents

theories differs in kind from its request to strike infringement theories not previously disclosed

because here, Defendant's argument rests not on the *absence* of disclosure, but on the *sufficiency*

of the prior disclosures.  While prejudice may be "inherent in the assertion of a *new* theory after

discovery has closed," *Adobe Sys.*, 2014 WL 709865, at *15 n.7 (emphasis added), the same does

not pertain to insufficiently supported but nevertheless previously disclosed theories.  Defendant

has identified no particular prejudice from Plaintiff more fully explaining its doctrine of

equivalents theories in its expert reports.  Indeed, Defendant has had full opportunity to depose

Plaintiff's experts and submit its own rebuttal reports on these theories.  Absent specific evidence

of prejudice caused by the deficient disclosures in Plaintiff's infringement contentions, the Court

declines to strike Plaintiff's doctrine of equivalents theories this late in the game.  Defendant's

motion to strike is therefore DENIED in this respect.

---

[3] As the Seventh Circuit recently noted, "ostriches do *not* bury their heads in the sand when frightened; if they did, they would asphyxiate themselves."  *United States v. Macias*, ---F.3d---, No. 13-2166, 2015 WL 3377773, at *2 (7th Cir. May 26, 2015) (emphasis in original).

United States District Court
Northern District of California

### III.    PLAINTIFF'S MOTION

Plaintiff seeks to strike the following invalidity theories from the case: (1) reliance on the IBM WebSphere product as prior art to the '731 Patent; (2) reliance on four previously un-elected combinations of prior art references to argue invalidity of the '731 Patent; (3) reliance on Mueller, a reference not previously elected, to argue invalidity of the '780 Patent; and (4) invalidity theories that exceed the number that the parties previously agreed to for their final elections.  Pl.'s Mot. 1-3. The last two challenges are moot.  With respect to the '780 Patent, Defendant clarified that it is only relying on Mueller in combination with Waldo, a combination previously disclosed and elected.  Def.'s Opp. 7, ECF 235.  Defendant moreover indicated that it does not plan to use the invalidity combinations of "'Chu and WebSphere' for the '731 patent and 'McClain and Uematsu'" for the '968 patent," *id.* at 9, thus bringing the number of invalidity theories down into strict compliance with the parties' prior agreement.  *See* Pl.'s Reply 1 (acknowledging mootness).

Plaintiff's first challenge to reliance on WebSphere also became moot during oral argument on Plaintiff's motion, where Defendant clarified that its election of "WebSphere" and its theory of invalidity will be based upon a 2002 manual for the product by Byron Braswell, et al.[4] *See* Def.'s Opp. 5.  This reference, which had previously been identified and charted against the '731 Patent as "Braswell," provided the basis for the opinion of Defendant's invalidity expert, Dr. George Necula.  *Id.* at 5-6.  Plaintiff argues, however, that Dr. Necula's report also appears to rely on a different reference— Ferreira[5]—describing a different version of the WebSphere product as prior art to two limitations of Claim 1 of the '731 Patent.  *See* Decl. of James Hannah, ECF 281-1 Exh. 1 (Expert Report of Dr. George Necula, hereinafter "Necula Report") ¶¶ 678-79, 692-93.  Defendant asserts that Dr. Necula only relied on Ferreira as "further background regarding WebSphere."  Def.'s Opp. 6 n.2; Necula Report ¶ 657.  The question is a close one, as some aspects of Dr. Necula's report do suggest reliance on the WebSphere product and not on the

---

[4] "IBM WebSphere Edge Server: New Features and Functions in Version 2," IBM Redbooks, Byron Braswell, Ming can Jing, Tomoyuki Ohta, Henry Orton, April 2002.

[5] "WebSphere Edge Server: Working with Web Traffic Express and Network Dispatcher," IBM Redbooks, Cristiane Ferreira, Ana Mostardinha, Byron Braswell, July 2001.

11

Braswell reference. The Court, however, has no occasion to doubt Defendant's assertion that Braswell forms the basis for its invalidity theories referencing "WebSphere," particularly as other disclosures in Dr. Necula's report very clearly indicate that Braswell is the basis of his opinion. *See, e.g.*, *id.* ¶ 685. To be sure, it would have been more clear to all had Defendant elected "Braswell" instead of "WebSphere." However, now that Defendant has stated its reliance on Braswell, the Court perceives no reason under the Patent Local Rules to strike theories based on a reference that was timely disclosed and charted against the '731 Patent.[6]

Turning to the second challenge, Plaintiff seeks to preclude Defendant from relying on four prior art combinations identified in its final election of theories that were allegedly not identified in its preliminary election.[7] Pl.'s Mot. 10-12. These are the combinations of (1) Judge[8] and WebSphere[9]; (2) Judge and Chu[10]; (3) Chu and WebSphere; and (4) WebSphere and Hailpern.[11] These combinations were not disclosed in Defendant's preliminary election in their current state, but instead listed with an additional *third* reference in combination with each. In the case of the first three combinations, Defendant had also identified the Ji[12] reference. In the case of the fourth combination of WebSphere and Hailpern, Defendant had identified the Chen[13] reference. *See* Hannah Decl. Exh. 4; Def.'s Opp. 4. After service of the preliminary elections in November 2014, Plaintiff challenged Defendant's reliance on Ji and Chen, arguing that those references had not

---

[6] To the extent Plaintiff continues to assert that Dr. Necula improperly relies on Ferreira (and not Braswell) as prior art for certain claim limitations, the Court reserves that question for an appropriate *Daubert* or pre-trial motion.

[7] The parties stipulated to a schedule, which became an order on September 12, 2014, wherein each side would make a preliminary election of asserted claims and invalidity theories after claim construction, followed by a final election in March 2015 of a smaller subset of the asserted claims and invalidity theories previously identified. *See* Stipulated Case Schedule, ECF 98.

[8] U.S. Patent Publication No. 2003/0172291.

[9] Or, more correctly, Braswell.

[10] Yang-hua Chu, "Trust Management for the World Wide Web," MIT Thesis, June 13, 1997.

[11] U.S. Patent No. 6,275,937.

[12] U.S. Patent No. 5,983,348.

[13] U.S. Patent No. 5,951,698.

12

United States District Court
Northern District of California

United States District Court
Northern District of California

1   previously been charted and that Defendant's use of those references therefore violated the parties'

2   agreement.  Defendant maintained the propriety of its preliminary elections but served

3   supplemental elections with the previously charted Demopoulos[14] and Richards[15] references in

4   lieu of Ji and Chen in an effort to resolve the dispute.  Plaintiff challenged the propriety of serving

5   supplemental elections and contended that Defendant would have to file a motion for leave to

6   supplement the elections.  Defendant did file that motion and on January 13, 2015 Magistrate

7   Judge Grewal denied leave to supplement.  *See* ECF 160.  Just a day before that ruling, the parties

8   were required to serve opening expert reports and Defendant served Dr. Necula's invalidity report,

9   which addresses three-reference obviousness combinations for the '731 Patent that include

10   Demopoulos and Richards.  Following Judge Grewal's ruling, "Blue Coat was left with the

11   combinations that do not include Demopoulos and Richards."  Def.'s Opp. 4.  Defendant's final

12   election thus included the common denominator of its prior elections following Plaintiff's

13   challenges and Judge Grewal's ruling: the two-reference combinations of Judge and WebSphere,

14   Judge and Chu, Chu and WebSphere, and WebSphere and Hailpern, *without* any third reference.

15   Plaintiff asserts that these combinations are different from the three-reference combinations

16   previously elected and must therefore be excluded.

17         The Court agrees with Plaintiff's basic proposition that a prior art combination involving

18   three references may present a different theory than a combination involving two references.  To

19   the extent that Dr. Necula's report relied upon Demopoulos or Richards to supply limitations not

20   found in Judge, WebSphere, Chu, or Hailpern, Defendant's election not to rely on Demopoulos or

21   Richards could very well prejudice Plaintiff.  Dr. Necula's report, however, clearly indicates that

22   Demopoulos and Richards are not critical in the prior art combinations he evaluated.  Rather, they

23   at most augment the disclosures in Judge, WebSphere, Chu, and Hailpern to the extent those

24   references are found not to disclose the limitations of the '731 Patent.  *See* Necula Report ¶¶ 695-

25   838, 887-928.  In this context, Defendant's election of two-reference combinations as opposed to

26

27   ―――――――――――――
    [14] U.S. Patent Publication No. 2005/0193429.

28   [15] U.S. Patent Publication No. 2002/0099829.

three-reference combinations makes little difference.  Furthermore, given the litigation history that led to this point, the Court is not convinced that the severe sanction of striking all of these theories is the appropriate remedy.  At most, an appropriate remedy would be to allow Plaintiff additional time to depose Dr. Necula concerning the challenged two-reference combinations.  Plaintiff has not requested that opportunity here and has not demonstrated any more particular prejudice than the general assertion that Defendant's final election was "highly prejudicial."  Pl.'s Mot. 10.  As such, the Court declines to strike Defendant's obviousness combinations for the '731 Patent.  As to Defendant's reservation of the right to use Demopoulos and Richards "to the extent that it is allowed to do so," it should be sufficiently clear that Defendant will not be allowed to do so.  *See* Hannah Decl. Exh. 3; Pl.'s Mot. 11; Pl.'s Reply 6.

Plaintiff's Motion to Strike is accordingly DENIED.  Because the motion is denied, the Court does not consider Plaintiff's additional request for "appropriate" sanctions within the Court's discretion.  Pl.'s Mot. 13.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion to Strike is DENIED.  Defendant's Motion to Strike is GRANTED IN PART and DENIED IN PART:

1.    Defendant's motion is GRANTED with respect to the theory that ProxySG's policy cache satisfies the "policy index" limitation of the '968 Patent and that theory is stricken from Plaintiff's expert reports;

2.    Defendant's motion is GRANTED as to the assertions that the MAA communicates MPC and is an information re-communicator for purposes of the '633 Patent, and those theories are stricken as well;

3.    The remainder of Defendant's motion is DENIED.

**IT IS SO ORDERED.**

Dated: June 11, 2015

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

14

1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **NORTHERN DISTRICT OF CALIFORNIA**

6 **SAN JOSE DIVISION**

7

| | |
|---|---|
| 8 FINJAN, INC., | Case No. 13-cv-03999-BLF |
| 9 Plaintiff, | |
| 10 v. | **ORDER ON PARTIES' MOTIONS *IN LIMINE* AND PRETRIAL ORDERS** |
| 11 BLUE COAT SYSTEMS, INC., | [Re: ECF 282, 284, 286, 288, 290, 300-304] |
| 12 Defendant. | |

13

14        Plaintiff Finjan, Inc. asserts that defendant Blue Coat Systems, Inc. infringes six of its web

15 security patents: U.S. Patent Nos. 6,154,844 ('844 Patent); 6,804,780 ('780 Patent); 6,965,968

16 ('968 Patent); 7,058,822 ('822 Patent); 7,418,731 ('731 Patent); and 7,647,633 ('633 Patent). This

17 Order addresses the parties' motions *in limine*. For the reasons explained below and on the record

18 at the July 2, 2015 pretrial conference, the motions are decided as follows:

19        Plaintiff's Motion *in Limine* No. 1: GRANTED IN PART, DENIED IN PART, and

20        DEFERRED IN PART.

21        Plaintiff's Motion *in Limine* No. 2: GRANTED IN PART and DENIED IN PART.

22        Plaintiff's Motion *in Limine* No. 3: DENIED.

23        Plaintiff's Motion *in Limine* No. 4: GRANTED IN PART, DENIED IN PART, and

24        DEFERRED IN PART.

25        Plaintiff's Motion *in Limine* No. 5: GRANTED.

26        Defendant's Motion *in Limine* No. 1: GRANTED IN PART and DENIED IN PART.

27        Defendant's Motion *in Limine* No. 2: DENIED.

28        Defendant's Motion *in Limine* No. 3: DENIED.

United States District Court
Northern District of California

1    Defendant's Motion *in Limine* No. 4: GRANTED IN PART and DENIED IN PART.

2    Defendant's Motion *in Limine* No. 5: GRANTED IN PART and DENIED IN PART.

3    **I.    PLAINTIFF'S MOTIONS *IN LIMINE***

4    Plaintiff brings five motions *in limine*, which the Court addresses in turn.

5    **1.    Plaintiff's Motion *in Limine* No. 1 to Exclude Evidence and Argument Concerning
6    Other Proceedings and Patents.  GRANTED IN PART, DENIED IN PART, and
     DEFERRED IN PART.**

7    Plaintiff seeks to exclude argument and evidence regarding (1) any co-pending litigation

8    involving Plaintiff; (2) any pending reexamination or *inter partes* review proceedings in the

9    United States Patent and Trademark Office ("PTO") involving Plaintiff's patents; and (3) any

10   patents other than those in suit or those that Defendant has properly asserted as prior art.  Pl.'s

11   MIL #1, ECF 300.  It is Plaintiff's contention that each of these categories of evidence is irrelevant

12   to the issues in this case.

13   Defendant argues that Plaintiff's litigation practices—in particular, its past and current

14   practices in enforcing patent rights and licensing those rights—are relevant to the determination of

15   a reasonable royalty under the *Georgia-Pacific* factors and that any prejudice can be mitigated by

16   a limiting instruction.  Def.'s Opp. #1 at 1-2, ECF 325; *see also Georgia-Pac. Corp. v. U.S.*

17   *Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The Court agrees with Defendant.

18   Accordingly, Plaintiff's Motion *in Limine* No. 1 to exclude argument and evidence concerning

19   prior and ongoing litigation involving Plaintiff's patents is DENIED.  Defendant shall prepare an

20   appropriate limiting instruction for the Court's consideration.

21   As to evidence of ongoing PTO proceedings, Defendant admits that such evidence is only

22   relevant to rebut any reliance by Plaintiff on preliminary statements by a PTO examiner that the

23   '822 and '633 Patents are not obvious in light of prior art references asserted in this case.  Def.'s

24   Opp. #1 at 2-4.  Because Plaintiff seeks to exclude "*any* argument and evidence concerning [PTO

25   proceedings]," it would appear that Plaintiff does not intend to rely on the PTO examiner

26   statements that Defendant wishes to rebut, but Plaintiff has not made this clear.  *See* Pl.'s MIL #1

27   at 3 (emphasis added).  As such, the Court DEFERS ruling on this portion of Plaintiff's first

28   motion *in limine* and will allow Defendant to seek leave to introduce rebuttal evidence from the

United States District Court
Northern District of California

2

1    ongoing PTO proceedings to the extent Plaintiff opens the door in its case in chief.

2          Finally, Defendant argues that evidence of its own patent portfolio is relevant to the

3    determination of damages and to rebut any attempts by Plaintiff to paint Defendant as a "bad

4    actor." Def.'s Opp. #1 at 4-5. Without the benefit of context, the relevance that Defendant argues

5    is not immediately apparent. However, it is plain at this stage that Plaintiff's motion sweeps too

6    broadly. Thus, to the extent Plaintiff seeks to preclude Defendant from introducing generalized

7    background information about its business and patented technology, that request is DENIED. To

8    the extent Plaintiff seeks to preclude Defendant from entering into evidence specific patents from

9    Defendant's portfolio, the Court DEFERS ruling on such request until such time as Defendant

10    actually seeks to introduce such evidence to the jury.

11          **2.   Plaintiff's Motion *in Limine* No. 2 to Preclude Use of Derogatory or Misleading**
          **Characterizations of Plaintiff's Business.  GRANTED IN PART and DENIED IN**
12          **PART.**

13          Plaintiff moves to preclude Defendant from using any derogatory or misleading

14    characterizations about Plaintiff's business. Pl.'s MIL #2, ECF 301. Defendant agrees that it will

15    not refer to Plaintiff as a "patent troll." Def.'s Opp. #2 at 1, ECF 326. Defendant intends,

16    however, to present factual evidence concerning Plaintiff's business, which is relevant to a

17    damages analysis under the *Georgia-Pacific* factors. *Id.* 2-5; *Digital Reg of Texas, LLC v. Adobe*

18    *Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4090550, at *12 (N.D. Cal. Aug. 19, 2014). Indeed, both

19    parties have a right to introduce their respective companies to the jury and to provide factual

20    background information concerning the companies. As such, Plaintiff's Motion *in Limine* No. 2 is

21    GRANTED as to uses of the terms "patent troll" and "patent assertion entity,"[1] but DENIED as to

22    neutral, factual statements concerning Plaintiff's business.

23

24

25    _____

[1] Although the Court is aware that other courts have permitted use of the term "patent assertion
26    entity," the Court finds that this term carries negative connotations similar to the term "patent
    troll." *Cf. Digital Reg*, 2014 WL 4090550, at *12; *HTC Corp. v. Tech. Properties Ltd.*, No. 5:08-
27    CV-00882-PSG, 2013 WL 4782598, at *4 (N.D. Cal. Sept. 6, 2013). Furthermore, because there
    are factual disputes concerning whether Plaintiff is solely a patent *assertion* entity, such term is
28    more likely to mislead a jury than other more neutral and factual terms such as "non-practicing
    entity."

3

### 3. Plaintiff's Motion *in Limine* No. 3 to Exclude Evidence and Argument Concerning Non-Infringing Alternatives and Design Arounds.  DENIED.

Plaintiff seeks to exclude evidence and argument concerning non-infringing alternatives to two accused features: Cookie2 in WebPulse, accused of infringing the '844 and '731 Patents; and Pop-Up Blocker in ProxySG, accused of infringing the '822 and '633 Patents.  Pl.'s MIL #3, ECF 302.  The Pop-Up Blocker aspect of Plaintiff's motion is moot in light of the Court's summary judgment ruling.  *See* Summary J. Order at 18-22, ECF 256; Def.'s Opp. #3 at 1 n.1, ECF 327.

As to Cookie2, Plaintiff asserts that Defendant disclosed a non-infringing alternative for this accused feature for the first time in updated disclosures served February 13, 2015, two months after the close of fact discovery.  As such, Plaintiff argues that it would be prejudiced by Defendant's reliance on such alternative in its damages case.  Pl.'s MIL #3 at 2, 4-5.  Defendant argues that it properly and timely disclosed Mr. Roger Harrison under Rule 26(a)(2)(C) as an expert who could offer opinions regarding non-infringing alternatives to and design arounds for Cookie2 and that such disclosure could not have been made earlier because Plaintiff's specific theory of infringement was not fully disclosed until its opening expert report.  Def.'s Opp. #3 at 1, ECF 327.  Defendant further contends that Plaintiff cannot complain of prejudice when it declined to depose Mr. Harrison regarding his non-infringing alternative opinions.  *Id.* at 2-3.

Although the Court previously determined that Plaintiff had adequately disclosed its infringement theory under the Patent Local Rules, it does not necessarily follow that the disclosure was detailed enough for Defendant to identify an applicable non-infringing alternative or design around.  *See* Order on Mot. to Strike at 4-5, ECF 271.  Furthermore, the Court agrees that Plaintiff had ample opportunity to depose Mr. Harrison but chose not to do so.  In any case, any prejudice from Defendant's disclosure is better addressed through discovery and the Court has ordered that Mr. Harrison be made available for a deposition not exceeding 3 hours on the subject of his opinions regarding available non-infringing alternatives or design arounds for the accused Cookie2 feature.  Plaintiff's Motion *in Limine* No. 3 to exclude evidence and argument concerning non-infringing alternatives and design arounds for the accused features is therefore DENIED.

4

**4. Plaintiff's Motion *in Limine* No. 4 to Exclude Evidence and Argument Concerning Certain Invalidity and Non-Infringement Theories. GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART.**

Plaintiff's fourth motion *in limine* seeks to exclude evidence and argument regarding a variety of issues. First, Plaintiff moves to preclude Defendant's invalidity expert, Dr. George Necula, from offering any invalidity opinions based upon IBM's WebSphere product or on the Ferreira reference that describes that product. Pl.'s MIL #4 at 1-2, ECF 303. This request is largely moot in light of the Court's ruling on Plaintiff's motion to strike, Order on Mot. to Strike at 11-12, and Defendant acknowledged at the pretrial conference that Dr. Necula will rely only on descriptions of the WebSphere product found in the Braswell reference for his invalidity opinions, *see* Def.'s Opp. #4 at 1, ECF 328. Thus, Plaintiff's Motion *in Limine* No. 4 to preclude reliance on WebSphere and the Ferreira reference is GRANTED. Dr. Necula may testify about Braswell and its descriptions of the WebSphere product, but may not testify about WebSphere alone.

Second, Plaintiff seeks to exclude evidence and argument on Japanese Patent Publication No. 2002-358229 by Tanaka Shunsuke and Matsuda Hideyuki (the "Shunsuke" reference). Plaintiff contends that Defendant produced a different translation of the Shunsuke reference than was relied upon by Dr. Necula in his report and that the correct translation—including translations for diagrams excerpted in Dr. Necula's report not found in the originally produced translation— was not produced until well after the close of fact discovery. Pl.'s MIL #4 at 2-4. Although Defendant provides a sensible explanation for this mix-up, *see* Def.'s Opp. #4 at 1-2, the unfortunate fact is that the belated production of the correct translation of the Shunsuke reference violated Patent Local Rule 3-4(b)'s requirement of an English translation "*of the portion(s) relied upon.*" As such, Plaintiff's motion to exclude reliance on the Shunsuke reference is GRANTED.

Plaintiff next seeks to exclude from the jury's consideration evidence and argument concerning prosecution history estoppel and ensnarement. Pl.'s MIL#4 at 4. These issues are questions of law reserved for the Court and Defendant agrees that they should not be presented to a jury. Def.'s Opp. #4 at 2. Plaintiff's motion is thus GRANTED, subject to any renewed objection by Plaintiff that the issues were not properly preserved for the Court's consideration.

Finally, Plaintiff seeks to preclude Defendant's experts from opining on any theories of

5

non-infringement or invalidity that are not contained within their expert reports. Pl.'s MIL #4 at

4-5. As a general matter, this request is moot because the parties have stipulated that neither side

will present theories outside of their respective expert reports. Def.'s Opp. #4 at 3; Proposed

Pretrial Order at 17, ECF 293. As to specifics, Plaintiff's motion to preclude reliance on the

pinpoint citations to the McClain reference in Dr. Necula's report is DENIED because the

McClain reference as a whole and the invalidity *theory* based on that reference were properly and

timely disclosed. With regard to other potentially "new" theories, Plaintiff's motion is largely

anticipatory, as it cannot presently point to any opinions offered by Defendant's experts that are

not contained within the expert reports. Thus, Plaintiff's fourth motion *in limine* to exclude new

theories of non-infringement and invalidity is GRANTED generally, but the Court DEFERS ruling

on specific other theories subject to renewed objections at trial.

### 5. Plaintiff's Motion *in Limine* No. 5 to Exclude Mention of Total Payments to Plaintiff's Consultants. GRANTED.

Plaintiff seeks to exclude argument or evidence concerning the total amount of money that

it has paid to two consultants who may testify at trial. Pl.'s MIL #5, ECF 304. Plaintiff argues

that the information has little probative value and violates the consultants' rights to privacy.

Defendant counters that the consultants' compensation is probative of their credibility and, as

such, outweighs their interest in keeping the information private. Def.'s Opp. #5, ECF 329.

The question is a close one, as compensation is unquestionably relevant to a witness's bias

and is usually one of the first questions in cross-examining a retained expert. Here, however, the

consultants' relationship with Plaintiff appears to be continuous, ongoing, and not limited to

litigation purposes. As such, the consultants are more akin to employees than retained experts.

Absent contextual information concerning the financial interests of other similarly-situated fact

witnesses employed by or consulting for either party, the disclosure of total money payments to

Plaintiff's two consultants would be more unfairly prejudicial than probative. Fed. R. Evid. 403.

Thus, due to the particular nature of the consulting relationship between Plaintiff and its two

consultants, Plaintiff's Motion *in Limine* No. 5 to exclude evidence of total money payments to

those consultants is GRANTED.

6

United States District Court
Northern District of California

## II.    DEFENDANT'S MOTIONS *IN LIMINE*

Defendant brings five motions *in limine*, which the Court addresses in turn.

### 1.    Defendant's Motion *in Limine* No. 1 to Preclude Plaintiff from Using Evidence of Revenues Unrelated to Accused Features and Evidence of Settlement Agreements. GRANTED IN PART and DENIED IN PART.

Defendant in its motion *in limine* #1 seeks to exclude several categories of financial information.  Def.'s MIL #1, ECF 282.

Defendant moves to exclude evidence of its and third parties' financial information, including financial size, market capitalization, acquisition costs, and overall revenues of the companies and total revenues for the accused products. *Id.* at 1-3.  Plaintiff contends that this information is relevant to its expert's analysis of the *Georgia-Pacific* factors.  Pl.'s Opp. #1, ECF 335.  The Court finds that Defendant's and third parties' financial size, market capitalization, and overall revenue is of little probative value and would unfairly prejudice Defendant by skewing "the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320-21 (Fed. Cir. 2011).  As to acquisition costs for technology containing the accused features and total revenues for the accused products, however, that information is relevant and probative if properly apportioned.  *See Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-01846-LHK, 2014 WL 549324, at *7 (N.D. Cal. Feb. 7, 2014).  Although it does not appear that Plaintiff's expert, Dr. Anne Layne-Farrar, actually relies on accused product revenues for any part of her analysis, the Court will permit Plaintiff to use such revenues and acquisition valuations as a *starting point* for a properly apportioned royalty base.  To the extent Plaintiff fails to adequately develop such testimony concerning apportionment, Defendant may move to strike the evidence from the record.  Defendant's Motion *in Limine* No. 1 is therefore GRANTED as to exclusion of Defendant's and third party companies' financial size, market capitalization, and overall revenue, and DENIED as to revenue of the accused products and acquisition prices for technology containing the accused features.

Defendant also seeks to exclude from the jury's consideration evidence relating to Plaintiff's three settlement agreements with other companies accused of infringing Plaintiff's patents.  Def.'s MIL #1 at 3-5.  Defendant asserts that these settlement agreements were not

7

1    entered willingly but rather under the coercive pressure of litigation and, as such, are not

2    comparable to the hypothetical negotiation analysis and do not accurately reflect the claimed

3    inventions' footprint in the marketplace. Defendant moreover notes that Plaintiff has sufficiently

4    comparable *license* agreements in its arsenal that it need not rely on the challenged settlement

5    agreements. *Id.* at 4-5. Plaintiff asserts that the three settlement agreements are relevant to several

6    of the *Georgia-Pacific* factors, including its own patent enforcement practices, and that Dr. Layne-

7    Farrar appropriately considered and accounted for the similarities and differences among the

8    license and settlement agreements in arriving at her damages opinion. Pl.'s Opp. #1 at 4-5.

9        Two of the challenged settlement agreements resolved litigation concerning one or more of

10   the patents asserted in this case and are therefore not wholly irrelevant. Def.'s MIL #1 3-4. The

11   third agreement with Webroot concerned similar technology invented by the same inventor of the

12   asserted patents in this case. *See* Decl. of Olivia M. Kim ECF 282-2, Exh. 3. Plaintiff moreover

13   represents that Dr. Layne-Farrar considered all similarities and differences among the various

14   agreements in arriving at her damages opinion. Pl.'s Opp. #1 at 5. So long as the jury is provided

15   evidence of these similarities and differences so that they may consider the relevance of the

16   challenged settlement agreements for themselves, the agreements may properly be admitted into

17   evidence. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014). Defendant's

18   Motion *in Limine* No. 1 to exclude Plaintiff's three prior settlement agreements is therefore

19   DENIED and Plaintiff may introduce such agreements upon a proper foundation establishing the

20   similarities and differences that the jury may consider in assessing their relevance. Should such

21   foundation be wanting, Defendant may move to strike the settlement agreements from the record.

22       **2. Defendant's Motion *in Limine* No. 2 to Preclude Plaintiff from Using Newly
23          Produced Information. DENIED.**

24       Defendant seeks to preclude Plaintiff from introducing evidence "newly produced on the

25   eve of trial." Def.'s MIL #2, ECF 284. It appears that this evidence largely pertains to a new

26   mobile application that Plaintiff first announced in April 2015 and subsequently released on June

27   3, 2015. *Id.* at 1-3; Decl. of Olivia M. Kim ECF 284-2, Exhs. 1-9. Plaintiff asserts that given the

28   recent release date, it could not have produced evidence regarding the application any earlier.

United States District Court
Northern District of California

8

1    Plaintiff also admits that its only purpose in introducing this evidence is to "refute Blue Coat's

2    claims that Finjan does not make or sell a product." Pl.'s Opp. #2 at 1, ECF 336. At the pretrial

3    conference, Plaintiff indicated its intent to introduce the new application to the jury only as

4    background and only through demonstratives containing general information about the product.

5    Although this information is minimally probative, Plaintiff should have an opportunity to

6    challenge assertions that it does not now make any products. Defendant's Motion *in Limine* No. 2

7    is therefore DENIED with the proviso that Plaintiff may only offer general and background

8    information concerning its recent mobile application and may not enter into evidence any

9    technical documents concerning the application.

10       **3.   Defendant's Motion *in Limine* No. 3 to Preclude Plaintiff from Alleging Copying.**
11       **DENIED.**

12       Defendant seeks to preclude Plaintiff from offering evidence of copying as a secondary

13    consideration of nonobviousness. Def.'s MIL #3, ECF 286. Defendant asserts that Plaintiff's

14    evidence of copying fails to satisfy the Federal Circuit's exacting requirements to prove such

15    copying and furthermore argues that what evidence Plaintiff does have is highly and unfairly

16    prejudicial. *Id.* at 3-5. Plaintiff argues that the challenged evidence is probative of Defendant's

17    motive and opportunity to copy and is therefore relevant to secondary considerations of

18    nonobviousness, infringement, and damages. Pl.'s Opp. #3, ECF 337.

19       "Not every competing product that arguably falls within the scope of a patent is evidence

20    of copying; otherwise, "every infringement suit would automatically confirm the nonobviousness

21    of the patent." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (quoting *Iron*

22    *Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)). Federal Circuit case

23    law holds that "copying requires evidence of efforts to replicate a specific product, which may be

24    demonstrated through internal company documents, direct evidence such as disassembling a

25    patented prototype, photographing its features, and using the photograph as a blueprint to build a

26    replica, or access to the patented product combined with substantial similarity to the patented

27    product." *Id.*; *Iron Grip*, 392 F.3d at 1324.

28       In *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186 (Fed. Cir.

United States District Court
Northern District of California

1   2003), the court concluded that a plaintiff could show copying through internal communications

2   establishing that the defendant's engineers had compared their own product to plaintiff's,

3   considered their own product's shortcomings, and then redesigned the defendant's product to use

4   plaintiff's approach. *Id.* at 1196-97. Here, there are some similar internal communications and

5   documents. Decl. of James Hannah ECF 337-1, Exhs. 7-11. To be sure, "[a]ccess to, and analysis

6   of, other products in the market is hardly rare, even in the design stages of competing devices."

7   *Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985) *overruled on*

8   *other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).

9   However, "[a]ccess in combination with similarity can create a strong inference of copying" if

10  shown. *Id.* Granted, Plaintiff's burden to show copying is significant: not only does it have to

11  demonstrate access, analysis, and similarity between Defendant's accused products and Vital

12  Security, Plaintiff must also establish that Vital Security embodied the claimed inventions of

13  which Defendant is accused of infringing. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,

14  239 F.3d 1343, 1366 (Fed. Cir. 2001) ("evidence of copying [the patentee's product] is legally

15  irrelevant unless the [product] is shown to be an embodiment of the claims."). That Plaintiff's

16  burden may be substantial, however, does not mean that the challenged evidence is not relevant,

17  and Plaintiff should have an opportunity to convince the jury that Defendant copied its products.

18      With that said, there is significant prejudice associated with this evidence, as a jury may

19  use evidence of copying to unfairly conclude that Defendant's products *infringe* the patents-in-

20  suit. Indeed, Plaintiff has argued that the same evidence is relevant to both, even though the two

21  analyses must necessarily be distinct. *See* Pl.'s Opp. #3 at 3-5; *Zenith Labs. v. Bristol-Myers*

22  *Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("As we have repeatedly said, it is error for a

23  court to compare in its infringement analysis the accused product or process with the patentee's

24  commercial embodiment or other version of the product or process; the only proper comparison is

25  with the claims of the patent."). Given the potential for unfair prejudice, the Court concludes that

26  Plaintiff may only present evidence of copying in rebuttal to Defendant's theory of obviousness.

27  Any potential confusion arising out of this limited use of the evidence may be mitigated through

28  an appropriate limiting instruction to ensure that the jury does not impermissibly conflate the

United States District Court
Northern District of California

10

1  copying inquiry with infringement.  *Accord CBOE v. ISE*, No. 07 C 623, 2013 WL 987765, at *1

2  (N.D. Ill. Mar. 14, 2013).  Defendant's Motion *in Limine* No. 3 is therefore DENIED, but Plaintiff

3  will only be permitted to introduce the evidence challenged in this motion in rebuttal to

4  Defendant's obviousness case.  Plaintiff shall furthermore prepare an appropriate limiting

5  instruction in connection with that use for the Court's consideration.

**4.  Defendant's Motion *in Limine* No. 4 to Preclude Plaintiff from Advancing Any Evidence that Plaintiff's Products Practiced Any of the Asserted Patents. GRANTED IN PART and DENIED IN PART.**

8  Defendant seeks in its fourth motion *in limine* to preclude any of Plaintiff's experts from

9  testifying that Plaintiff's Vital Security product practiced the patents-in-suit.  Def.'s MIL #4, ECF

10  288.  Defendant submits that Drs. Michael Mitzenmacher and Eric Cole testified that they had no

11  opinions regarding practicing embodiments and, as such, cannot offer any opinions at trial.  *Id.* at

12  2-3; Decl. of Olivia Kim ECF 288-2 Exh. 6 (Mitzenmacher Dep. Tr.) at 73:14-21; Kim Decl. Exh.

13  7 (Cole Dep. Tr.) at 79:20-80:1, 80:6-15.  Defendant further argues that Drs. David Lyon and

14  Trent Jaeger performed no independent analysis and instead adopted the assertions in Plaintiff's

15  interrogatory responses that Vital Security practiced the patents-in-suit.  Def.'s MIL #4 at 3-5.

16  Plaintiff contends that Drs. Lyon and Jaeger each testified that they independently

17  analyzed Plaintiff's interrogatory responses as well as the testimony of named inventor (and

18  Plaintiff's founder) Schlomo Touboul to satisfy themselves that Vital Security practiced the

19  patents-in-suit.  Pl.'s Opp. #4, ECF 338.  Plaintiff offers no rejoinder in connection with Drs.

20  Mitzenmacher and Cole.  Defendant's Motion *in Limine* No. 4 is therefore GRANTED with

21  regard to these two experts, and Drs. Mitzenmacher and Cole shall not offer any opinion at trial

22  regarding whether Plaintiff's Vital Security product practiced the patents-in-suit.

23  As to Drs. Lyon and Jaeger, the Court is satisfied with each expert's testimony that they

24  conducted an independent analysis.  *See* Decl. of James Hannah ECF 338-1, Exh. 15 (Jaeger Dep.

25  Tr.) at 145:5-25; *id.* Exh. 16 (Lyon Dep. Tr.) at 187:24-188:14.  Both relied upon Plaintiff's

26  interrogatory responses, including the response to Defendant's Interrogatory No. 15, which

27  included substantial claim charts comparing Vital Security to the asserted claims of the patents-in-

28  suit.  *Id.* Exh. 12.  Dr. Lyon's and Dr. Jaeger's independent analysis of the document excerpts in

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1  the claim chart to form their opinions is sufficient for those opinions to reach the jury.[2]  To be

2  sure, the experts may be cross-examined concerning the evidence underlying their opinions, and

3  the persuasiveness of their testimony may be diminished by the fact that they reviewed only the

4  evidence put in front of them by Plaintiff's attorneys.  That, however, goes to the weight of the

5  testimony and is better left to the jury.  Defendant's Motion *in Limine* No. 4 to exclude Dr. Lyon's

6  and Dr. Jaeger's opinions concerning Plaintiff's practicing embodiments is therefore DENIED.

7
8
> **5.  Defendant's Motion *in Limine* No. 5 to Preclude Plaintiff from Relying on the Prior *Secure Computing* Case for Infringement and Validity.  GRANTED IN PART and DENIED IN PART.**

9  Finally, Defendant moves to preclude Plaintiff from relying on the prior lawsuit of *Finjan*

10  *v. Secure Computing Corp.*, et. al., No. 1:06-cv-00369-GMS (D. Del. 2006) for infringement and

11  validity of the patents-in-suit on the ground that the outcome in that case is irrelevant to issues in

12  this case and that informing the jury of the result in *Secure Computing* would only serve to

13  confuse them and unfairly prejudice Defendant.  Def.'s MIL #5, ECF 290.  Plaintiff admits that it

14  will not introduce evidence concerning the result in *Secure Computing* to prove liability but argues

15  that the prior litigation is relevant to damages and secondary considerations of nonobviousness.

16  Pl.'s Opp. #5, ECF 339.

17  The Court finds that the outcome from the *Secure Computing* case is relevant only to the

18  jury's consideration of damages.[3]  As Plaintiff properly notes, the jury verdict in that case

19  occurred around the time of the hypothetical negotiation in this case and involved two of the six

20  patents-in-suit here.  *Id.* at 2.  Particularly to the extent that Defendant was aware of the *Secure*

21  *Computing* litigation at the time, the outcome from that litigation is relevant to Defendant's state

22  of mind entering the hypothetical negotiation and to the parties' relative bargaining strength.  *See*

23  *Georgia-Pac.*, 318 F. Supp. 1116 at 1121.

24

25  —————————

26  [2] The Court is not persuaded that Mr. Touboul's testimony forms an independent factual basis for Dr. Lyon's and Dr. Jaeger's opinions, as Mr. Touboul testified as a corporate representative and did not personally verify that Plaintiff's products practiced the patents-in-suit.  Hannah Decl. Exh. 14 (Touboul Dep. Tr.) at 418:17-24, 420:6-9.

27

28  [3] The Court misspoke on the record that *Secure Computing* would also be relevant to secondary considerations of non-obviousness.  This order corrects that misstatement.

12

1    The same cannot be said for secondary considerations of nonobviousness, for although

2    "[p]rior litigation *may* be evidence of the 'secondary' considerations of commercial success or

3    copying," *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1573 (Fed. Cir. 1993) (emphasis added),

4    Plaintiff has offered no persuasive authority indicating that prior litigation success against a

5    different party is probative evidence of commercial success or other secondary indicia of

6    nonobviousness in this case.  Indeed, the court in *Mendenhall* expressly disallowed reliance on a

7    judicial opinion in lieu of factual evidence, which would appear to be Plaintiff's intent in noting

8    that the *Secure Computing* court found that the defendant in that case had copied Plaintiff's

9    patents.  *See id.*; Pl.'s Opp. #5 at 1.

10    Nevertheless, the Court is persuaded that the *Secure Computing* case may be put to the

11    limited purpose of supporting Plaintiff's damages analysis without unfairly prejudicing Defendant.

12    Defendant's Motion *in Limine* No. 5 is therefore GRANTED with respect to Plaintiff's reliance on

13    the *Secure Computing* outcome to prove infringement or validity but DENIED with respect to

14    Plaintiff's reliance on the settlement agreement from that case for damages.  Plaintiff shall prepare

15    an appropriate limiting instruction for the Court's consideration.

### III.    OTHER ORDERS

17    Following discussion with the parties at the July 2 and 6 hearings, the Court orders as

18    follows:

19    1.    **By no later than July 8, 2015**, Plaintiff shall disclose to and/or clarify for

20    Defendant what remains of Plaintiff's infringement case with respect to the '968,

21    '822, and '633 Patents.

22    2.    **By no later than July 15, 2015**, Plaintiff shall notify the Court whether it will

23    withdraw its willfulness and indirect infringement claims.  To the extent possible,

24    the parties are encouraged to stipulate to dismissal of those claims.

25    3.    **By no later than July 15, 2015**, the parties shall stipulate to the hypothetical

26    negotiation date for each of the patents-in-suit.

27    4.    Where the Court has ordered a party to prepare a limiting instruction in connection

28    with the rulings above, that party shall provide the limiting instruction to the Court

13

United States District Court
Northern District of California

1    **by no later than July 17, 2015.**

2    5.    As stated above, Defendant shall make Mr. Roger Harrison available before trial

3          for a deposition regarding his opinions concerning non-infringing alternatives.

4          Such deposition shall not exceed 3 hours.

5    6.    To the extent the courtroom needs to be sealed, the party requesting sealing must

6          submit a written request by 11:59 p.m. on the day before the testimony sought to be

7          sealed.

8    7.    All fact witnesses, with the exception of corporate designees sitting at counsel

9          table, will be excluded from the courtroom and may not discuss their testimony

10         with anyone else.

11   8.    The parties' Joint Pretrial Statement at ECF 293-4 is hereby adopted as the order of

12         the Court.

13   **IT IS ORDERED.**

14   Dated: July 8, 2015

15
                                        _____
16                                      BETH LABSON FREEMAN
                                        United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

14

1
2
3        **UNITED STATES DISTRICT COURT**
4        **NORTHERN DISTRICT OF CALIFORNIA**
5        **SAN JOSE DIVISION**
6
7    FINJAN, INC.,                                  Case No.  13-cv-03999-BLF
                        Plaintiff,
8
9        v.                                          **ORDER ON *DAUBERT* MOTIONS**
                                                     [Re:  ECF 245, 250]
10   BLUE COAT SYSTEMS, INC.,
                        Defendant.
11
12
13           Before the Court are the parties' motions to exclude certain opinions of each party's
14   experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
15   509 U.S. 579, 589 (1993).  Pl.'s Mot. 250; Def.'s Mot. 245.  The Court heard argument on July 6,
16   2015.  For the reasons stated on the record and set forth below, plaintiff Finjan, Inc.'s motion is
17   GRANTED IN PART and DENIED IN PART and defendant Blue Coat Systems, Inc.'s motion is
18   GRANTED IN PART and DENIED IN PART.

19   **I.      BACKGROUND**
20           Plaintiff holds a portfolio of patents directed toward various aspects of Internet security
21   and has accused Defendant's suite of web security appliances and software of infringing six of
22   those patents.  All of the patents asserted in this lawsuit are directed toward protecting network
23   computers from hostile files downloaded from the Internet.  U.S. Patent No. 6,154,844 ('844
24   Patent) teaches the inspection of downloaded files for suspicious code or behavior according to a
25   set of rules and generating a profile of the results from that inspection.  U.S. Patent No. 6,804,780
26   ('780 Patent) teaches the generation of a re-usable ID for downloaded files so that future iterations
27   of those files can be easily identified.  U.S. Patent No. 7,418,731 ('731 Patent) claims methods
28   and systems for caching security information at a computer or network gateway, again so that

1  prior analyses of the same downloaded file can be easily retrieved.  U.S. Patent No. 6,965,968

2  ('968 Patent) teaches the management of cached downloadable content accessible to multiple

3  destination computers by creating a policy-based index that stores information indicating the

4  allowability of cached content relative to different user security policies.  Finally, U.S. Patent Nos.

5  7,058,822 ('822 Patent) and 7,647,633 ('633 Patent) are related patents that claim systems and

6  methods for detecting and protecting network computers from malicious code operations through

7  the deployment of "mobile protection code" ("MPC") that can intercept and neutralize hostile

8  operations at runtime.

9       The products accused of infringing these myriad patents are Defendant's ProxySG

10  appliance and software, ProxyAV appliance and software, WebPulse service, Malware Analysis

11  Appliance ("MAA") component, and Content Analysis System ("CAS") component.  Each

12  product has multiple different or overlapping features, only a subset of which are accused of

13  infringing the asserted patents.  The ProxySG appliance provides a proxy server or web gateway

14  between an intranet of computers and the Internet that performs a number of network security

15  functions including caching and policy management.  The other accused products in this case may

16  be added to ProxySG to provide additional collaborative protection.  ProxyAV provides anti-virus

17  and malware detection along with sandboxing.  MAA is a customizable sandboxing environment

18  that can integrate with CAS, another antivirus scanner integrated with ProxySG.  WebPulse is a

19  cloud-based infrastructure that categorizes web pages and runs background processes that include

20  searching for evidence of malware activity.  The WebPulse service requires an add-on to

21  ProxySG—WebFilter.  The products, or combinations thereof, accused of infringing each asserted

22  patent are set forth below:

| Patent | Asserted Claims | Accused Product(s) |
| --- | --- | --- |
| '780 Patent | 9, 13 and 18 | ProxyAV; ProxySG with ProxyAV |
| '844 Patent | 1, 7, 11, 15-16 and 41 | WebPulse |
| '731 Patent | 1 | ProxySG (and WebFilter) with WebPulse |
| '968 Patent | 1, 9 and 33 | ProxySG (and WebFilter) with WebPulse |
| '822 Patent | 9 and 10 | ProxySG |

*United States District Court*
*Northern District of California*

2

| '633 Patent | 8 and 14 | ProxySG; MAA; ProxySG with CAS and MAA |
|---|---|---|

*See* Summary J. Order at 4, ECF 256, 265.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony.  The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) *aff'd*, 131 S. Ct. 2238 (2011).  So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury. *Micro Chem.*, 317 F.3d at 1392; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

## III.    DISCUSSION

Plaintiff and Defendant have each moved to exclude opinions rendered by the other party's technical and damages experts.  Plaintiff seeks to strike the following of Defendant's expert opinions: (1) Dr. George Necula's opinion that the Braswell prior art reference anticipates the '731 Patent; (2) Dr. Michael Hicks's opinion that the Ji prior art reference anticipates the '822 and '633

3

United States District Court
Northern District of California

1    Patents; and (3) all of Ms. Julie Davis's opinion on damages.  *See generally* Pl.'s Mot.  Defendant,

2    for its part, seeks to exclude the following of Plaintiff's expert opinions: (1) Dr. Nenad

3    Medvidovic's opinions regarding infringement and Defendant's recognition of the importance of

4    Plaintiff's patented technology; (2) Dr. Eric Cole's testing results in support of his infringement

5    opinion as well as his opinion regarding Defendant's recognition of the importance of Plaintiff's

6    patented technology; (3) Dr. Michael Mitzenmacher's testing results in support of his infringement

7    opinion; and (4) all of Dr. Anne Layne-Farrar's opinion on damages.  *See generally* Def.'s Mot.

8    The Court addresses the parties' motions regarding their respective technical experts first.

9        **A.    Opinions of Technical Experts**

10       Neither Plaintiff nor Defendant challenges the qualification of the opposing party's

11   technical experts.  Rather, both advance arguments grounded largely in the reliability of the

12   opinions offered by each expert and whether his opinion was sufficiently disclosed under Federal

13   Rule of Civil Procedure 26.  For the reasons stated on the record at the July 6 hearing, the Court

14   disposes of these issues quickly as follows.

15           **i.   Dr. Necula's and Dr. Hicks's Opinions on Anticipation**

16       Plaintiff's motion to exclude Dr. Necula's anticipation opinion based upon the Braswell

17   reference is DENIED.  Pl.'s Mot. 3-6.  As has already been extensively addressed in the Court's

18   rulings on the parties' motions to strike and *in limine* motions, Dr. Necula may offer an opinion

19   that Braswell—and Braswell alone—discloses all elements of the '731 patent, whether overtly or

20   inherently.  *See* Order on Mots. to Strike at 11-12, ECF 271; Order on Mots. *in Limine* at 5, ECF

21   367.  Whether or not Dr. Necula improperly considered elements from other sources to form his

22   opinion on anticipation is an issue that may be the subject of cross-examination and goes to

23   Defendant's ability to meet its burden of proving anticipation.

24       Plaintiff's motion to exclude Dr. Hicks's anticipation opinion based upon the Ji reference

25   is likewise DENIED.  Pl.'s Mot. 6-8.  Plaintiff's challenge is not to Dr. Hicks's qualification to

26   testify as an expert, nor even to the reliability of his opinion, but rather to its sufficiency.

27   "Anticipation, including whether a limitation is inherent in the prior art, is a question of fact."

28   *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013).  As such,

1  Dr. Hicks, as a qualified expert in the field, may present to a jury his opinion that a person having

2  ordinary skill in the art at the time of the claimed inventions would have understood the Ji

3  reference.  *See, e.g.*, *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373-74 (Fed. Cir.

4  2005).  Dr. Hicks may be cross-examined on that opinion and a jury may determine whether his

5  opinion is sufficient to satisfy Defendant's high burden of proving invalidity.

### ii.  Dr. Medvidovic's Opinion on Infringement

7  Defendant's motion to exclude Dr. Medvidovic's infringement opinion is DENIED as

8  moot because Plaintiff has indicated that he will not be offered for infringement.  Def.'s Mot. 14-

9  18; Pl.'s Opp. 18, ECF 274.

### iii.  Dr. Medvidovic's and Dr. Cole's Opinions on Importance of Plaintiff's Patented Technology

12  Defendant's motion to exclude Dr. Medvidovic's and Dr. Cole's opinion regarding

13  Defendant's recognition of the importance of Plaintiff's technology is GRANTED.  Def.'s Mot.

14  18-20.  While Drs. Medvidovic and Cole may certainly testify to the objective "technical merits"

15  of Plaintiff's patents, Pl.'s Opp. 23, what Defendant thought about Plaintiff's patents is not the

16  proper subject of expert testimony, nor are Drs. Cole and Medvidovic qualified to offer opinions

17  regarding Defendant's subjective beliefs.  Fed. R. Evid. 702.

### iv.  Testing Conducted by Plaintiff's Experts

19  Finally, Defendant's motion to preclude Dr. Cole's and Dr. Mitzenmacher's reliance on

20  testing results in support of their respective opinions on infringement is DENIED.  Def.'s Mot. 21-

21  23.  This challenge is not so much to the reliability of the experts' testing as it is to the sufficiency

22  of their disclosures of that testing.  Federal Rule of Civil Procedure 26 requires a disclosed expert

23  to provide an expert report that contains "a complete statement of all opinions the witness will

24  express and the basis and reasons for them" as well as "the facts or data considered by the witness

25  in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).  "The purpose of the expert disclosure rule is

26  to 'provide opposing parties reasonable opportunity to prepare for effective cross examination and

27  perhaps arrange for expert testimony from other witnesses.'"  *Rembrandt Vision Techs., L.P. v.*

28  *Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (quoting *Reese v.*

United States District Court
Northern District of California

5

1   *Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008)).  Dr. Cole and Dr. Mitzenmacher each disclosed

2   their testing methodology and the results that they observed.  *See* Decl. of Olivia S. Kim ECF 245-

3   2 Exh. 8 (Cole Report) ¶¶ 29-30 (methodology); *see, e.g.*, *id.* ¶¶ 86, 95, 98, 133 (observed results);

4   Kim Decl. Exh. 9 (Mitzenmacher Report) ¶¶ 25-26 (methodology).  While Dr. Mitzenmacher's

5   disclosures are somewhat less detailed than those of Dr. Cole, both experts were deposed and thus

6   subjected to unfettered questioning regarding their testing.  Decl. of James Hannah ECF 274-1

7   Exhs. 8, 9.  As such, Rule 26 does not mandate exclusion of this evidence.  *Cf. Rembrandt Vision*

8   *Techs.*, 725 F.3d at 1382 (opinion properly rejected on judgment as a matter of law where expert

9   did not disclose *any* testing methodology until cross-examination at trial).

10          By contrast, Dr. Medvidovic's report discloses no methodology other than to assert that he

11   "personally performed these tests on the Accused Products and will reenact my tests during trial

12   either live or by video during trial."  *See* Kim Decl. Exh. 6 (Medvidovic Report) ¶¶ 26-27.

13   Furthermore, as Dr. Medvidovic will not testify concerning infringement, it is not clear whether

14   his test results would even be relevant to his testimony.  In any case, because Dr. Medvidovic does

15   not disclose any methodology for his test results, Defendant's motion to exclude his testimony

16   regarding testing is GRANTED.

17          **B.    Opinions of Damages Experts**

18          "Upon finding for the claimant the court shall award the claimant damages adequate to

19   compensate for the infringement, but in no event less than a reasonable royalty for the use made of

20   the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. §

21   284.  Two typical categories of compensation for infringement are the patentee's lost profits and

22   the "reasonable royalty he would have received through arms-length bargaining."  *Lucent Techs.,*

23   *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The only measure of damages at

24   issue in this case is a reasonable royalty, which is "merely the floor below which damages shall

25   not fall."  *Id.* (quoting *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983)).

26          "A reasonable royalty may be a lump-sum payment not calculated on a per unit basis,"

27   *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014), which is what Plaintiff

28   seeks here.  The most common method for determining a reasonable royalty is the hypothetical

United States District Court
Northern District of California

1  negotiation approach, which "attempts to ascertain the royalty upon which the parties would have

2  agreed had they successfully negotiated an agreement just before infringement began." *Lucent*

3  *Techs.*, 580 F.3d at 1324.  The Federal Circuit has approved application of the non-exhaustive

4  factors identified in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120

5  (S.D.N.Y. 1970), to arrive at a reasonable royalty through hypothetical negotiation, and both

6  parties' damages experts have applied that analysis here.  *See* Kim Decl. Exh. 1 (Expert Report of

7  Dr. Anne Layne-Farrar, hereinafter "Layne-Farrar Report") at ¶¶ 102-04; Decl. of James Hannah,

8  ECF 250-1 Exh. 9 (Rebuttal Expert Report and Disclosure of Julie L. Davis, hereinafter "Davis

9  Report") at 17.

10     "When the accused infringing products have both patented and unpatented features,

11  measuring this value requires a determination of the value added by such features." *Ericsson, Inc.*

12  *v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  "Indeed, apportionment is required

13  even for non-royalty forms of damages: a jury must ultimately 'apportion the defendant's profits

14  and the patentee's damages between the patented feature and the unpatented features' using

15  'reliable and tangible' evidence."  *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 120 (1884)).

16  Here, both parties' experts agree that the hypothetical negotiators would have determined a royalty

17  rate and multiplied it by a properly apportioned royalty base (representing the portion of a

18  product's revenue attributable to the infringing features) in order to arrive at a reasonable royalty

19  for the patents-in-suit.  Layne-Farrar Report ¶ 149; Davis Report at 20.

20     Thus, to be admissible under Rule 702, "expert testimony opining on a reasonable royalty

21  rate must 'carefully tie proof of damages to the claimed invention's footprint in the market

22  place.'"  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting

23  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).  Nevertheless, the Court is

24  cognizant that "[d]etermining a fair and reasonable royalty is often . . . a difficult judicial chore,

25  seeming often to involve more the talents of a conjurer than those of a judge." *ResQNet.com*, 594

26  F.3d at 869 (quoting *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed.

27  Cir. 1988)); *see also Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).  As

28  such, the Court excludes speculation but allows hypothesized damages sufficiently grounded in

7

United States District Court
Northern District of California

1    fact to reach the jury.

2            **i.  Plaintiff's Motion to Exclude Opinion of Ms. Davis**

3       Plaintiff advances five challenges to the damages opinion proffered by Defendant's expert,

4    Ms. Julie Davis, in large part directed toward her various methods of apportioning accused

5    product revenues to account only for the infringing features.  The Court addresses each in turn.

6         **a.  Apportionment Based Upon Percentage of Source Code**

7       Plaintiff argues that Ms. Davis's apportionment of the royalty base using the percentage of

8    each accused product's source code attributable to the feature(s) accused of infringing one or more

9    of Plaintiff's patents-in-suit should be stricken because it is based upon unreliable data.  Pl.'s Mot.

10    8-11; *see* Davis Report at 20, 30, 33.

11       In passing, and without any citation to authority, Plaintiff suggests that the method itself is

12    unreliable because it varies depending on the competency of the programmer.  Pl.'s Mot. at 11

13    ("an accused infringer who has inefficient programmers would pay less in damages because the

14    overall code base would be larger").  This argument has little appeal because an incompetent

15    programmer is likely to be equally incompetent in programming all of an accused product's code,

16    just as an efficient programmer would efficiently program an entire product's code; the percentage

17    of code attributable to a feature would not change.  In any case, although the Federal Circuit has

18    indicated that the portion of an accused product's realizable profit attributable to the patentee's

19    technology, "cannot be reduced to a mere counting of lines of code," the court acknowledged that

20    "the glaring imbalance between infringing and non-infringing features must impact the analysis of

21    how much profit can properly be attributed to the use of the [accused feature] compared to non-

22    patented elements and other features of [the accused product]."  *Lucent Techs.*, 580 F.3d at 1332-

23    33 (analyzing *Georgia-Pacific* Factor 13).  As such, this apportionment method is neither

24    inherently unreliable nor absolutely barred by Federal Circuit precedent.

25       The remainder of Plaintiff's arguments is directed toward the veracity of the source code

26    percentages that Ms. Davis used in her analysis.  Plaintiff contends that Ms. Davis improperly

27    relied upon information given to her by Defendant's counsel, which was only subsequently

28    confirmed by Defendant's technical experts, Drs. Azer Bestavros and Michael Hicks.  Pl.'s Mot.

1    9; *see* Davis Report at 33 nn.168-69. Drs. Bestavros and Hicks, in turn, based their analysis of the

2    percentage of infringing source code on discussions with Defendant's engineers. Plaintiff asserts

3    that the experts could not be fairly cross-examined on this analysis at their depositions. Pl.'s Mot.

4    at 10. Plaintiff therefore submits that the "inability to test the accuracy of information that is the

5    basis for Ms. Davis's apportionment opinion" demonstrates its unreliability. *Id.*

6        This argument focuses more on a lack of disclosure under Rule 26 and less on the

7    reliability of the factual basis for Ms. Davis's opinion, as "patent damages experts often rely on

8    technical expertise outside of their field when evaluating design around options or valuing the

9    importance of the specific, infringing features in a complex device." *Apple Inc. v. Motorola, Inc.*,

10   757 F.3d 1286, 1321 (Fed. Cir. 2014) *overruled on other grounds by Williamson v. Citrix Online,*

11   *LLC*, ---F.3d---, No. 2013-1130, 2015 WL 3687459 (Fed. Cir. June 16, 2015); Fed. R. Evid. 703.

12   The Court thus looks to whether the factual basis for Ms. Davis's opinion was properly disclosed

13   and available for cross-examination. *See Rembrandt Vision Techs.*, 725 F.3d at 1381. As

14   Defendant notes, Plaintiff had complete access to Defendant's source code as well as the

15   opportunity to depose Drs. Bestavros and Hicks concerning their opinions regarding the

16   percentage of source code attributable to the infringing features. Def.'s Opp. 12, ECF 269.

17   Plaintiff appears to suggest, however, that it had no fair opportunity to cross-examine the technical

18   experts because "when Finjan's counsel asked Dr. Hicks at his deposition about how the lines of

19   source code were determined, he answered that he solely relied upon brief conversations with Blue

20   Coat employees who told him the number and they did not inform him of the number of lines of

21   code for other features of the product." Pl.'s Reply 10, ECF 297.

22       In recognition of the potential prejudice arising from an inability to cross-examine the

23   source of Ms. Davis's data, the Court ordered the parties to submit relevant portions from the

24   depositions of Drs. Bestavros and Hicks along with short supplemental briefing addressing the

25   Rule 26 issue. The supplemental deposition excerpts reveal that Plaintiff had ample opportunity to

26   cross-examine Drs. Bestavros and Hicks regarding the "lines of code they identified, how they

27   were identified and corresponded to the infringing technology," Pl.'s Mot. 10, and that Plaintiff

28   simply did not ask those questions. For example, Plaintiff's counsel questioned Dr. Hicks

9

extensively concerning his review of Defendant's source code and the amount of time that he spent in that review.  Def.'s Supp. Br., ECF 363 Exh. A (Hicks Dep.) 336:12-339:15.  When asked whether any of Defendant's employees were present, Dr. Hicks answered that none were present during his source code review but that he had conversations with certain engineers regarding the source code.  *Id.* 339:19-340:3.  The questioning then transitioned into Dr. Hicks's discussions with Defendant's engineers regarding the size of each accused product's source code and the percentage attributable to the infringing features.  *Id.* 340:4-349:20.  Plaintiff's questions focused on the amount of time that Dr. Hicks spent in conversation with those engineers.  Critically, Dr. Hicks did not testify that he *solely* relied on the engineers' information concerning the percentage of infringing code, as Plaintiff claims, nor was he unable to "identify the lines of code, much less provide any information regarding how Blue Coat's engineers came up with the specific number of lines of code," Pl.'s Supp. Br. at 2, ECF 362, because those questions were not asked.[1]  Similarly, Plaintiff's questioning of Dr. Bestavros focused on the amount of time that he spent in conversation with Defendant's engineers and not on his own analysis of the source code.  *See id.* Exh. 2.  Because Plaintiff failed to ask the necessary questions of Drs. Bestavros and Hicks, it cannot now complain of prejudice from the inability to cross-examine them concerning their opinions regarding the infringing lines of source code, particularly—as Defendant represented at oral argument—when the Defendant's source code computer was available during the experts' depositions.  The Court therefore finds that the factual basis for Ms. Davis's apportionment opinion was properly disclosed and that she reasonably relied upon the opinions of Drs. Bestavros and Hicks in performing her analysis.

Plaintiff's other major argument against Ms. Davis's opinion is that the identified source code does not "account for all the elements of the asserted patent claims," nor does it account for the other ways in which Plaintiff accuses Defendant's products of infringing the patents-in-suit.  Pl.'s Mot. 10-11.  These arguments are really disputes concerning the underlying facts: whether and to what extent Defendant's accused products actually infringe the asserted patents.  Since

---

[1] Nor did Plaintiff cite to any portion of the deposition transcripts to support this assertion.

United States District Court
Northern District of California

1  Defendant disputes the value of Plaintiff's patented technology and whether all elements of the

2  asserted claims are present in its accused products, Ms. Davis's opinion understandably accounts

3  for the facts as her client sees them.  "When, as here, the parties' experts rely on conflicting sets of

4  facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's

5  testimony."  *Micro Chem.*, 317 F.3d at 1392.  That is a determination better left to the jury.

6      Plaintiff's motion to strike Ms. Davis's apportionment analysis based upon the percentage

7  of infringing source code in each accused product is therefore DENIED.

8                **b.  Apportionment Based Upon WebPulse Categorizations**

9      Plaintiff next challenges Ms. Davis's apportionment of WebPulse revenues based upon the

10  percentage of "suspicious or malicious" categorizations of webpages returned by WebPulse's

11  accused Dynamic Real Time Rating service ("DRTR").  Pl.'s Mot. 11-12.  For the reasons stated

12  on the record, this portion of Plaintiff's motion is DENIED.

13      Ms. Davis based her analysis upon discussions with Roger Harrison, Defendant's Senior

14  Director of Development for WebPulse, who indicated that of the numerous categories that DRTR

15  can use to classify a webpage, only a small number were implicated by Plaintiff's patents-in-suit.

16  Davis Report at 32.  Plaintiff asserts that this apportionment methodology does not reliably

17  account for the value of the patented technology.  Pl.'s Mot. 12.  The Federal Circuit has

18  recognized, however, that "frequency of expected use and predicted value are related" in

19  considering *Georgia-Pacific* Factor 11, which concerns "[t]he extent to which the infringer has

20  made use of the invention; and any evidence probative of the value of that use."  *Lucent Techs.*,

21  580 F.3d at 1333 (quoting *Georgia-Pacific*, 318 F. Supp. at 1120).  Ms. Davis's valuation based

22  upon the extent to which the '844 Patent is used in WebPulse is therefore appropriate.  Davis

23  Report at 50.  Plaintiff's assertions that the analysis does not include all patents or claim elements

24  that it asserts are infringed by WebPulse's DRTR and that the few categorizations considered  may

25  be of more significant importance to Defendant's customers are more appropriately subjects for

26  cross-examination so that a jury may determine the ultimate question of value.  *See* Pl.'s Mot. 12.

27                **c.  Apportionment Based Upon Plaintiff's Patent Portfolio**

28      Plaintiff's third challenge to apportionment focuses on the royalty rate.  Pl.'s Mot. 12-15.

11

1    For the reasons stated on the record, this portion of Plaintiff's motion is GRANTED.

2        Ms. Davis apportioned Plaintiff's proposed royalty rate of 6% to 8% by dividing each by

3    20 in order to account for the value of each asserted patent in this lawsuit as a portion of the 20

4    patents that Plaintiff has asserted in all litigation thus far.  Davis Report at 50.  Although Ms.

5    Davis could reasonably rely on the testimony of Plaintiff's own witness that the patents Plaintiff

6    has asserted in litigation are "core" and thus equally valued, her apportionment analysis is an

7    improper use of the "book of wisdom" comprised of post-infringement evidence.  *See* Def.'s Opp.

8    15-16; *see Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698-99 (1933).  As Plaintiff

9    notes, the additional 14 patents that Ms. Davis folded into Plaintiff's portfolio include patents

10   asserted in separate litigation against third parties, "largely <u>after</u> the dates of the hypothetical

11   negotiations."  Pl.'s Reply 12 (emphasis in original).  Plaintiff's future litigation activity is

12   therefore not probative of the value of the patents-in-suit at the time of the hypothetical

13   negotiation.

**d.  Non-Infringing Alternatives and Design Arounds**

15       Plaintiff moves to preclude Ms. Davis from relying on any evidence of non-infringing

16   alternatives to the patents-in-suit or design arounds to inform her damages opinion.  Pl.'s Mot. 15-

17   17.  This issue is DENIED as moot, following the Court's ruling on the parties' *in limine* motions.

18   Order on Mots. *in Limine*, at 4.

**e.  Damages in Past Valued Dollars**

20       Finally, Plaintiff seeks to preclude Ms. Davis from opining on the amount of damages that

21   Defendant would owe in past-valued dollars, as opposed to today's dollars.  Pl.'s Mot. 17-18.  For

22   the reasons stated on the record, this portion of Plaintiff's motion is GRANTED.

23       Both experts applied the same net present value discount to the hypothesized lump sum

24   payment for damages, but they differed on the scope of the discounted time period.  Ms. Davis

25   discounted her royalty payment to the dates of the hypothetical negotiation for each patent.  Davis

26   Report at 50-51.  Dr. Layne-Farrar discounted to 2014, the beginning of the period for which

27   Plaintiff seeks damages.  Layne-Farrar Report ¶ 163.  Defendant presents no persuasive authority

28   to indicate that Ms. Davis's discount is more appropriate than Dr. Layne-Farrar's, and presenting

12

both discount calculations to a jury would be intractably confusing.  As Plaintiff seeks damages

only for the period beginning with the filing of the complaint in this action, the Court finds Dr.

Layne-Farrar's discounting methodology more appropriate to compensate Plaintiff for the value of

what was taken through Defendant's alleged infringement.  *Lucent Techs.*, 580 F.3d at 1324.

### ii.  Defendant's Motion to Exclude Opinion of Dr. Layne-Farrar

Defendant raises four challenges to Dr. Layne-Farrar's damages opinion all targeted at her

apportionment of the royalty base for the accused products.  The Court addresses each in turn.

### a.  Apportionment Using Forward Citation Analysis (Method 1)

Defendant seeks to exclude Dr. Layne-Farrar's first apportionment methodology based

upon academic literature suggesting that a patent's value is strongly correlated with the number of

times that patent is cited as prior art by future patents.  Def.'s Mot. 7-8; Layne-Farrar Report ¶¶

150-55.  Defendant asserts that this so-called forward citation analysis has little meaningful

connection to the accused features in this lawsuit.  Plaintiff counters that this method is

academically accepted, was properly applied in Dr. Layne-Farrar's analysis, and has been

accepted by other courts.  Pl.'s Opp. 4.  Although a qualitative analysis of asserted patents based

upon forward citations may be probative of a reasonable royalty in some instances, the Court finds

that Dr. Layne-Farrar's application of the analysis in this case must be rejected.

Most problematically, Dr. Layne-Farrar offers no explanation as to why the forward

citation methodology is an appropriate measure of the value of the patents at issue in this case.

*See* Layne-Farrar Report ¶¶ 150-51.  Without facts tying her analysis to the facts of this case, Dr.

Layne-Farrar's reliance on a methodology discussed in empirical economics literature has little

more probative value than the "25 percent rule of thumb" and Nash Bargaining Solution analyses

that the Federal Circuit rejected in *Uniloc* and *VirnetX*.  *Uniloc*, 632 F.3d at 1314-15; *VirnetX*, 767

F.3d at 1331-34; *accord LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed.

Cir. 2012) (rejecting expert's "vague qualitative notions of the relative importance of the

[patented] technology" to arrive at a higher royalty rate).  For example, two of the patents-in-suit

are related and many of Plaintiff's patents reference one another.  Surely a patent's objective

quality cannot be based on the number of times an inventor cites himself in prosecuting related

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    patents.  Further, as Defendant notes, the patent with the highest number of forward citations is

2    (unsurprisingly) the oldest patent in this suit.  Def.'s Mot. 8 n.2.  Dr. Layne-Farrar's

3    straightforward application of a forward citation analysis without taking into consideration these

4    potential problems renders the method unreliable for failure to specifically tie the methodology to

5    the facts of this case.  *Cf. Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL

6    877125, at *2 (N.D. Cal. Mar. 15, 2012) (rejecting forward citation methodology used to rank

7    reexamined patent in a portfolio because expert did not count citations to predecessor patents).

8          Equally troubling is Dr. Layne-Farrar's assumption of a six-patent portfolio comprised of

9    the six patents-in-suit in her apportionment analysis.  Layne-Farrar Report ¶ 155.  As Defendant

10   aptly points out, this methodology does not account for the value of the accused features as a

11   portion of the accused products, but rather demonstrates only the value of each patent-in-suit

12   relative to each other.  Def.'s Mot. 8.; Def.'s Reply 1-2, ECF 292.  As such, Dr. Layne-Farrar's

13   use of the forward citation analysis in her first apportionment methodology does not demonstrate

14   the value of the asserted patents in the marketplace in relation to other patents that cover or

15   potentially cover the infringing and non-infringing features of the accused products.  The resulting

16   apportionment demonstrates, at most, the asserted patents' relative value in the abstract,

17   untethered to any of the facts in this case.

18         Plaintiff's argument that this apportionment method has been accepted by other courts is

19   unpersuasive.  Pl.'s Opp. 4-5.  Of the two relevant cases that Plaintiff identifies, *GPNE Corp. v.

20   Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014), concerned

21   standard essential patents, which are not at issue here.  Moreover, unlike Dr. Layne-Farrar's

22   analysis, which is conducted in a vacuum, the allowed expert in *GPNE* apportioned the royalty

23   base by considering the "number of patent families included in the standard," thus accounting for

24   the value of the patents-in-suit relative to other patents covering the standard.  *Id.* at *7.  Plaintiff's

25   reliance on *Triangle Software LLC v. Garmin Int'l, Inc.*, No. 1:10-cv-1457 (E.D. Va.) is similarly

26   unpersuasive, as there the Court refused to exclude Dr. Layne-Farrar's testimony where she

27   conducted a qualitative analysis of the patents-in-suit compared to other patents "within the same

28   technology market" as a basis for concluding that a hypothetical licensee would be willing to pay

14

1    more for a higher quality patent. *Daubert* Motion at 13, *Triangle Software*, No. 1:10-cv-1457

2    (E.D. Va. Sept. 30, 2011), ECF 315; *id.* at ECF 369 (*Daubert* Order). Here, by contrast, Dr.

3    Layne-Farrar compares the forward citations of the patents-in-suit to one another as a method of

4    apportioning a royalty base that quizzically does not take into account the infringing and non-

5    infringing features in the accused products.

6        In sum, the Court agrees with Defendant that Dr. Layne-Farrar's forward citation method

7    of apportionment fails to "carefully tie proof of damages to the claimed invention's footprint in the

8    *market place*." *ResQNet.com*, 594 F.3d at 869 (emphasis added). As such, Defendant's motion to

9    exclude Dr. Layne-Farrar's first method of apportionment is GRANTED.

### b. Apportionment of Using Totality of Features in Defendant's Products (Method 2)

12       Defendant challenges Dr. Layne-Farrar's second method of apportionment on the ground

13   that it also fails to account for the patented features of the accused products. Def.'s Mot. 9-11.

14   For the reasons stated on the record, this portion of Defendant's motion is DENIED.

15       In her second method of apportionment, Dr. Layne-Farrar relied upon a slide from one of

16   Defendant's internal presentations that identifies 24 functions that cover "all features in the full

17   suite of Blue Coat security products." Layne-Farrar Report ¶ 156. The patents-in-suit correspond

18   to or "drive" the functionality of approximately 9 of these 24 functions. Relying on Dr.

19   Medvidovic's report, Dr. Layne-Farrar concluded that the evidence "suggests a per-feature

20   apportionment of sales revenue" and thus apportioned accused product revenue according to the

21   number of functions out of 24 that each patent-in-suit drives. *Id.* ¶ 158. Dr. Layne-Farrar notes

22   that this apportionment approach is "highly conservative because not every accused product has

23   all 24 features, and yet I apply only 1/24th for each feature to each accused product." *Id.* ¶ 159.

24   As with Ms. Davis's apportionment based upon lines of infringing code, Dr. Layne-Farrar's

25   second apportionment method may not be perfect, but it reasonably ties the value that Defendant

26   places on product features to the accused products in this case. Any factual challenges to Dr.

27   Layne-Farrar's analysis are better presented to the jury.

28       The Court notes one concern: it is not clear how Dr. Layne-Farrar arrived at the conclusion

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  that each of the 24 functions identified in Defendant's presentation should be valued equally.

2  Absent foundational facts to support the assumption that the functions are of equal value, this

3  method of apportionment may be unreliable.  *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421,

4  2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014); *see also Good Tech. Corp. v. MobileIron, Inc.*,

5  No. 5:12-CV-05826-PSG, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015).  In the absence of

6  sufficient factual foundation supporting a simple 1/24 apportionment for each function, the Court

7  will permit Defendant to renew its objection to this apportionment methodology.

8                          **c.  Convoyed Sales for the '844 Patent**

9         Defendant challenges Dr. Layne-Farrar's damages calculation for the '844 Patent because

10  she improperly includes convoyed sales revenue.  Def.'s Mot. 11-13.  For the reasons stated on the

11  record, this portion of Defendant's motion is GRANTED IN PART and DENIED IN PART.

12         The '844 Patent is allegedly practiced by the WebPulse service, which is not sold alone.

13  Rather, WebPulse must be run on ProxySG with the WebFilter addition or "alternatively, the

14  Cacheflow appliance" not at issue in this case.  Layne-Farrar Report ¶ 160.  Relying on evidence

15  that "WebPulse is a part of WebFilter" and that Defendant "touts the value of WebPulse," *id.* ¶ 57-

16  58, Dr. Layne-Farrar concludes that "a portion of the sales for the ProxySG should be considered

17  as convoyed sales . . . for the '844 Patent," *id.* ¶ 160.  Dr. Layne-Farrar thus includes a portion of

18  ProxySG revenues supposedly driven by purchases of WebPulse in determining the appropriate

19  royalty base for the '844 Patent.  *Id.* ¶ 161.

20         As the Federal Circuit has cautioned, "[the] issue of royalty base is not to be confused with

21  the relevance of anticipated collateral sales to the determination of a reasonable royalty rate."

22  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 n.9 (Fed. Cir. 1995) (citing *Deere & Co. v.*

23  *International Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir. 1983)).  Here, however, Dr. Layne-

24  Farrar has done just that by using supposedly convoyed sales of ProxySG to expand the royalty

25  *base* for damages in connection with the '844 Patent.  Layne-Farrar Report ¶¶ 160-61.  To the

26  extent convoyed ProxySG sales could be used to form the royalty base for the '844 Patent, there

27  must be some evidence or analysis indicating that the ProxySG sales were driven by demand for

28  WebPulse and not the other way around.  Absent such evidence, including a product that does not

16

1  practice the patent at issue and indisputably has an independent use would overcompensate

2  Plaintiff for the alleged infringement of the '844 Patent by WebPulse.

3      It is unclear to the Court, however, whether Dr. Layne-Farrar also considered anticipated

4  collateral sales of ProxySG in support of her analysis of *Georgia-Pacific* Factor 6 and the royalty

5  *rate* that Defendant would hypothetically have been willing to pay for the '844 Patent.  *See* Layne-

6  Farrar Report ¶ 136-37; *see Georgia-Pac.*, 318 F. Supp. at 1120 (Factor 6: "The effect of selling

7  the patented specialty in promoting sales of other products of the licensee; that existing value of

8  the invention to the licensor as a generator of sales of his non-patented items; and the extent of

9  such derivative or convoyed sales.").  Because the likelihood of bundled sales is a relevant

10 consideration in the hypothetical negotiation of a reasonable royalty under *Georgia-Pacific*, the

11 Court will permit Dr. Layne-Farrar to address convoyed or bundled sales only in that limited

12 context, and only upon a sufficient factual foundation.  *See Interactive Pictures Corp. v. Infinite*

13 *Pictures, Inc.*, 274 F.3d 1371, 1386 (Fed. Cir. 2001).

### d. Apportionment Using Proposed Original Equipment Manufacturer Software License for WebPulse (Method 3)

16     Finally, Defendant moves to strike Dr. Layne-Farrar's third apportionment method for

17 WebPulse revenues.  Def.'s Mot. 13-14.  For the reasons stated on the record, this portion of

18 Defendant's motion is GRANTED.

19     Dr. Layne-Farrar's third apportionment methodology is based upon a proposal to license

20 WebPulse to original equipment manufacturers.  Layne-Farrar Report ¶¶ 121-25.  As it is

21 undisputed that WebPulse contains non-infringing features, *see id.* ¶ 53, this method is only

22 reliable if there is evidence to indicate that the suggested value of the license covers only the

23 accused features at issue in this lawsuit or if Dr. Layne-Farrar properly apportioned the suggested

24 license fee to account only for the accused features.  There is nothing in Dr. Layne-Farrar's report

25 to that effect other than the conclusory assertion, without citation to any underlying facts or

26 evidence, that "[t]he WebPulse pricing that Blue Coat considered reflects the value of the

27 WebPulse technology embodied by the '844 Patent, the '968 Patent and the '731 Patent."  *Id.* ¶

28 124.  What's more, Dr. Layne-Farrar makes no attempt to apportion the hypothetical WebPulse

1   OEM license to account only for the accused features.  As such, Dr. Layne-Farrar's third

2   apportionment method for WebPulse is insufficiently reliable to reach a jury.

**IV.   ORDER**

For the foregoing reasons, Plaintiff's and Defendant's *Daubert* motions are both

GRANTED in PART and DENIED IN PART.

1.   Plaintiff's motion to exclude expert testimony is GRANTED with respect to:

    a.   Damages expert Ms. Julie Davis's royalty rate apportionment method based

        upon Plaintiff's patent portfolio; and

    b.   Ms. Davis's calculation of a damages amount discounted to the net present

        value on the date of the hypothetical negotiations for each patent-in-suit.

2.   Plaintiff's motion is DENIED as to the remainder.

3.   Defendant's motion to exclude expert testimony is GRANTED with respect to:

    a.   The opinions of technical experts Drs. Nenad Medvidovic and Eric Cole

        regarding Defendant's recognition of the importance of Plaintiff's patented

        technology;

    b.   Dr. Medvidovic's testing results;

    c.   Damages expert Dr. Anne Layne-Farrar's first apportionment method based on

        forward citations to the patents-in-suit;

    d.   Dr. Layne-Farrar's reliance on convoyed sales of ProxySG to form the royalty

        base for the '844 Patent; and

    e.   Dr. Layne-Farrar's third apportionment method for WebPulse based on a

        proposed OEM license for the service.

4.   Defendant's motion is DENIED as to the remainder.

**IT IS SO ORDERED.**

Dated: July 14, 2015

*[signature]*

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

18

1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

7 FINJAN, INC.,                     Case No.  13-cv-03999-BLF

Plaintiff,

8

9 v.                                **ORDER REGARDING NON-JURY LEGAL ISSUES**

10 BLUE COAT SYSTEMS, INC.,

Defendant.

11

12

13     Plaintiff Finjan, Inc. ("Plaintiff") brings this action, alleging that Defendant Blue Coat

14 Systems, Inc.'s ("Defendant") Internet security software products infringe six of Finjan's patents.

15 ECF 1.  Plaintiff alleges that Defendant infringes U.S. Patent Nos. 6,804,780 (the "'780 patent"),

16 6,154,844 (the "'844 patent"), 7,418,731 (the "'731 patent"), 6,965,968 (the "'968 patent"),

17 7,058,822 (the "'822 patent"), 7,647,633 (the "'663 patent") (collectively, the "Asserted Patents").

18 The Court conducted a jury trial, in which the jury found Blue Coat infringed five of the asserted

19 patents and awarded damages.  ECF 438.  Following the jury's verdict, the Court conducted a

20 bench trial regarding the priority dates for the '844 and '731 patents, prosecution history estoppel,

21 the patent eligibility of the '844 patent, and laches.  The Court having heard live testimony, and

22 considered the evidence and parties' briefing, makes the following findings of fact and

23 conclusions of law in accordance with Fed. R. Civ. P. 52(a).[1]

24 **I.   BACKGROUND**

25     The factual and procedural background of this case is well-known to the parties and need

26 not be repeated in full here.  From July 20, 2015 to August 4, 2015, the Court held a jury trial

27

28 _____

[1] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

United States District Court
Northern District of California

1    regarding Defendant's alleged infringement of the Asserted Patents.  On August 4, 2015, the jury

2    returned a verdict finding that Defendant infringed claims 1, 7, 11, 15, and 41 of the '844 patent,

3    claim 14 of the '633 patent, claims 1 and 17 of the '731 patent, claim 1 of the '968 patent, and

4    claims 9 and 13 of the '780 patent.  ECF 438 at 2-3.  The jury found that Defendant did not

5    infringe claims 9 and 10 of the '822 patent.  *Id*.  As part of the verdict, the jury was asked to

6    provide an advisory verdict on the dates of invention for the '844 and '731 patents.  *Id*. at 4.  The

7    jury found that the '844 patent was invented on November 8, 1996 and the '731 patent was

8    invented on November 6, 1997.  *Id*.  The jury found that Defendant did not prove the Asserted

9    Patents were anticipated by any prior art references.  *Id*. at 5.  Finally, the jury awarded a lump-

10   sum damages award to Plaintiff for each of the patents Defendant infringed.  *Id*. at 6-7.

11       Following the jury's verdict, the Court set a bench trial on the non-jury legal issues for

12   September 9, 2015.  ECF 466.  Defendant submitted its opening brief on August 20, 2015.  ECF

13   446.  Plaintiff filed its opposition brief on August 27, 2015.  ECF 451.  Defendant filed its reply

14   brief on September 2, 2015.  ECF 459.  On September 3, 2015, Defendant also filed a motion to

15   exclude certain witnesses from testifying about laches during the bench trial.[2]  ECF 460.  During

16   the bench trial, Defendant elicited testimony from Steven Schoenfeld and Plaintiff elicited

17   testimony from Dr. Harry Bims.  ECF 465 at 3.  The Court also heard argument from Plaintiff and

18   Defendant about the non-jury legal issues.  *Id*.  The Court ordered the parties to submit proposed

19   findings of fact and law by September 23, 2015.  ECF 470.  However, on September 18, 2015, the

20   Federal Circuit issued its *en banc* decision in *SCA Hygiene Products Atiebolag v. First Quality*

21   *Baby Products*, LLC, No. 2013-1564 (Fed. Cir. Sept. 18, 2015) which addressed the current status

22   of laches in the patent context.  As a result, at the parties' request, the Court allowed the parties to

23   file their findings of fact and law by September 28, 2015.  ECF 470.  On September 28, 2015, both

24   parties submitted their proposed findings of fact and law.  ECF 472, 473.

25   **II.    LEGAL STANDARD**

26       Federal Rule of Civil Procedure 52(a) requires district courts to make findings of fact in an

27   _____

28   [2] For the reasons addressed on the record during the bench trial, the Court TERMINATES AS MOOT Defendant's motion to exclude witnesses.

2

1  action "tried on the facts without a jury or with an advisory jury." Fed. R. Civ. P. 52(a)(1). When

2  a claim is submitted to an advisory jury, "the court is free to accept or reject the jury's advisory

3  verdict in making its own findings." *Harris v. Sec'y. U.S. Dep't of Army*, 119 F.3d 1313, 1320

4  (8th Cir. 1997). The Court is required to "find facts specially and state its conclusions of law

5  separately." *Id*. "One purpose behind Rule 52(a) is to aid the appellate court's understanding of

6  the bases of the trial court's decision." *Simeonoff v. Hener*, 249 F.3d 883, 891 (9th Cir. 2001)

7  (internal citations omitted). The Court is not required to make findings on each and every fact

8  presented at trial. *Id*. Conflicting testimony must be resolved on relevant issues. *Zivkovic v.*

9  *Southern California Edison*, *Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002).

## III.    PRIORITY DATES

### A.    '844 Patent

12  Defendant argues that the '844 patent is not entitled to an effective filing date earlier than

13  December 22, 1997 for two reasons. Def.'s Mot. at 1-3, ECF 446-3. First, Defendant argues that

14  Plaintiff did not properly claim priority to an earlier effective filing date of November 8, 1996

15  through the '388 and '097 applications during prosecution. *Id*. at 1-2. Second, Defendant

16  contends that Plaintiff has not put forth evidence to show it conceived of the invention covered by

17  the '844 patent by November 8, 1996, and was diligent in reducing it to practice from November

18  8, 1996 to December 22, 1997. *Id*. Plaintiff argues that it is not trying to claim priority to

19  November 8, 1996 based on its actions during prosecution. Sept. 9 Trial Tr. 218:2-7, ECF 465.

20  Instead, Plaintiff argues that it provided evidence that it conceived of the '844 patent invention by

21  November 8, 1996. Plaintiff contends it showed that the '639 provisional application which is

22  listed on the front page of the '844 patent was filed on November 8, 1996. Plaintiff also argues

23  that it showed it was diligent between November 8, 1996 and December 22, 1997 in reducing the

24  invention to practice by filing the '097 and '388 provisional applications. Pl.'s Opp. at 1-2, ECF

25  451-4. The jury's advisory verdict found that the '844 patent's priority date is November 8, 1996.

26  ECF 438 at 4.

### i.    Findings of Fact

28  With respect to the priority date of the '844 patent, the Court makes the following findings

3

of fact:

1. The '844 patent issued on November 28, 2000. *See* JTX-2001.

2. The Provisional Application No. 60/030,639 ("the '639 provisional application") is listed on the first page of the '844 patent, *id.*, and is also identified in the specification under the title "Priority Reference to Related Applications." *Id.* at col. 1:8-12

3. The '639 provisional application was filed on November 8, 1996. *Id.*

4. Dr. Trent Jaeger testified that the '844 patent specification told him that the idea for the patent was disclosed on November 8, 1996 by claiming benefit to the '639 provisional application. Trial Tr. at 1918:8-1919:1. Dr. Jaeger did not show that the '639 provisional application disclosed the claimed invention of the '844 patent and he did not testify as to why the disclosure of the '639 provisional application informed him that one of ordinary skill in the art had conceived of the claimed invention of the '844 patent. *See id.*

5. Application Nos. 08/964,388 ("the '388 application) and 08/790,097 ("the '097 application") are listed within the "Priority Reference to Related Applications" section of the '844 patent. *See* JTX-2001 at col. 1:5-20.

6. The '097 application was filed on January 29, 1997 and the '388 application was filed on November 6, 1997. *Id.*

7. The '844 patent application was filed on December 22, 1997. *Id.*

8. Dr. Jaeger did not provide any testimony regarding diligence in reduction to practice between November 8, 1996 and December 22, 1997. *See* Trial Tr. 1918:8-1919:1.

9. Shlomo Touboul was the only named inventor of the '844 patent presented at trial. He offered no evidence of conception or diligent reduction to practice for the '844 patent. Trial Tr. 366:21.

10. There was no evidence of activities between November 8, 1996 and January 29, 1997 indicating diligent reduction to practice of the '844 patent. *See generally* Trial Tr.

11. On January 29, 1997, the '097 application was filed. *See* JTX-2001 at col. 1:5-20

12. There was no evidence of activities between January 29, 1997 and November 6, 1997

4

1    indicating diligent reduction to practice of the '844 patent.  *See generally* Trial Tr.

2    13. On November 6, 1997, the '388 application was filed.  *See* JTX-2001 at col. 1:5-20

3    14. There was no evidence of activities between November 6, 1997 and December 22,

4    1997 indicating diligent reduction to practice of the '844 patent.  *See generally* Trial

5    Tr.

6    15. In 1996, Plaintiff was focused on computer security software and hardware security.

7    Trial Tr. 284:6-285:4.  By 1998, the company had around 150 to 200 employees

8    including a large research and development group.  *Id.*  There was no evidence about

9    how many people were working on the '844 patent.  *See id.*

10   16. Plaintiff's two main lines of business were investing, researching, and developing new

11   products and licensing its technology relating to software and hardware security.  Trial

12   Tr. 285:23-286:22; *see also* 317:16-21.  There was no evidence about how much

13   resources Plaintiff spent on the '844 patent.  *See id.*

14   17. Plaintiff spent more than $65 million in researching and developing the Asserted

15   Patents.  Trial Tr. 302:1-4.  There was no evidence about how much of that money was

16   spent developing the '844 patent.  *See id.*

17   **ii.    Conclusions of Law**

18   The date on which a patent application is filed is presumed to be the applicant's date of

19   invention.  *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir.

20   1986) ("[T]he date of invention [is] presumed to be the filing date of the application until an

21   earlier date is proved.").  "Priority of invention is a question of law, based on findings of

22   evidentiary fact directed to conception, reduction to practice, and diligence."  *Scott v. Koyama*,

23   281 F.3d 1243, 1246 (Fed. Cir. 2002) (citation omitted).  "Conception is the formation, in the

24   mind of the inventor, of a definite and permanent idea of the complete and operative inventions, as

25   it is thereafter to be applied in practice."  *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir.

26   1998).  "The filing of a patent application is constructive reduction to practice of the invention

27   disclosed therein."  *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 975

28   (Fed. Cir. 2014).  In order to show diligence, there must be "reasonabl[e] continuing activity to

1   reduce the invention to practice." *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).

2   "There is no rule requiring a specific kind of activity in determining whether the applicant was

3   reasonably diligent in proceeding toward…reduction to practice." *Id*. at 1382.

4        Since Plaintiff is not trying to claim an earlier effective priority date based on its action

5   during the prosecution of the '844 patent, the Court does not address Defendant's first argument.

6   With respect to whether Plaintiff has shown conception and diligent reduction to practice, the

7   jury's advisory verdict found that the priority date of the '844 patent is November 8, 1996.  ECF

8   438 at 4.  Based on the record, the Court will not adopt the jury's advisory verdict and instead

9   finds that Plaintiff did not put forth sufficient evidence to show that the '844 patent is entitled to a

10   November 8, 1996 priority date.

11        Starting with conception, Dr. Trent Jaeger testified only that the '844 patent was conceived

12   by November 8, 1996 because it claimed priority to the '639 provisional application.  However,

13   Dr. Jaeger did not provide evidence about how the '639 application showed that the invention of

14   the '844 patent had been conceived.  Without knowing whether Dr. Jaeger reviewed the '639

15   provisional application and whether the '639 provisional application disclosed enough information

16   to show that the inventor had "a definite and permanent idea of the complete ['844 patent]," the

17   Court finds that Plaintiff has not shown the '844 patent was conceived by November 8, 1996.  *See*

18   *Cooper*, 154 F.3d at 1327.

19        Plaintiff also failed to show that it was diligent in reducing to practice the invention of the

20   '844 patent.  Between November 8, 1996 and December 22, 1997, Plaintiff's sole evidence of

21   diligence is that the applications listed as priority references to the '844 patent were filed on

22   January 29, 1997 and November 6, 1997 and general information about its business plans and

23   research and development budget for all of the Asserted Patents.  At best, this evidence indicates

24   Plaintiff engaged in activity on two different days in a thirteen month span in an effort to reduce to

25   practice the invention of the '844 patent.  However, there is no evidence about how Plaintiff was

26   diligent during the remaining time within those thirteen months.  Additionally, general

27   information about business plans or research expenditures covering several patents is not sufficient

28   to establish that any amount of funds or effort was directly devoted to the development of the '844

United States District Court
Northern District of California

6

1    patent. Accordingly, the Court finds that Plaintiff has not met its burden to show that the '844

2    patent has a priority date of November 8, 1996 and therefore, the presumptive invention date of

3    the '844 patent is its filing date of December 22, 1997.

4        **B.    '731 Patent**

5            Defendant argues Plaintiff has not shown that claims 1 and 17 of the '731 patent are

6    entitled to a priority date earlier than May 3, 2004, the filing date of the '731 patent. Def.'s Mot.

7    at 3, ECF 446-3. Plaintiff argues that the '731 patent is entitled to an effective filing date of

8    November 6, 1997, based on an earlier continuation-in-part '667 patent application filed on March

9    30, 2000, which was a continuation of the '388 patent application filed on November 6, 1997.

10   Jury Instructions 38:22-26, ECF 437. Defendant counters that Plaintiff cannot rely on the '667

11   and '338 applications to establish an earlier effective filing date because it failed to show that the

12   '667 and '388 applications supported every element of claims 1 and 17 of the '731 patent

13   application. Def.'s Mot. at 3-4, ECF 446-3. Specifically, Defendant argues that claims 1 and 17

14   of the '731 patent application contain the terms "cache," "file cache," and "security profile cache"

15   and claim 1 also contains the term "security profile cache" (collectively, "caching terms"). *Id.*

16   According to Defendant, none of the caching terms appear in the '667 and '388 patent applications

17   and Plaintiff has not shown that the caching terms are supported by the disclosures of the '667 and

18   '388 patent applications. *Id.* Finally, Defendant notes that the '667 and '388 applications' failure

19   to mention any of the caching terms is fatal to Plaintiff's argument that these applications disclose

20   the caching terms. *Id.* Defendant contends that during the prosecution of the '731 patent, Plaintiff

21   distinguished the prior art reference Ji by arguing that it did not disclose a "security profile cache"

22   because it provided no discussion of a security profile cache or any cache at all. *Id.* Plaintiff

23   argues that it presented evidence through Dr. David Lyon's testimony that showed the '667 and

24   '338 patent applications disclosed every element of claims 1 and 17 of the '731 patent application.

25   Pl.'s Opp. at 2-3. Plaintiff also argues that Defendant misconstrues Plaintiff's arguments with

26   respect to the Ji patent during prosecution. *Id.* The jury's advisory verdict found that the '731

27   patent's priority date is November 6, 1997. ECF 438 at 4.

28        **i.    Findings of Fact**

United States District Court
Northern District of California

With respect to the priority date of the '731 patent, the Court makes the following findings of fact:

1. The '731 patent issued on August 26, 2008. *See* JTX-2005.

2. Plaintiff asserted claims 1 and 17 of the '731 patent.

3. The patent application that led to the '731 patent is a continuation-in-part of Application No. 09/539,667 ("the '667 application"), which was filed on March 30, 2000. JTX-2005. The '667 application is a continuation of Application No. 08/964,388 ("the '388 application"), which was filed on November 6, 1997. *Id.*

4. The '388 issued as U.S. Patent No. 6,092,194 ("the '194 Patent").

5. The specification in the section entitled "Cross References to Related Applications" also identifies the relationship between the '731 Patent and the November 6, 1997 filing of the patent application for the '194 Patent. JTX 2005 at col. 1:7-16.

6. The asserted claims 1 and 17 of the '731 patent contain the terms "cache," "file cache," and "security profile cache." *Id.* at 11:35-55 and 13:26-44.

7. The words "cache" or "caching" do not appear within the '194 patent. Trial Tr. 1907:6-8 (testimony of Dr. David Lyon).

8. The terms "cache," "file cache," "security profile cache," and "security policy cache" do not appear within the '388 application. Exh. 8 to Kim Decl., ECF 447-9.

9. Dr. Lyon testified that the '194 patent disclosed the concepts of "cache" or "caching." Trial Tr. 1879:1-1880:8 and 1907:1-24. Dr. Lyon further opined that all of the elements from claims 1 and 17 are disclosed in the '194 patent. *Id.* Dr. George Necula testified that the '194 patent did not disclose the concepts of "cache" or "caching." *Id.* at 1822:24-1823:16. The Court finds Dr. Lyon's testimony to be credible.

10. During the prosecution of the '731 patent, in order to overcome prior art, Plaintiff argued that the prior art Ji reference did not disclose a "security profile cache" because "Ji provides no discussion of a security profile cache, or, for that matter, any cache at all." Ex. 5 to Kim Decl. at FINJAN-BC 000982, ECF 447-6.

**ii.    Conclusions of Law**

8

*United States District Court*
*Northern District of California*

1    When determining the priority date of a patent, "the test for sufficiency of support in a

2    parent application is whether the disclosure of the application relied upon 'reasonably conveys to

3    the artisan that the inventor had possession at that time of the later claimed subject matter.'"

4    *Ralston Purina Co. v Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir 1985).

5    The Court agrees with Plaintiff and finds that the '731 patent is entitled to a priority date of

6    November 6, 1997. Plaintiff presented persuasive evidence to show that all the elements of the

7    '731 patent are disclosed in the '667 and '338 applications. Trial Tr. 1879:2-1880:7 (Dr. David

8    Lyon testifying that "[a]ll of the necessary terms from the '731 claims were [in the '667 and '388

9    applications].") Thus, based on the '667 and '338 applications, an artisan would know "that the

10    inventor had possession of the later claimed subject matter." *Ralston Purina*, 772 F.3d at 1575.

11    Although Defendant presented evidence through Dr. George Necula that the '667 and '338

12    application did not disclose the idea of caching terms, Trial Tr. 1822:24-1823:16, based on the

13    jury's advisory verdict, the jury necessarily found Dr. David Lyon's testimony credible. The

14    Court agrees with the jury's credibility finding.

15    With respect to Defendant's belief that Plaintiff's presentation during the prosecution of

16    the '731 patent contradicts its position regarding the priority date of the '731 patent, the Court

17    finds Defendant's argument overgeneralizes Dr. David Lyon's testimony and the disclosure of the

18    Ji patent. Dr. Lyon testified that the '667 and '337 patent applications disclose caching because

19    they disclose "a memory [which] can be a cache." Trial Tr. 1879:17. Defendant's argument

20    generalizes memory to include any storing of files and as a result argues that any storing of files

21    must include a cache. Defendant then turns to the Ji patent and notes that it discloses "files stored

22    on a disk drive" which Defendant generalizes to the storing of files and then argues that based on

23    Plaintiff's theory about the '667 and '337 patent applications, the Ji patent must, contrary to

24    Plaintiff's position during prosecution, also disclose a cache. However, Defendant's argument

25    fails because Defendant has provided no evidence that a memory and disk drive are co-extensive

26    terms. Given that they are two different terms, the reasonable inference, in the absence of any

27    evidence, is that these terms have different meanings. Accordingly, the Court finds that the '731

28    patent is entitled to a priority date of November 6, 1997.

United States District Court
Northern District of California

9

## IV.     PROSECUTION HISTORY ESTOPPEL

Defendant argues that Plaintiff is barred from asserting infringement under the doctrine of equivalents for the asserted claims of the '844, '633, '968, and '780 patents.  Def.'s Mot. at 4-9, ECF 446-3.  With respect to the '633 patent, Defendant argues that Plaintiff is estopped from asserting the doctrine of equivalents because of the position it took during the prosecution of the '633 patent to distinguish the claimed subject matter from the prior art.  Def.'s Mot. at 6-7, ECF 446-3.  Defendant notes that the Patent Office initially rejected the pending claims in view of the Golan prior art.  *Id*.  In responding to the rejection, Plaintiff stated:

> "In distinction with the claimed invention, Golan does not describe the packaging of protection code. Instead, Golan discusses a situation whereby a security monitor is already resident on a client computer, as illustrated in FIGS. 2, 5 and 9 of Golan, without concerning itself as to how the security monitor was installed. In fact, prima facie the methodology of the claimed invention, of packaging mobile protection code with downloadable information, seems wasteful and counter-intuitive, since such protection code is typically re-transmitted to the client computer many times - in particular, each time a downloadable with executable code is downloaded."

Id.  According to Defendant, this response clearly and unmistakably surrendered any method or system that does not have packaging of the protection code, transmitting the protection code to the client computer, and packaging and transmitting each time a downloadable with executable code is downloaded.  *Id*.  Defendant argues that Plaintiff is now trying to reclaim this abandoned subject matter by arguing that the "kernel scout" found in Defendant's MMA meets the causing limitation through the doctrine of equivalents even though the "kernel scout" is not packaged, transmitted, or packaged and transmitted each time a downloadable executable code is downloaded.  *Id*.  Plaintiff counters that it did not make any clear and unmistakable surrender of subject matter during the prosecution of the '633 patent.  Pl.'s Opp. at 5-6, ECF 451-4.

### A.     Findings of Fact

With respect to prosecution history estoppel, the Court makes the following findings of fact:

1.  Defendant disclosed its defense of prosecution history estoppel during discovery.
    Defendant's Third Supplemental Responses to Plaintiff's Second Set of Interrogatories at 24, ECF 451-6.

10

United States District Court
Northern District of California

2. The verdict form instructed the jury to decide whether the accused products literally infringed the asserted claims.  EC 438 at 2.  For each claim that was not literally infringed, the verdict form instructed the jury to decide whether the claim was infringed under the doctrine of equivalents.  *Id.* at 2-3.

3. The jury found all the claims literally infringed except for the claims of the '822 patent and the '633 patent.  *Id.* at 2.

4. Despite the instructions on the verdict form, the jury decided whether each asserted claim was infringed under the doctrine of equivalents.  *Id.* at 3.  The jury found all the claims were infringed under the doctrine of equivalents except for the claims of the '822 patent.  *Id.*

5. The parties waived this inconsistency and agreed to allow the jury to be discharged.  Trial Tr. 2192-2193.

6. Plaintiff asserted infringement under the doctrine of equivalents for the following limitation found in claim 14 of the '633 patent: "causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code."  Trial Tr. at 610:21-612:14.

7. During the prosecution of the '633 patent, the Patent Office rejected the pending claims in view of a prior art called Golan.  Exh. 4 at FINJAN-BC 001281-286, ECF 447-5.

8. In a letter addressing the rejection under, Plaintiff remarked on the distinctions between the claimed invention and Golan:

> "In distinction with the claimed invention, Golan does not describe the packaging of protection code. Instead, Golan discusses a situation whereby a security monitor is already resident on a client computer, as illustrated in FIGS. 2, 5 and 9 of Golan, without concerning itself as to how the security monitor was installed. In fact, prima facie the methodology of the claimed invention, of packaging mobile protection code with downloadable information, seems wasteful and counter-intuitive, since such protection code is typically re-transmitted to the client computer many times - in particular, each time a downloadable with executable code is downloaded."

*Id.* at FINJAN-BC 001269.

9. In responding to the Examiner's Arguments, *see id.* at FINJAN-BC 001269-001274,

11

1    Plaintiff dealt with the rejection of each claim individually.  *Id.* at FINJAN-BC

2    001270.

3    10. In addressing the rejection of claim 30 (current claim 14), Plaintiff asserted that claim

4    14 "is neither shown nor suggested in Golan."  *Id.* at FINJAN-BC 001271.  Plaintiff

5    did not reference its earlier general remarks.  *Compare id.* at FINJAN-BC 001271

6    (addressing rejection of claim 30 without referencing earlier general remarks) *with id.*

7    at FINJAN-BC 001270 (addressing rejection of claim 1 and referencing earlier general

8    remarks).

9    **B.    Conclusions of Law**

10    Prosecution history estoppel "is a legal question for the court."  *Glaxo Wellcome, Inc. v.*

11   *Impax Laboratories, Inc.*, 220 F. Supp. 2d 1089, 1093 (N.D. Cal. Aug. 21, 2002).  "To invoke

12   argument-based estoppel, the prosecution history 'must evince a clear and unmistakable surrender

13   of subject matter.'"  *Conoco, Inc. v. Energy & Envtl Int'l., L.C.*, 460 F.3d 1349, 1364 (Fed. Cir.

14   2006).  With argument-based estoppel, unlike amendment-based estoppel, "we do not presume a

15   patentee's arguments to surrender an entire field of equivalents through simple arguments and

16   explanations to the patent examiner."  *Id.*

17    As an initial matter, the Court finds Defendant's prosecution history estoppel defense with

18   respect to the '844, '968, and '780 patents is moot.  The jury found that these patents were literally

19   infringed by the accused products and were instructed not to consider whether these patents were

20   also infringed under the doctrine of equivalents.  As a result, the jury verdict with respect to the

21   doctrine of equivalents of the '844, '968 and '780 patents is surplusage and not necessary for the

22   resolution of this action.  Accordingly, the Court declines to issue an opinion on issues that are not

23   necessary to the resolution of this action.

24    With respect to the '633 patent, the Court agrees with Plaintiff and finds that it did not

25   clearly and unmistakably surrender subject matter that it is now trying to recapture.  "Generally,

26   courts will only find argument-based estoppel appropriate when the patentee has explicitly

27   disavowed a specific feature in the prior art; additional statements meant to further distinguish the

28   claimed invention from prior art do not constitute clear and unmistakable surrender." *Baseball*

United States District Court
Northern District of California

12

1   *Quick, LLC v. MLB Adv. Media L.P.*, No 11-CV-1735-KBF, 2014 WL 6850965, at *9 (S.D.N.Y.

2   Dec. 4, 2014) (collecting cases).  Contrary to Defendant's argument, Plaintiff's statements about

3   the Golan prior art did not amount to a clear and unmistakable surrender of subject material.

4   Rather, Plaintiff was explaining the novelty of its invention in light of the prior art.  If Defendant's

5   argument was true, it "would effectively eviscerate the doctrine of equivalents, because all patent

6   applicants must explain with particularity how their claimed invention differs from prior art in

7   order to obtain a patent." *Id.*

8        Further, Defendant has not shown that Plaintiff's general statements about the Golan prior

9   art pertain to claim 14.  Reviewing Plaintiff's response to the patent office's rejection shows that

10  Plaintiff only referred to its general remarks about the Golan prior art in reference to claim 1.  Exh.

11  4 at FINJAN-BC 001270, ECF 447-5 (explaining the limitation "is neither shown nor suggested in

12  Golan, *as explained above hereinabove* [referring to Plaintiff's general statements about the Golan

13  prior art]) (emphasis added).  Meanwhile, with respect to claim 30 (current claim 14), Plaintiff

14  simply argues that Golan does not disclose the limitations present in clam 30 but its argument does

15  not reference the prior general statements about the Golan prior art.  *Id.* at FINJAN-BC 001271.

16  Given this uncertainty, Plaintiff's arguments do not constitute a clear and unmistakable surrender

17  of subject matter.  Accordingly, the Court finds that argument-based estoppel does not apply to the

18  '633 patent.

19  **V.    PATENT ELIGIBILITY UNDER 35 U.S.C. § 101**

20      **A.    Findings of Fact**

21          1.  Plaintiff asserted claims 1, 7, 11, 15, and 41 of the '844 patent.  EC 438 at 1.

22          2.  Contested terms are construed as set forth in the Court's order construing claims.  ECF

23              118.

24      **B.    Conclusions of Law**

25          Defendant argues that the '844 patent is ineligible under 35 U.S.C. § 101 because  its

26  claims are directed to an abstract idea and do not contain an inventive concept.  Def.'s Mot. at 9-

27  17.  The '844 patent claims a system and methods of network protection wherein an inspector

28  reviews a piece of downloadable-information for suspicious code or behavior.  JTX-2001 at col.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

2:3-19.  The inspector generates a profile characterizing the areas of suspicion and then attaches

that profile to the downloadable-information.  *Id.*  The profile can include other unique identifiers

and certificates that are later read by a protection engine to determine whether or not to trust the

profile.  *Id.* at col. 2:20-48. By providing verifiable profiles, the object of the invention is to

provide flexible, efficient protection against known and unknown hostile downloadable

information without having to re-inspect the same piece of downloadable-information each time.

*Id.* at col. 2:61-3:7.

The asserted claims of the '844 patent include three independent claims—claims 1, 15, and

41—and two dependent claims—claims 7 and 11, each of which is dependent on claim 1.  JTX-

2001 at col. 11-14.  Claim 1 of the '844 patent, representative for § 101 purposes, recites:

> 1. A method comprising:
>> receiving by an inspector a Downloadable;
>> generating by the inspector a first Downloadable security profile that
>> identifies suspicious code in the received Downloadable; and
>> linking by the inspector the first Downloadable security profile to the
>> Downloadable before a web server makes the Downloadable available to
>> web clients.

*Id.* at col. 11:13-21.  Claim 15 differs from claim 1 through the addition of a memory for storing a

"rule set," followed by a "content inspection engine for using the first rule set to generate a first

Downloadable security profile."  *Id.* at col. 11:61-12:2.  Claim 41 differs from claim 1 through the

addition of a "computer-readable storage medium."  *Id.* at col. 14:8-19.  Dependent claim 7 adds

that the "[d]ownloadable includes a JavaScript script," *id.* at 11:34-35, and dependent claim 11

adds that the prolife "includes a list of operations deemed suspicious," *id.* at 11:44-46.

Section 101 of the Patent Act defines the classes of patentable subject matter: "Whoever

invents or discovers any new and useful process, machine, manufacture, or composition of matter,

or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions

and requirements of this title."  35 U.S.C. § 101.  Despite the apparent breadth of this language, §

101 has long contained "an important implicit exception: Laws of nature, natural phenomena, and

abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics*, 133 S.Ct.

2107, 2116 (2013) (quoting *Mayo Collaborative Services v. Prometheus Laboratories*, 132 S.Ct.

14

1   1289, 1293 (2012)).

2       In *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014), the Supreme Court clarified the

3   framework that should be used to determine whether a patent claims patent-eligible subject matter.

4   First, the claims at issue should be analyzed to determine if they are directed to one of those

5   patent-ineligible concepts.  Step two of the analysis is a "search for an 'inventive concept'—i.e.,

6   an element or combination of elements that is sufficient to ensure that the patent in practice

7   amounts to significantly more than a patent upon the ineligible concept itself." *Id*. (internal

8   citations omitted).

9       The burden of proof applicable to a Section 101 challenge is not a settled question of law.

10  *See Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067-LPS, 2015 WL 1843528, at *5-6

11  (D. De. April 22, 2015) (describing whether to apply a burden of clear and convincing evidence or

12  a burden of a preponderance of the evidence to patent eligibility).  However, this question does not

13  need to be resolved in the context of this motion because the Court's holding would be the same

14  whether the Court applied a burden of clear and convincing evidence or a burden of a

15  preponderance of the evidence.

16      The first step in a Section 101 analysis is to determine whether the claim at issue is

17  directed to a "patent-ineligible concept."  *Ultramercial, Inc. v. Hulu,* LLC, 772 F.3d 709, 714

18  (Fed. Cir. 2014).  Defendant argues that claim 1 of the '844 patent is directed towards an abstract

19  idea.  Def.'s Mot at 9-11, ECF 446-3.  According to Defendant, although the specification states

20  that the benefit of the '844 patent is to recognize computer viruses in a downloadable, the actual

21  claim does not provide a non-abstract solution to the problem of recognizing a computer virus in a

22  downloadable.  *Id*. at 10-11.  Defendant contends that claim 1 is directed to the abstract idea of

23  "receiving" a downloadable, "generating" information, and then "linking" the downloadable and

24  generated information.  *Id*.

25      Plaintiff argues that claim 1 of the '844 patent is not abstract because it is "necessarily

26  rooted in computer technology in order to overcome a problem specifically arising in the realm of

27  computer networks."  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir.

28  2014).  Plaintiff contends that contrary to Defendant's overgeneralization of claim 1 of the '844

15

1    patent, claim 1 covers a specific technique of protecting computer networks.  Pl.'s Opp. at 9-12,

2    ECF 451-4.  As further support for its argument that the '844 patent is not directed towards an

3    abstract idea, Plaintiff notes that guidance from the Patent Office has held a similar claim directed

4    towards isolating and removing malicious code from electronic messages through receiving data,

5    storing data, scanning data, and creating a new data file is not abstract.  *Id.* at 10-11.

6          The Court concludes that claim 1 of the '844 patent is not directed towards an abstract

7    idea.  The Court finds the claim at issue to be similar to the hypothetical claim in the Patent

8    Office's guidance.  See "2014 Interim Guidance on Patent Subject Matter Eligibility (Interim

9    Eligibility Guidance) for USPTO personnel to use when determining subject matter eligibility

10   under 35 U.S.C. § 101 in view of recent decisions by the U.S. Supreme Court, including Alice

11   Corp., Myriad, and Mayo", *available at* www.uspto.gov/patent/laws-and-regulations/examination-

12   policy (last visited November 9, 2015) (hereinafter "Patent Office's Guidance).  Although

13   Defendant argues and the Court recognizes that the Patent Office's guidance is not binding, the

14   Court finds its reasoning persuasive.  *See Intellectual Ventures I*, 2015 WL 1843528 at *9

15   (discussing the Patent Office's guidance in a patent eligibility analysis).  In its guidance, the Patent

16   Office analyzed a hypothetical claim covering "Isolating and Removing Malicious Code from

17   Electronic Messages."  Patent Office's Guidance at Abstract Idea Examples, part 1, example 1,

18   claim 1.  The hypothetical claim covers "receiving an electronic communication," "storing the

19   communication," and "extracting…malicious code from the electronic communication to create a

20   sanitized electronic communication."  *Id.*  The Patent Office explained that the hypothetical claim

21   was not directed to an abstract idea because

22         The claimed invention relates to software technology for isolation and extraction
23         of malicious code contained in an electronic communication. The claim is
          directed towards physically isolating a received communication on a memory
24         sector and extracting malicious code from that communication to create a
          sanitized communication in a new data file. Such action does not describe an
25         abstract concept, or a concept similar to those found by the courts to be abstract,
          such as a fundamental economic practice, a method of organizing human activity,
26         an idea itself (standing alone), or a mathematical relationship. In contrast, the
          invention claimed here is directed towards performing isolation and eradication of
27         computer viruses, worms, and other malicious code, a concept inextricably tied to
          computer technology and distinct from the types of concepts found by the courts

United States District Court
Northern District of California

16

to be abstract. Accordingly, the claimed steps do not recite an abstract idea.

*Id.*

In this case, claim 1 of the '844 patent is directed towards receiving a downloadable, identifying suspicious or malicious code and generating a security profile, and associating the downloadable with the security profile. These steps do not describe an abstract concept as they are directed towards performing steps leading to identifying malicious code to create a new data file containing a security profile. Further, the Patent Office's hypothetical claim is "necessarily rooted in computer technology because malicious code or 'viruses' have no significance outside the realm of computer technology." *Intellectual Ventures I*, 2015 WL 1843528, at *9. Similarly, claim 1 of the '844 patent is also rooted in computer technology as it covers the identification of suspicious code which do not have significance outside the realm of computer technology. *See DDR Holdings, LLC*, 773 F.3d at 1257; *see also Intellectual Ventures I, LLC v. Canon Inc.*, No. 13-473-SLR, 2015 WL 687446, at *19-*22 (D. De. Nov. 9, 2015) (finding computer-implemented invention eligible under 35 U.S.C. § 101).

Defendant relies on another *Intellectual Ventures* case to argue that claims directed to malware can still be abstract. *See Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, 13-CV-3777-AKH, 2015 WL 1941331 (S.D.N.Y. April 28, 2015). But *Intellectual Ventures II* is distinguishable because preemption was an overriding concern with the claims in that case. *Id.* In *Intellectual Ventures II*, the claims were so broad that they had the potential to "monopolize every concrete application of post-distribution access to intellectual property and validating such a patent 'would tend to impede innovation rather than promote it, thereby thwarting the primary object of the patent laws.'" Contrary to *Intellectual Ventures II*, the Court does not find a similar preemption concern in this case. While Defendant argues that these patent claims would preempt a broad swath of network security-based innovation, Plaintiff counters that there are many possible ways and unclaimed alternatives to malware protection. The Court agrees with Plaintiff and finds that the '844 patent has important and specific limitations about providing pro-active protection. These limitations provide meaningful boundaries on the invention and thus, the '844 patent does not raise preemption concerns. Accordingly, the '844 patent is not directed to an abstract idea and

United States District Court
Northern District of California

17

1    is therefore patent eligible under 35 U.S.C § 101.

2    **VI.    LACHES**

3         Defendant argues that Plaintiff should be barred from recovering any damages by the

4    doctrine of laches.  Def.'s Mot. at 17-25, ECF 446-3.  Plaintiff counters that the doctrine of laches

5    is irrelevant to this action because laches prevents the recovery of only pre-suit damages and

6    Plaintiff only sought damages from the filing date of this action.  Pl.'s Opp. at 18, ECF 451-4.

7         **A.    Findings of Fact**

8         With respect to laches, the Court makes the following findings of fact:

9         1.  On August 28, 2013, Plaintiff filed a Complaint for patent infringement against

10            Defendant.  ECF 1.

11        2.  Defendant disclosed a laches defense for the '968, '822¸ '731, and '633 patents.  Ex. 6

12            at 23-24, ECF 451-6.

13        3.  Defendant did not disclose a laches defense with respect to the '844 patent in its

14            interrogatories.  PTX 660.  However, Plaintiff did not disclose the specific accused

15            functionality of the '844 patent until expert discovery.  ECF 271 4:6.  One week after

16            the Court denied Defendant's motion to strike Plaintiff's disclosure of the specific

17            accused functionality, *see* ECF 271, the parties submitted a joint pretrial statement

18            where Defendant indicated it was asserting laches against the '844 patent.  ECF 293-4

19            at 6.

20        4.  Defendant did not timely disclose a laches defense with respect to the '780 patent.  Ex.

21            6 at 23-24, ECF 451-6.

22        5.  The damages calculation started from August 28, 2013, the filing date of the

23            Complaint.  Trial Tr. 1048:4-10 (testimony of Dr. Anne Layne-Farrar).

24        6.  Plaintiff only presented evidence for a lump sum damages award.  Trial Tr. 1049:7-14.

25            Dr. Anne Layne-Farrar testified that the parties would have agreed to "a lump sum

26            payment covering the royalties."  *Id*; *see also* Jury Instructions at 42:21-22, ECF 437

27            ("reasonable royalty damages in the form of a one-time lump payment").

28        7.  Plaintiff is not seeking prejudgment interest for any time period prior to filing the

United States District Court
Northern District of California

18

1    Complaint.  Sept. 9 Trial Tr. 178:7-9, ECF 465.

2        8.   There was no evidence presented of extraordinary circumstances that would bar an

3             ongoing royalty.  *See generally* Trial Tr.

4        **B.   Conclusions of Law**

5        During the pendency of briefing on the non-jury legal issues, the Federal Circuit issued an

6    *en banc* decision in *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC.*, --- F.3d --

7    -, 2015 WL 5474261 (Fed. Cir. Sept. 18, 2015) which clarified the applicability of laches in the

8    patent context.  The Federal Circuit granted *en banc* review to consider whether "laches remains a

9    defense to legal relief in a patent infringement suit."  *Id.* at *1.

10       Although laches has long been recognized as a defense in patent cases, *see A.C. Aukerman*

11   *Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (en banc), in response to the

12   Supreme Court's ruling in *Petrella*, the Federal Circuit held an *en banc* hearing in *SCA Hygiene* to

13   determine whether laches can still bar claims for pre-suit damages in patent infringement actions

14   and whether laches could bar entire patent infringement suits.  After considering *Petrella*, the

15   relevant statutes, and the legislative history, the Federal Circuit upheld the viability of laches to

16   bar pre-suit damages in the patent infringement context.  *SCA Hygiene Prods. Aktiebolag v. First*

17   *Quality Baby Prods., LLC.*, --- F.3d ---, 2015 WL 5474261 (Fed. Cir. Sept. 18, 2015).  With

18   respect to whether laches could bar prospective relief, the Federal Circuit reexamined *Aukerman* in

19   light of *Petrella* and *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and held that laches

20   may bar a permanent injunction and that consideration of injunctive relief "fits naturally" within

21   the *eBay* framework.  *SCA Hygiene*, 2015 WL 5474261, at *15.  However, with respect to

22   ongoing royalties, the Federal Circuit held that "while the principles of equity apply, equity

23   normally dictates that courts award ongoing royalties, despite laches" and "absent egregious

24   circumstances, when injunctive relief is inappropriate, the patentee remains entitled to an ongoing

25   royalty."  *Id.* at *16.

26       The Court concludes that Defendant's disclosure of a laches defense to the '844 patent was

27   timely under the particular circumstances regarding Plaintiff's disclosure of infringement

28   contentions.  Plaintiff's infringement contentions were sufficiently vague as to the disclosure of

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1   the Cookie2 functionality as to require the Court to determine whether a sufficient disclosure had

2   been made.  Upon issuance of that order, *see* ECF 271, Defendant disclosed its laches defense

3   within one week, *see* ECF 293-4 at 6.  The Court finds Defendant's disclosure regarding the '844

4   patent to be timely.  The Court also concludes that Defendant did not timely disclose a laches

5   defense to the '780 patent.  In responding to Plaintiff's interrogatory seeking the bases for its

6   laches defense, Defendant did not assert laches for the '780 patent.  Ex. 6 at 23-24, ECF 451-6.

7   Although the joint pretrial statement indicated that Defendant was asserting a laches defense to the

8   '780 patent, unlike the '844 patent, there were not any circumstances excusing Defendant's delay

9   in disclosing this information.  Thus, the Court finds that Defendant's disclosure of a laches

10  defense to the '780 patent was untimely.

11          The Court finds that Defendant's laches defense, regardless of the outcome, will not affect

12  any issue in this action.  In *SCA Hygiene*, the Federal Circuit confirmed that under the appropriate

13  circumstances, laches may bar pre-suit damages, injunctive relief, and an ongoing royalty.  Here,

14  Plaintiff did not seek pre-suit damages, injunctive relief, or an ongoing royalty as it only sought

15  damages from the filing date of the complaint and in the form of a "one-time lump payment."

16  Even if Plaintiff were seeking an ongoing royalty, there has been no evidence of extraordinary

17  circumstances that would preclude such relief.  Defendant also does not dispute that Plaintiff is

18  only seeking a lump-sum award covering damages from the filing of this action but rather appears

19  to have hinged its laches argument on the hope that the Federal Circuit would dramatically expand

20  the scope of laches in the face of *Petrella*.  That did not happen and while the *en banc* decision in

21  *SCA Hygiene* may not be the last word on the issue of laches in the patent context, the Court,

22  applying *SCA Hygiene*, finds the issue of laches MOOT.

23  **VII.    ORDER**

24          For the foregoing reasons, IT IS HEREBY ORDERED that:

25          1.      Plaintiff has not met its burden to show that the priority date of the '844 patent is

26                  November 8, 1996 and therefore the presumptive invention date of the '844 patent

27                  is December 22, 1997.

28          2.      The priority date of the '731 patent is November 6, 1997.

3.    Plaintiff is not barred by prosecution history estoppel from asserting infringement under the doctrine of equivalents for the '633 patent.  Defendant's prosecution history estoppel defense with respect to the '844, '968, and '780 patents is MOOT.

4.    Defendant has not met its burden to show that the '844 patent is patent ineligible under 35 U.S.C. § 101.

5.    The issue of laches is MOOT.

Dated:  November 20, 2015

BETH LABSON FREEMAN
United States District Judge

21

1

2

3                              **UNITED STATES DISTRICT COURT**

4                            **NORTHERN DISTRICT OF CALIFORNIA**

5                                     **SAN JOSE DIVISION**

6

7    FINJAN, INC.,                                Case No.  13-cv-03999-BLF

                    Plaintiff,

8

9         v.                                      **JUDGMENT IN A CIVIL CASE**

10   BLUE COAT SYSTEMS, INC.,

                    Defendant.

11

12

13       **IT IS SO ORDERED AND ADJUDGED** that pursuant to the jury verdict filed on

14   August 4, 2015 (ECF No. 438) and the Court's order regarding non-jury legal issues filed on

15   November 20, 2015 (ECF No. 486), judgement is entered in favor of Plaintiff.

16

17   Dated: November 20, 2015

18                                              _____

19                                              BETH LABSON FREEMAN
                                                United States District Judge

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation, | Case No.: 13-CV-03999-BLF |
| Plaintiff, | **VERDICT FORM** |
| v. | |
| BLUE COAT SYSTEMS, INC., a Delaware Corporation, | |
| Defendant. | |

Case 5:13-cv-03999-BLF   Document 481   Filed 08/04/15   Page 2 of 9

## VERDICT FORM

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout this Verdict Form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

1

VERDICT FORM                                      CASE NO. 13-CV-03999-BLF

**QUESTION 1:** Did Finjan prove by a preponderance of the evidence that Blue Coat's product or combination of products as identified below literally infringes any of the following claims of the Asserted Patents? **Answer "Yes" or "No" for each claim.**

| '844 Patent WebPulse | Claim 1 | Yes | Claim 15 | Yes |
| | Claim 7 | Yes | Claim 41 | Yes |
| | Claim 11 | Yes | | |
| '822 Patent ProxySG | Claim 9 | No | Claim 10 | No |
| '633 Patent ProxySG + CAS + MAA | Claim 14 | No | | |
| '731 Patent ProxySG + WebPulse | Claim 1 | Yes | Claim 17 | Yes |
| '968 Patent ProxySG + WebPulse | Claim 1 | Yes | | |
| '780 Patent ProxySG + ProxyAV | Claim 9 | Yes | Claim 13 | Yes |

For each claim you did not find to be literally infringed, answer Question 2.

2

VERDICT FORM                                              CASE NO. 13-CV-03999-BLF

**QUESTION 2:** Did Finjan prove by a preponderance of the evidence that Blue Coat's product or combination of products as identified below infringe under the doctrine of equivalents? **Answer "Yes" or "No" for each claim.**

| **'844 Patent** **WebPulse** | Claim 1 _Yes_   Claim 7 _Yes_   Claim 11 _Yes_ |
|---|---|
| **'822 Patent** **ProxySG** | Claim 9 _No_   Claim 10 _No_ |
| **'633 Patent** **ProxySG + CAS + MAA** | Claim 14 _Yes_ |
| **'968 Patent** **ProxySG + WebPulse** | Claim 1 _Yes_ |
| **'780 Patent** **ProxySG + ProxyAV** | Claim 9 _Yes_   Claim 13 _Yes_ |

3

VERDICT FORM                                    CASE NO. 13-CV-03999-BLF

**QUESTION 3:** What are the dates of invention for the '844 Patent and the '731 Patent?

'844 Patent: <u>November 8, 1996</u>

'731 Patent <u>November 6, 1997</u>

Regardless of the dates you find, please answer Question 4 with respect to each patent.

4

VERDICT FORM                                   CASE NO. 13-CV-03999-BLF

**QUESTION 4:** Did Blue Coat prove by clear and convincing evidence that any of the following claims of the Asserted Patents are invalid because they are anticipated? **Answer "Yes" or "No" for each claim.**

| '844 Patent<br><br>U.S. Patent No. 6,253,370 ("Abadi") | Claim 1 No<br><br>Claim 7 No<br><br>Claim 11 No | Claim 15 No<br><br>Claim 41 No |
|---|---|---|
| '822 Patent<br><br>U.S. Patent No. 5,983,348 ("Ji") | Claim 9 No | Claim 10 No |
| '633 Patent<br><br>U.S. Patent No. 5,983,348 ("Ji") | Claim 14 No | |
| '731 Patent<br><br>IBM WebSphere Edge Server: New Features and Function in Version 2, IBM Redbooks ("Braswell") | Claim 1 No | Claim 17 No |
| '968 Patent<br><br>U.S. Patent No. 6,722,214 ("McClain") | Claim 1 No | |
| '780 Patent<br><br>U.S. Patent No. 5,815,709 ("Waldo") | Claim 9 No | Claim 13 No |

5

VERDICT FORM

CASE NO. 13-CV-03999-BLF

**Answer Question 5(a)-(f) only if you have found one or more claims of the Asserted Patents to be infringed and not invalid from Questions 1, 2 and 4.**

**QUESTION 5(a):** If you found any of the asserted claims of the '844 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ _24,000,000_

**QUESTION 5(b):** If you found any of the asserted claims of the '822 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ _0_

**QUESTION 5(c):** If you found the asserted claim of the '633 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ _1,666,700_

**QUESTION 5(d):** If you found any of the asserted claims of the '731 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ _6,000,000_

[continued to the next page]

6

VERDICT FORM                                    CASE NO. 13-CV-03999-BLF

**QUESTION 5(e):**  If you found the asserted claim of the '968 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 7,750,000

**QUESTION 5(f):**  If you found any of the asserted claims of the '780 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 111,787

7

VERDICT FORM                                                    CASE NO. 13-CV-03999-BLF

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations.  The Presiding Juror should then sign and date the verdict form in the spaces below and notify the Security Guard that you have reached a verdict.  The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

DATED: August 4th , 2015          By: _____
                                        Presiding Juror

8

VERDICT FORM                                    CASE NO. 13-CV-03999-BLF

1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

7 FINJAN, INC.,                                    Case No.  13-cv-03999-BLF

        Plaintiff,

8

9     v.                                          **ORDER REGARDING POST-
                                                   JUDGMENT MOTIONS**

10 BLUE COAT SYSTEMS, INC.,

        Defendant.                                 [RE: ECF 492, 498, 499, 500, 505]

11

12

13          Following a ten-day jury trial, the jury returned a verdict finding that Defendant Blue Coat

14 Systems, Inc. infringed five of Plaintiff Finjan, Inc.'s patents involving computer and network

15 security: U.S. Patent Nos. 6,804,780 (the "'780 patent"), 6,154,844 (the "'844 patent"), 7,418,731

16 (the "'731 patent"), 6,965,968 (the "'968 patent"), and 7,647,633 (the "'663 patent").  Verdict 2-3,

17 ECF 438.  The jury found Blue Coat did not infringe U.S. Patent No. 7,058,822 (the "'822

18 patent").  *Id*.  The jury also rejected Blue Coat's invalidity defense of anticipation, *id*. at 5, and

19 issued an advisory verdict that on invention dates of the '844 and '731 patents, *id*. at 4.  The jury

20 awarded Finjan a total of $39,528,487 in lump-sum damages.  *Id*. at 6-7.  Following the jury's

21 verdict, the Court held a bench trial on non-jury legal issues regarding the priority dates for the

22 '844 and '731 patents, prosecution history estoppel, patent eligibility under 35 U.S.C. § 101, and

23 laches.  ECF 466.

24          Blue Coat now moves on several grounds to amend the Court's judgment as a matter of

25 law, ECF 498, and for a new trial, ECF 499, findings of facts and conclusions of law, ECF 500.

26 For the reasons herein, Blue Coat's motion to amend the Court's findings of facts and conclusions

27 of law is DENIED; Blue Coat's motion for judgment as a matter of law is DENIED; Blue Coat's

28 motion for a new trial and motion to amend the judgment is GRANTED IN PART AND DENIED

1  IN PART; Finjan's motion for enhanced damages and pre- and post-judgment interest is

2  GRANTED IN PART AND DENIED IN PART; and Finjan's motion for attorneys' fees is

3  DENIED.

4  **I.     BACKGROUND**

5       Finjan filed its original complaint on August 28, 2013.  ECF 1.  Finjan asserted Blue Coat

6  infringed its '780, '844, '968, '822, and '633 patents.  *Id*. at 9-33.

7       All of the asserted patents are directed toward behavior-based Internet security. That is,

8  rather than scanning and maintaining a list of known viruses and malicious code signatures, the

9  asserted patents provide a system and methods for identifying, isolating, and neutralizing

10  potentially malicious code based on the behavior of that code.

11       The '822 and '633 patents, both titled "Malicious Mobile Code Runtime Monitoring

12  System and Methods," are related and share the same specification. The '822 patent issued on

13  June 6, 2006 and lists Yigal Mordechai Edery, Nimrod Itzhak Vered, and David R. Kroll as

14  inventors.  The '633 patent is a continuation of the '822 Patent, and issued on January 12, 2010.

15  The '633 Patent lists Yigal Mordechai Edery, Nimrod Itzhak Vered, David R. Kroll, and Shlomo

16  Touboul as inventors.  These patents provide systems and methods for protecting devices on an

17  internal network from code, applications, and/or information downloaded from the Internet that

18  performs malicious operations.  '633 patent at Abstract.  At a high level, the disclosed

19  embodiments describe a protection engine that generally resides on a network server and inspects

20  incoming downloads for executable code.  *Id*. col. 2:20-3:4. Upon detection of executable code,

21  the protection engine deploys "mobile protection code" and protection policies to the download

22  destination.  *Id*. col. 3:5-21.  At the destination, the downloadable-information is executed,

23  typically within a sandboxed environment, and malicious or potentially malicious operations that

24  run or attempt to run are intercepted and neutralized by the mobile protection code according to set

25  protection policies.  *Id*. col. 3:22-40.

26       The '844 patent, titled "System and Method for Attaching a Downloadable Security Profile

27  to a Downloadable," issued on November 28, 2000 and lists Shlomo Touboul and Nachshon Gal

28  as inventors.  This patent claims a system and methods of network protection wherein an inspector

United States District Court
Northern District of California

2

reviews a piece of downloadable-information for suspicious code or behavior according to a set of rules. '844 patent at col. 2:3-19. The inspector generates a profile characterizing the areas of suspicion and then attaches that profile to the downloadable-information. *Id*. The profile can include other unique identifiers and certificates that are later read by a protection engine to determine whether or not to trust the profile. *Id*. col. 20-48. By providing verifiable profiles, the object of the invention is to provide flexible, efficient protection against known and unknown hostile downloadable information without having to re-inspect the same piece of downloadable-information each time. *Id*. col. 2:61-3:7.

The '731 patent, titled "Method and System for Caching at Secure Gateways," issued on August 26, 2008 and lists Shlomo Touboul as the sole inventor. This patent describes systems and methods of operating computer and network gateways that protect an intranet of computers. The claimed invention provides for caching of security information and policies at the gateway. '731 patent at Abstract. This caching mitigates network latency—delay in the transmission of data— caused when the gateway processes downloadable information to protect intranet devices. *Id*. col. 1:55-67.

The Court held a *Markman* hearing on August 22, 2014 and construed ten terms. ECF 118. Finjan moved for summary judgment of infringement, ECF 179, and Blue Coat moved for summary judgment of non-infringement of the asserted patent claims, ECF 174. The Court denied Finjan's motion for summary judgment and finding Blue Coat's ProxySG Pop-Up Blocker did not infringe the '822 and '633 patents, granted in part Blue Coat's motion. Order on SJ 25, ECF 184.

From July 20, 2015 to August 3, 2015, the Court held a jury trial regarding Blue Coat's alleged infringement. At trial, Finjan asserted claims 1, 7, 11, 15, and 41 of the '844 patent, claims 9 and 10 of the '822 patent, claim 14 of the '633 patent, claims 1 and 17 of the '731 patent, claim 1 of the '968 patent, and claims 9 and 13 of the '780 patens. Verdict 2, ECF 438. At the close of Finjan's case, Blue Coat moved for judgment as a matter of law on all claims of infringement, judgment as a matter of law pursuant to the Court's claim constructions, and judgment as a matter of law on damages. Trial Tr. 1179:4-18, ECF 428. At the close of all evidence, Blue Coat renewed its request for judgment as a matter of law as to infringement and

United States District Court
Northern District of California

1    damages, and moved for judgment as a matter of law as to invalidity of all asserted claims.  Trial

2    Tr. 1977:15-21, ECF 433.  Finjan moved for judgment as a matter of law on all asserted claims

3    with respect to infringement, validity, and damages.  Trial Tr. 1867:11-14.  The Court allowed all

4    issues to reach the jury.  Trial Tr. 1987:24-1988:1.

5        On August 4, 2015, the jury returned its verdict. Verdict, ECF 438.  The jury found that

6    Blue Coat literally infringed claims 1, 7, 11, 15, and 41 of the '844 patent, claims 1 and 17 of the

7    '731 patent, claim 1 of the '968 patent, and claim 9 and 13 of the '780 patent.  *Id*. at 2.  The jury

8    also found that Blue Coat infringed claim 14 of the '633 patent under the doctrine of equivalents.

9    *Id.* at 3.  The jury found Blue Coat did not infringe, either literally or under the doctrine of

10   equivalents, claims 9 and 10 of the '822 patent.  *Id*. 2-3.  In addition, the jury found Blue Coat did

11   not prove the asserted claims were anticipated by clear and convincing evidence.  *Id*. at 5.  The

12   jury awarded Finjan $24,000,000 for Blue Coat's infringement of the '844 patent, $1,667,000 for

13   infringement of the '633 patent, $6,000,000 for infringement of the '731 patent, $7,750,000 for

14   infringement of the '968 patent, and $111,787 for infringement of the '780 patent.  *Id*. 6-7.

15       On September 9, 2015, the Court held a bench trial regarding priority dates for the '844

16   and '731 patents, prosecution history estoppel, patent eligibility of the '844 patent, and laches.  On

17   November 20, 2015, the Court issued its findings of facts and conclusions of law.  Order

18   Regarding Non-Jury Legal Issues, ECF 486.  The Court found that Finjan had not met its burden

19   to show that the priority date of the '844 patent is November 8, 1996 and thus, the presumptive

20   invention date of the '844 patent is December 22, 1997; the priority date of the '731 patent is

21   November 6, 1997; prosecution history estoppel does not preclude Finjan from asserting

22   infringement of the '633 patent under the doctrine of equivalents; Blue Coat had not met its

23   burden to show the '844 patent is patent ineligible; and Blue Coat's defense of laches is moot.  *Id*.

24   That same day, the Court entered judgment.  ECF 487.

25       The parties filed their respective post-trial motions on December 4, 2015, ECF 492, and

26   December 18, 2015, ECF 498, 499, 500, 505, and the Court held a hearing on these motions on

27   April 28, 2016, ECF 538.

28

United States District Court
Northern District of California

4

## II.    BLUE COAT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL AND AMEND THE JUDGMENT

### A.    Legal Standard

In a patent infringement case, the Federal Circuit applies the law of the regional circuit with respect to matters of procedural law. *Wordtech Sys., Inc. v. Integrated Network Solutions*, 609 F.3d 1308, 1318-19 (Fed. Cir. 2010).

### 1.    Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) allows a party to renew no later than 28 days after the entry of judgment, a motion of for judgment as a matter law made under Rule 50(a) that was not granted by the Court. Fed. R. Civ. P. 50(b). Under Ninth Circuit law, a renewed motion for judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *see also Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1314 (Fed. Cir. 2006) ("A motion for JMOL is properly granted only if no reasonable juror could find in the non-movant's favor.") (citing *Sanghvi v. City of Claremont*, 328 F.3d 532, 536 (9th Cir. 2003)).

In reviewing a motion for a judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1241 (9th Cir. 2014). "'[A]lthough the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe,' and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)(quoting *Reeves v. Sanderson Plumbing Prods. , Inc.*, 530 U.S. 133, 150 (2000)). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Harper v. City of Los Angeles*, 533 F3d 1010, 1021 (9th Cir. 2008).

### 2.    Motion for a New Trial

Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial on all or some of the issues." A court may grant a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A judge should not grant a

2    new trial unless she "is left with the definite and firm conviction that a mistake has been

3    committed." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir.

4    1987) (internal citations omitted). In considering a Rule 59(a) motion for a new trial, the court "is

5    not required to view the trial evidence in the light most favorable to the verdict. Instead, the

6    district court can weigh the evidence and assess the credibility of the witnesses." *Experience

7    Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014). "Ultimately, the

8    district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage

9    of justice." *Id.* (citing *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)). A trial

10   court should grant a motion for a new trial if (1) the jury instructions were erroneous or

11   inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3) the verdict is

12   contrary to the great weight of the evidence. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247,

13   1258 (Fed. Cir. 2004).

### B.    Overview

14

15       All of the issues raised in Blue Coat's Rule 50(b) motion are also raised in Blue Coat's

16   Rule 59 motion for a new trial. As a result, the Court addresses the issues in the order set forth in

17   Blue Coat's Rule 59 motion. Where issues overlap between the Rule 59 and Rule 50(b) motion,

18   the Court discusses them together.

19       In both motions, Blue Coat moved for relief on some issues only in short conclusory

20   statements, often in footnotes. *See, e.g.* Mot. for New Trial 7 n. 10 ("The erroneous jury

21   instructions with regards to damages also warrants a new trial. (*See* Dkt. 425.) So too do

22   erroneous claim constructions."); *see also id.* at 14 n. 16 ("Blue Coat still contends that claim 14 is

23   invalid for the reasons explained in its claim construction brief and motion for summary judgment

24   motion."). Where Blue Coat made conclusory arguments or attempted to incorporate other filings

25   by reference, the Court will not address those arguments further and summarily denies the motions

26   on the grounds previously stated by the Court. *See Asetek Danmark A/S v. CMI USA, Inc.*, Case

27   No. 13-cv-00457-JST, 2015 WL 5568360, at *10; *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182

28   (9th Cir. 2001) ("Issues raised in a brief which are not supported by argument are deemed

6

1    abandoned.").

2        **C.    Settlement Agreements**

3        In support of its damages case, Finjan presented a number of settlement agreements in

4    other cases along with other licensing agreements.  Blue Coat argues the admission of the

5    following three settlement agreements was contrary to law and highly prejudicial: (1) 2012

6    settlement agreement with Webroot; (2) 2010 settlement agreement with Intel/McAfee; (3) 2014

7    settlement agreement with Websense.  Mot. for New Trial 2-5, ECF 499.  According to Blue Coat,

8    under the Federal Circuit's decision in *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed.

9    Cir. 2009), settlement agreements are only admissible in limited circumstances that are not present

10   in this case.  Moreover, Blue Coat argues the settlement agreements were not comparable to the

11   hypothetical negotiation because they took place years after the hypothetical negotiation.  *Id*. at 3.

12   Finally, Blue Coat argues the jury instructions regarding settlement agreements were erroneous

13   because they did not inform the jury that the admitted settlement agreements did not properly

14   reflect a hypothetical negotiation between the parties.  *Id*. at 5.  Finjan responds that the admission

15   of these three settlement agreements does not warrant a new trial.  Opp. to New Trial 1-4, ECF

16   518.

17       The Court disagrees with Blue Coat and finds the admission of the three settlement

18   agreements was not contrary to law and not highly prejudicial.  First, Blue Coat's reliance on

19   *Lucent* is not persuasive.  In *Lucent*, plaintiff's expert relied upon one settlement agreement that

20   was drastically different than other available license agreements and resulted in a damages award

21   three to four times larger than any amount in evidence.  *Id*. at 1328-32.  Here, Finjan used the

22   three disputed settlement agreements as further support for a reasonable royalty within the range

23   suggested by Finjan's other license agreement.  *See, e.g.*, Trial Tr. 1089:6-9 ("But here the royalty

24   that they used here to calculate the settlement payment falls exactly in the range of both the arms

25   length agreements…"); *see also GPNE Corp. v. Apple, Inc.*, Case No. 12-cv-02885-LHK, 2014

26   WL 1494247, at *7 (N.D. Cal. Apr. 16. 2014).

27       As to the fact that the settlement agreements took place after the date of the hypothetical

28   negotiation, under the facts of this case, where Finjan's business model is based "entirely on

United States District Court
Northern District of California

7

1  litigation and licensing of [its] patents," Finjan's licenses are probative of the royalty to which the

2  parties would have agreed in a hypothetical negotiation.  *GPNE*, 2014 WL 1494247, at *7.

3        Finally, the Court does not find persuasive Blue Coat's argument that the jury instruction

4  regarding settlement agreements did not inform the jury that "the settlement agreements fail to

5  properly reflect a hypothetical negotiation between the parties…[and]… have little probative value

6  to the question of royalty damages."  The Court provided a separate instruction that specifically

7  addressed Blue Coat's concern by stating that "settlement agreements are negotiated on dates

8  earlier or later than the [hypothetical negotiation date]" and that the license fees negotiated by a

9  settlement may be influenced by factors unrelated to the value of a patent.  Jury Instructions 47,

10  ECF 437.   The record shows that Blue Coat had ample opportunity to distinguish these settlement

11  agreements through fact and expert testimony and to argue to the jury, consistent with the jury

12  instruction given by the Court, that no weight should be given to them.  However, admission of

13  these agreements in light of the other evidence of comparable licenses was not erroneous and not

14  prejudicial.   The Court concludes a new trial is not warranted as a result of the admission of the

15  settlement agreements.

16      **D.   Total Product Revenues**

17      Blue Coat argues that allowing evidence of the total product revenue for the accused

18  products and services was contrary to law and highly prejudicial.  Mot. for New Trial 6, ECF 499.

19  In response, Finjan argues that Blue Coat waived this argument by not objecting to the

20  presentation of this testimony.  Opp. to New Trial 4, ECF 518.  In reply, Blue Coat argues that it

21  objected to this testimony by making a motion in limine to preclude the admissibility of the total

22  revenue for each of the accused products.  Reply to New Trial 4, ECF 526.

23       The admission of total product revenue was neither contrary to law nor highly prejudicial.

24  The Court allowed total product revenue into evidence because it was potentially relevant to Dr.

25  Layne-Farrar's damages analysis under the *Georgia-Pacific* factors. Order Regarding MILS 7,

26  ECF 367.  Contrary to Blue Coat's argument, there is not a per se prohibition on the admission of

27  total product revenue.  Blue Coat now claims that Finjan did not properly utilize total product

28  revenue during trial, but anticipating this concern, the Court previously stated in its order

United States District Court
Northern District of California

8

1    regarding the parties' motions in limine that it "w[ould] permit [Finjan] to use such revenues and

2    acquisition valuations as a starting point for a properly apportioned royalty base. [If Finjan] fails

3    to adequately develop such testimony concerning apportionment, [Blue Coat] may move to strike

4    the evidence from the record."  Blue Coat's argument, however, comes too late.  To the extent that

5    Finjan never connected total product revenues to a properly apportioned royalty base, Blue Coat

6    never made that objection at trial and has thus waived that objection.  Accordingly, a new trial is

7    not warranted on the basis of the admission of total product revenues.

8        **E.    Damages Award**

9            **1.    '844 Patent**

10            Blue Coat argues that there is no factual or legal support for the jury's damages award

11    regarding the '844 patent.  Mot. for New Trial 6-7, ECF 499.  According to Blue Coat, Finjan

12    asked the jury to award it $24 million based on WebPulse's 75 million users multiplied by 4%, the

13    portion of web requests processed by DRTR, multiplied by an $8 per user royalty.  *Id*.  Blue Coat

14    argues that Finjan's use of 75 million users improperly includes extraterritorial instances of

15    alleged infringement.  *Id*.  Blue Coat also argues that Finjan's use of a 4% apportionment did not

16    properly apportion out the non-infringing functions of DRTR.  JMOL 3, ECF 498.  Finally, Blue

17    Coat argues that the $8 per user fee did not reflect Finjan's licensing practices at the time of the

18    hypothetical negotiation.  *Id*. at 3-5.

19            Finjan responds that it presented unrebutted evidence that WebPulse was developed and

20    updated within the United States, Opp. to New Trial 6, ECF 518 and that at the time of the

21    hypothetical negotiation the parties would have agreed to $8 per user royalty, Opp. to JMOL 2,

22    ECF 516.  Finjan also argues that it properly apportioned WebPulse to the patented invention's

23    footprint.  *Id*. at 3.

24            After reviewing the evidence, the Court agrees with Finjan.  First, Finjan expressly

25    addressed the territoriality of WebPulse's users during trial.  Dr. Layne-Farrar discussed how

26    "with the patents you only have to pay if the accused product is made or use or sold within the

27    jurisdiction of that patent."  Trial Tr. 1106:4-6.  With respect to WebPulse, Dr. Layne-Farrar

28    testified that it was "made in the U.S., it's the cloud product…that's pushed and it's pushed out of

United States District Court
Northern District of California

9

1  Utah.  So, again, that would have been covered out of these patents because it was made in the

2  U.S."  Trial Tr. 1106:11-15.  This was unrebutted as Blue Coat did not contest Finjan's evidence

3  that WebPulse was made and pushed out of Utah.  Accordingly, there was substantial evidence for

4  the jury to conclude that WebPulse was made in the United States.

5         Second, Finjan submitted evidence to the jury apportioning WebPulse to the scope of '844

6  patent.  Finjan apportioned WebPulse to its DRTR functionality and based its damages request on

7  the fact that DRTR processed approximately 4% of WebPulse's 1 billion daily requests.  Trial Tr.

8  474:20-475:1, 495:21-22.  Although Blue Coat argues that Finjan should have apportioned DRTR

9  further to the Cookie2 logs, Finjan's infringement case implicated other parts of DRTR as well.

10  Trial Tr. at 472:6-25, 492:5-493:23, 497:14-21, 503:4-11, 507:4-19, 511:5-513:4, 514:4-515:4,

11  516:16-517:6, 529:24-530:22, 630:18-631:3, 634:1-15.  Thus, there was substantial evidence in

12  the record for the jury to conclude that 4% was a proper apportionment.

13         Third, Finjan proffered evidence that at the time of the hypothetical negotiation in 2008,

14  the starting point for licensing negotiation was approximately $8 per user.  Mr. Chaperot testified

15  that since the 2008 Secure Computing jury award was upheld on appeal, Finjan used a licensing

16  rate of 8-16% and that $8 per user was consistent with this rate.  Trial Tr. 907:17-908:1.  Since

17  this licensing rate came from a 2008 judgment, it provided evidence regarding the negotiations

18  that would have occurred between Finjan and Blue Coat in 2008.  Accordingly, there was

19  substantial evidence for the jury to conclude that $8 per user was an appropriate licensing fee.

20         Thus, in summary, the jury's award was based on substantial evidence.  In assessing the

21  credibility of witnesses under Rule 59, to the extent any Blue Coat witness offered testimony

22  relevant to damages on the '844 patent, the Court does not find Blue Coat's witnesses persuasive.

23  *See Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) ("The

24  judge can weigh the evidence and assess the credibility of witnesses, and need not view the

25  evidence from the perspective most favorable to the prevailing party.").  Moreover, the Court finds

26  the jury's award was not against the clear weight of the evidence.  Thus, the Court also denies

27

28

United States District Court
Northern District of California

10

1    Blue Coat's request for a new trial under the Rule 59 standard.[1]

2    **2.   '633, '731, '968, and '780 Patents**

3    Blue Coat argues the damages award for the '633, '731, '968, and '780 patents are not

4    supported by law or facts and seeks judgment as a matter of law or a new trial for three reasons.

5    JMOL 6-8, ECF 498.  First, Blue Coat argues Finjan improperly apportioned the value of the

6    infringing features from the non-infringing features.  *Id*. at 6.  Second, Blue Coat argues that the

7    jury improperly doubled the damages award at the request of Finjan's counsel during closing

8    arguments.  *Id*. at 7-8.  Third, Blue Coat claims Finjan's improper apportionment led to a damages

9    award that allowed Finjan to recover damages multiple times for each accused feature.  *Id*. at 8.

10    Finjan argues that there was substantial evidence supporting Dr. Layne-Farrar's

11    apportionment method.  Opp. to JMOL 6-8, ECF 516.  Next, Finjan argues that Dr. Layne-Farrar

12    provided a "very conservative" floor for a reasonable royalty and that the jury properly found it

13    was entitled to a higher reasonable royalty based on the trial evidence.  *Id*. at 8.  Finally, Finjan

14    argues that it did not recover damages multiple times as the jury separately identified the

15    reasonable royalty for the specific infringing functionality of each patent.  *Id*. at 8-9.

16    After reviewing the evidence in the record, the Court finds there was substantial evidence

17    to support the jury's damages award for the '633, '731, '968, and '780 patents.  Dr. Layne-Farrar

18    testified that she apportioned the 24 functions of Blue Coat's security products equally based on

19    Blue Coat's documents, her discussions with Finjan's technical experts, and a Blue Coat

20    engineer's deposition.  Trial Tr. 1110: 5-24; 1118:2-12, 1144:3-1145:11.  Finjan also proffered

21    evidence that although WebPulse is a part of the Global Intelligence Network, internal Blue Court

22    documents equated WebPulse with the Global Intelligence Network.  Trial Tr. 988:9-12, 990:10-

23    15, 1006:11-1008:8; 1142:9-12.  Thus, Dr. Layne-Farrar provided sufficient foundation for her

24    apportionment analysis.

25    Next, Dr. Layne-Farrar testified and Finjan offered evidence indicating that her reasonable

26

27    _____

28    [1] Blue Coat alternatively requests the Court to issue a remittitur on damages at $0 or nominal
damages.  The Court denies this request, having found substantial evidence supports the jury's
award.

11

*United States District Court*
*Northern District of California*

1   royalty analysis was a conservative floor for damages.  Trial Tr. 1044:21-1045:2-7; 1112:23-

2   1114:24; 1116:21-1118:1; 1158:17-20; *see also id.*at 1113:9-14; 1150:17-1151:6; 1153:6-15.  As a

3   result, the jury could have considered other evidence in the trial to determine the appropriate

4   reasonable royalty and contrary to Blue Coat's arguments, the jury did not simply double Dr.

5   Layne-Farrar's conservative numbers.  Thus, the jury's award was based on substantial evidence

6   at trial.

7        Finally, Finjan did not recover damages multiple times for each accused figure.  Finjan

8   sought damages for each of its patents, each of which covers different functionalities.  Although

9   some of Blue Coat's products may contain multiple functionalities and thus, infringe more than

10  one patent that does not equate to "double-dipping" or "triple-dipping" on damages.  Thus, the

11  jury's award was based on substantial evidence.

12       In assessing the experts' credibility under Rule 59, *see Landes*, 833 F.2d at 1371 (9th Cir.

13  1987), the Court does not find Blue Coat's witnesses persuasive on the issue of damages.  *See, e.g.*

14  Trial Tr. 1253:14-1253:23 (Mr. Schoenfeld testifying that it is not possible to equate values on any

15  of the 24 functions).  The Court also finds the jury's award was not against the clear weight of the

16  evidence.   Thus, the Court also denies Blue Coat's request for a new trial under the Rule 59

17  standard.

18       **F.    Infringement**

19            **1.    '844 Patent**

20       Blue Coat argues that Finjan did not prove WebPulse infringes claims 1, 7, 11, 15, and 41

21  of the '844 patent and seeks judgment as a matter of law or a new trial for two reasons.  Mot. for

22  New Trial 7-8, ECF 499.  First, Blue Coat claims that there is no evidence WebPulse generates a

23  "[d]ownloadable security profile that identifies suspicious code" as required by the asserted

24  claims.  *Id.*.  According to Blue Coat, at trial, Finjan argued that Cookie2 logs generated by

25  WebPulse include the "security profile."  *Id.*  However, Blue Coat argues that Finjan did not prove

26  where the "security profile" in Cookie2 identified suspicious code.  *Id.*  Second, Blue Coat argues

27  that there is no evidence of WebPulse "linking…the first Downloadable security profile *before* a

28  web server makes the Downloadable available to web clients."  *Id.* at 8-9.  Finjan responds that its

United States District Court
Northern District of California

12

1    expert testified and documents show that WebPulse satisfies the "identifies suspicious code"

2    element of the asserted claims when it generates a DRTR response.  Opp. to New Trial 7-9, ECF

3    518.  Second, Finjan argues that its expert's testing of Blue Coat's products, Blue Coat's own

4    documents, and Blue Coat's experts provided evidence that WebPulse's "linking" occurs "before a

5    webserver makes the Downloadable available to web clients."  *Id*. at 9.

6        The Court concludes that substantial evidence supports the jury's determination that

7    WebPulse infringes the asserted claims of the '844 patent.  First, Finjan provided evidence that

8    WebPulse creates a "security profile" through its DRTR component.  Trial Tr. 490:11-493:23.  Dr.

9    Cole described an example where the DRTR analyzed Javascript within a webpage and generated

10   a response that identifies suspicious code such as eval, unescape, and document.write functions.

11   Trial Tr. 491:10-493:23.  Although Blue Coat claims the Cookie2 is the security profile, Dr. Cole

12   testified that Cookie2 is actually evidence of a security profile created by WebPulse.  Trial Tr.

13   497:14-497:21 ("Evidence of the security profile is in a file that you've heard a lot about called

14   Cookie2.").  However, Finjan also provided evidence that Cookie2 identifies suspicious code.

15   Trial Tr. 490:1-515:16 ("If we go to the bottom you can see it will also track those suspicious

16   system calls that we talked about so you see eval, unescape, document write and so it is tracking

17   and creating a profile for that suspicious activity.").  Blue Coat's expert testified that Cookie2 did

18   not identify suspicious code.  Trial Tr. 1424:3-1445:6.  The jury considered all the testimony and

19   credited Finjan's evidence in reaching its infringement verdict.  The Court concludes that

20   substantial evidence supports the jury's findings that WebPulse meets this limitation of the '844

21   patent.

22       Second, whether WebPulse meets the linking limitation revolves around whether

23   WebPulse is part of the "web client" or an inspector that inspects content for suspicious code.

24   Finjan provided evidence that WebPulse is an inspector that detects suspicious code.  Trial Tr.

25   469:2-472:25.  As a result, Finjan proffered evidence that WebPulse performs any linking before

26   the web server makes the downloadable available to web clients.  *Id*.  While Blue Coat's expert

27   provided testimony that WebPulse is a web client, and thus performs its linking after the

28   downloadable is available to web clients, Trial Tr. 1453:8-17, the jury credited Finjan's evidence.

United States District Court
Northern District of California

13

1    In reviewing the record, the Court concludes that substantial evidence supports the jury's findings

2    that WebPulse also meets this limitation of the '844 patent.  Accordingly, substantial evidence

3    supports the jury's verdict that WebPulse infringes the '844 patent.

4          Under Rule 59, however, the Court may make a credibility determination.  *See Landes*,

5    833 F.2d at 1371 (9th Cir. 1987).  The Court does not find Blue Coat's witnesses persuasive on the

6    issue of infringement of the '844 patent and does not find the jury's verdict was against the clear

7    weight of the evidence.  Thus, the Court also denies Blue Coat's request for a new trial under the

8    Rule 59 standard.

9                    **2.  '731 Patent**

10         Blue Coat seeks judgment as a matter of law or a new trial because Finjan did not prove

11   ProxySG and WebPulse in combination meet the following limitation of claims 1 and 17 of the

12   '731 patent:  "deriving security profiles . . . [wherein each of] the security profile[s]

13   [comprises/includes] a list of [at least one] computer command[s]…."  Mot. for New Trial 9, ECF

14   499.  Blue Coat claims that Finjan did not provide any evidence that Cookie2 is a profile that

15   comprises or lists a "list of computer commands."  *Id*.  Finjan responds that Dr. Mitzenmacher

16   testified that the infringing security profile includes a list of computer commands.  Opp. to New

17   Trial, ECF 518.

18         The Court agrees with Finjan and finds there is substantial evidence to show that the

19   "security profile" includes "a list of computer commands."  For example, Dr. Mitzenmacher, when

20   asked whether the security profile contained a list of commands, testified that "It's clearly a list of

21   computer commands. You have in that case three computer commands…In fact, it's giving you

22   more detail and potentially more useful information and at a minimum certainly it comprises a list

23   of computer commands."  Trial Tr. 881:23-882:6; *see also* Trial Tr. at 769:15-770:2 ("…in the

24   course of scanning the file, it's going to look for many things, but of particular relevance to the

25   patent is that it's going to identify the existence -- identify various computer commands…"),

26   772:9-773:4,781:20-782:13, 794:3-23.  Thus, substantial evidence supports the jury's verdict that

27   ProxySG and WebPulse infringe the '731 patent.

28         In assessing the experts' credibility under Rule 59, *see Landes*, 833 F.2d at 1371 (9th Cir.

14

United States District Court
Northern District of California

1   1987), the Court does not find Blue Coat's witnesses persuasive on the issue of infringement of

2   the '731 patent and does not find the jury's verdict was against the clear weight of the evidence.

3   Thus, the Court also denies Blue Coat's request for a new trial under the Rule 59 standard.

### 3.   '968 Patent

5          Blue Coat argues that Finjan did not prove ProxySG and WebPulse in combination meet

6   the following limitations of claim 1 of the '968 patent:  (1) "a memory storing…a policy index to

7   the cache contents, the policy index including entries that relate cache content and policies by

8   indicating cache content that is known to be allowable relative to a given policy…" and (2)

9   "content evaluator…for determining whether a given digital content is allowable relative to a

10  given policy, based on the content profile, the results of which are saved as entries in the policy

11  index."  Mot. for New Trial 10, ECF 499.   Blue Coat seeks judgment as a matter of law or a new

12  trial.  At the *Markman* hearing, the parties agreed that "policy index" means "a data structure

13  indicating allowability of cached content relative to a plurality of policies."  Order Construing

14  Claims 4, ECF 118.  According to Blue Coat, Finjan did not provide evidence that the "policy

15  index" required by claim 1 exists in the accused product.  *Id*.  Finjan argues that it presented

16  substantial evidence that the accused product contains a policy index which stores policy decisions

17  in variables that indicate allowability of analyzed content.  Opp. to New Trial 10-12, ECF 518.

18         After reviewing the record, substantial evidence supports the jury's conclusion that

19  ProxySG and WebPulse infringe claim 1 of the '968 patent.  Dr. Mitzenmacher testified that

20  ProxySG applies policies to digital content at checkpoints, saves the results of these policy

21  decisions in the policy index, and the policy decisions are used throughout the system.  Trial Tr. at

22  823:14-26:12, 833:5-35:23, 836:1-10, 24-842:4, 898:14-900:6.  He also confirmed his analysis

23  through testing of Blue Coat's products.  Trial Tr. 754:11-755:5, 820:12-823:1.  He also used Blue

24  Coat's own documents to support his opinion.  Trial Tr. 840:6-14.  Accordingly, there is

25  substantial evidence to support the jury's verdict that ProxySG and WebPulse infringe claim 1 of

26  the '968 patent.

27         In assessing the experts' credibility under Rule 59, *see Landes*, 833 F.2d at 1371 (9th Cir.

28  1987), the Court does not find Blue Coat's witnesses persuasive on the issue of infringement of

United States District Court
Northern District of California

15

1   the '968 patent and does not find the jury's verdict was against the clear weight of the evidence.

2   Thus, the Court also denies Blue Coat's request for a new trial under the Rule 59 standard.

3       **4.   '780 Patent**

4       Blue Coat seeks judgment as a matter of law or a new trial and argues that Finjan did not

5   provide any evidence that ProxyAV and ProxySG in combination meet the following limitation of

6   claims 9 and 13 of the '780 patent:  "an ID generator coupled to the communications engine…for

7   performing a hashing function on the Downloadable and the fetched software components to

8   generate a Downloadable ID."  Mot. for New Trial 9, ECF 498.   At the *Markman* hearing, the

9   parties agreed to construe "performing a hashing function on the Downloadable and the fetched

10   software components" as "performing a hashing function on the Downloadable *together* with its

11   fetched software components."  Order Construing Claims 4, ECF 118 (emphasis added).   Blue

12   Coat argues that Dr. Mitzenmacher testified only that a hashing function was performed on objects

13   to create fingerprints and then the fingerprints were combined to correspond to a specific I.D.

14   Mot. for New Trial 11, ECF 499.  Blue Coat claims that combining fingerprints after the hashing

15   function is performed does not meet the claim's requirement that they happen together.  *Id.*

16   Moreover, Blue Coat argues that despite Dr. Mitzenmacher's opinion, there is no evidence that

17   fingerprints are combined after the hashing functions are performed.  *Id.*   Finjan argues that it

18   provided evidence that when a web page is obtained, its components are fetched together.  Opp. to

19   New Trial 13, ECF 518.

20       There is substantial evidence in the record to support the jury's verdict finding

21   infringement of claims 9 and 13 of the '780 patent.  Finjan demonstrated that when a web page is

22   obtained, its components are fetched in parallel via pipelining, and the objects are passed to

23   ProxyAV.  Trial Tr. 851:9-852:11.  Dr. Mitzenmacher testified, based on documents, source code,

24   and the testimony of Blue Coat engineers, that the web page and its components are gathered in a

25   buffer and then hashes are related to form a Downloadable ID of the web page and its components.

26   Trial Tr. 851:1-858:23; 1553:20-1554:13.  Thus, substantial evidence supported the jury's verdict.

27       In assessing the experts' credibility under Rule 59, *see Landes*, 833 F.2d at 1371 (9th Cir.

28   1987), the Court does not find Blue Coat's witnesses persuasive on the issue of infringement of

United States District Court
Northern District of California

16

1    the '780 patent and does not find the jury's verdict was against the clear weight of the evidence.

2    Thus, the Court also denies Blue Coat's request for a new trial under the Rule 59 standard.

### 5.    '633 Patent

4        Blue Coat argues that Finjan did not provide substantial evidence that the combination of

5    ProxySG, CAS, and MAA infringe claim 14 of the '633 patent under the doctrine of equivalents

6    and seeks judgment as a matter of law or a new trial for three reasons.   Mot. for New Trial 11,

7    ECF 499.   First, Dr. Cole did not testify there were insubstantial differences between the accused

8    products and claim 14.   *Id*. at 11-13.   Second, Finjan did not offer substantial evidence that the

9    mobile protection code is communicated to the downloadable-information destination.   *Id*. at 13-

10   14.   Third, Finjan did not proffer evidence that the MAA or its equivalent satisfies the claimed

11   "downloadable-information destination."   *Id*. at 14-16.   Finjan responds that contrary to Blue

12   Coat's argument, Dr. Cole testified that the accused products function in the same manner, same

13   way, and yielded the same results as the asserted claim.   Opp. to New Trial 14, ECF 518.   Finjan

14   also argues that it submitted evidence that mobile protection code is communicated to the

15   downloadable-information destination.   *Id*. at 14-16.   Finally, Finjan responds that Dr. Cole

16   explained that the MAA satisfies the claimed downloadable-information destination.

17       The Court concludes substantial evidence supports the jury's verdict that ProxySG, CAS,

18   and MAA infringe claim 14 of the '633 patent.   First, Dr. Cole testified with particularized

19   testimony and evidence on a limitation by limitation basis and explained how the accused product

20   infringed claim 14 under the doctrine of equivalents.   *See, e.g.*, Trial Tr. 610:21-612:9.   In support

21   of its argument, Blue Coat relies upon *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314,

22   1322-23 (Fed. Cir. 2003).   However, *Hewlett-Packard* is inapposite to the circumstances of this

23   case.   In *Hewlett-Packard*, the expert simply replied with a "yes" when asked whether the accused

24   products performed the same function, way, and result as the claim element, failing to provide any

25   reasoning for his answer on a limitation by limitation basis.   *Id*. at 1322.   Here, Dr. Cole provided

26   detailed testimony on a limitation by limitation basis for why the accused products function in the

27   same manner, way, and yielded the same results.   Trial Tr. 610:21-612:9.

28       Second, there was substantial evidence through testimony and documents that the mobile

17

United States District Court
Northern District of California

1    protection code element of the claim is met by the accused product.  Finjan demonstrated that

2    ProxySG receives executable code, acts as a re-communicator and sends the executable code to

3    CAS, which acts as a re-communicator and sends the executable code to the MAA.  *See, e.g.*, Trial

4    Tr. 578:15-584:12, 589:3-612:15.

5           Third, there was substantial evidence that the MAA satisfies the "downloadable-

6    information destination" element as Dr. Cole testified that the MAA is the information destination.

7    Trial Tr. 739:18-740:3.  As a result, there is sufficient evidence to support the jury's verdict.

8           In assessing the experts' credibility under Rule 59, *see Landes*, 833 F.2d at 1371 (9th Cir.

9    1987), the Court does not find Blue Coat's witnesses persuasive on the issue of infringement of

10   the '633 patent and does not find the jury's verdict was against the clear weight of the evidence.

11   Thus, the Court also denies Blue Coat's request for a new trial under the Rule 59 standard.

12        **G.    Invalidity of the '844, '822,'633, '731, '968, and '780 Patents**

13          Blue Coat argues that the asserted claims of the '844 patent are anticipated by U.S. Patent

14   No 6,253,370 ("Abadi"); the asserted claims of the '822 and '633 patents are anticipated by U.S.

15   Patent No. 5,983,348 ("Ji"); the asserted claims of the '731 patent are anticipated by a publication

16   entitled "IBM Websphere Edge Server: New Features and Functions in Version 2" dated April

17   2002 ("Braswell"); the asserted claim of the '968 patent is anticipated by U.S. Patent No.

18   6,772,214 ("McClain"); and the asserted claims of the '780 patent are anticipated by U.S. Patent

19   No. 5,815,709 ("Waldo").  Mot. for New Trial 16-18, ECF 499.  Blue Coat seeks judgment as a

20   matter of law or a new trial.  However, in its briefs, Blue Coat does not adequately explain how it

21   proved invalidity on an element-by-element basis, neglects to address Finjan's rebuttal evidence,

22   and instead makes conclusory statements.  *Id.*

23          In reviewing the record, the Court concludes that substantial evidence supports the jury's

24   finding that Blue Coat failed to prove by clear and convincing evidence that the asserted patents

25   are invalid.  Although Blue Coat argues its experts, Dr. Necula and Dr. Hicks, offered evidence

26   that the asserted patents were invalid, Finjan's experts, Dr. Lyon and Dr. Jaeger testified that the

27   asserted patent were not invalid.  *See* Trial Tr. 1923:20-1933:1 (explaining how Abadi does not

28   teach all the elements of the asserted claims of the '844 patent); Trial Tr. 1934:17-1940:20

18

1    (explaining how Ji does not teach all the elements of the asserted claims of the '822 patent); Trial

2    Tr. 1940:21-1942:1 (explaining how Ji does not teach all the elements of the asserted claim of the

3    '633 patent); Trial Tr. 1877:4-1877:22; 1880:15-1888:12 (explaining how Braswell does not teach

4    all the elements of the asserted claims of the '731 patent); Trial Tr. 1888:13-1897:21 (explaining

5    how McClain does not teach all the elements of the asserted claim of the '968 patent); Trial Tr.

6    1897:22-1904:18 (explaining how Waldo does not teach all the elements of the asserted claims of

7    the '780 patent).  To the extent there was disagreement between the experts, the jury's verdict

8    indicates they credited Finjan's experts.  Given the testimony by Finjan's experts with respect to

9    the validity of the asserted patents, there was substantial evidence in the record for a reasonable

10   jury to conclude that Blue Coat failed to prove by clear and convincing evidence the asserted

11   patents were invalid.

12        Under Rule 59, however, the Court may make a credibility determination.  *See Landes*,

13   833 F.2d at 1371 (9th Cir. 1987).  The Court does not find Dr. Necula or Dr. Hicks persuasive on

14   the issue of invalidity of the asserted patents and does not find the jury's verdict was against the

15   clear weight of the evidence.  Thus, under the Rule 59 standard, Blue Coat's arguments also do

16   not stand.

17        **H.    Jury Instructions**

18        Although Rule 59 motions are generally governed by Ninth Circuit law, "[t]he legal

19   sufficiency of jury instructions on the issue of patent law is a question of Federal Circuit law[.]"

20   *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011).  A new trial should

21   only be granted based on erroneous instructions when "the movant can establish that the

22   instructions were legally erroneous and that the errors had a prejudicial effect."  *Id*.

23        Blue Coat argues that the jury instructions on the dates of inventions for the asserted

24   claims of the '844 and '731 patents were confusing to the jury and highly prejudicial.  Mot. for

25   New Trial 18-19, ECF 499.  Blue Coat claims the instructions were improper because the jury was

26   asked to determine the invention dates of the '844 and '731 patents and regardless of the

27   determination of such dates, the jury was also asked to determine whether the asserted claims of

28   those patents are invalid or not.  *Id*.  Since the jury found the invention date of the '844 patent to

United States District Court
Northern District of California

19

1    be November 8, 1996, Blue Coat argues it is not clear whether the jury found the '844 patent was

2    not invalid because the prior art introduced by Blue Coat is dated after November 8, 1996.  *Id.*

3         The Court disagrees with Blue Coat that the jury instructions on dates of inventions were

4    confusing and highly prejudicial.  As Blue Coat notes, the jury instructions explained that prior art

5    "does not include a publication that…was published less than one year before the date of

6    invention."  Jury Instructions 36, ECF 437.  However, the jury instructions continue and explain

7    that "In this case, [the jury] must determine the dates of invention for the asserted claims of the

8    '844 and '731 Patents.  The date of invention that you determine is related to the issue of whether

9    the prior art described in the evidence was published or patented before the invention was made."

10   *Id*.  The verdict form then instructed the jury that "Regardless of the dates [of invention] you find,

11   please answer Question 4 [on invalidity] with respect to each patent."  Verdict 4, ECF 438.  There

12   would be no reason for the verdict form to state that if, as Blue Coat argues, the jury was supposed

13   to use the invention date it found in determining anticipation.  If Blue Coat's argument is correct,

14   then the verdict form would simply have read "move on to the next question" without additionally

15   stating that the jury should disregard its answer to the date of invention in moving on to the next

16   question.  Thus, the jury instruction was proper and clear.  The verdict form expressly told the jury

17   to disregard the date of invention when determining whether the asserted patents were invalid.

18   Moreover, any error was not prejudicial.

19        **I.    Closing Arguments**

20        Blue Coat argues that Finjan made two highly prejudicial and confusing statements to the

21   jury.  Mot. for New Trial 19, ECF 499.  First, Blue Coat claims Finjan's request for $24 million in

22   damages for the '844 patent lacked any factual or legal basis.  *Id*.   Second, Blue Coat argues that

23   Finjan's attorney improperly gave his own personal opinion as to the credibility of Blue Coat's

24   witnesses.  *Id*. 19-20.  Specifically, Blue Coat asserts that Finjan's attorney's comments that he

25   "didn't believe him either.  I didn't.  I didn't think he was credible…I didn't believe Dr.

26   Bestavros…I didn't believe him" were highly prejudicial and improper under Rule 3.4(e) of the

27   Model Rules of Professional Conduct.  *Id*. at 19. Finjan argues that in closing, it properly

28   explained why Dr. Bestavaros was not credible.  Opp. to New Trial 21-22, ECF 518.

United States District Court
Northern District of California

20

1    As the Court discussed *supra* II.E.1, there was adequate factual and legal basis for Finjan's

2    request for $24 million in damages.

3    The Court also finds Finjan's closing argument regarding Dr. Bestavaros was neither

4    highly prejudicial nor confusing.  As a threshold matter, Blue Coat never objected to any of the

5    allegedly prejudicial statements during closing and has thus waived this argument.  Moreover, the

6    purpose of closing argument is to explain the evidence, and where parties offer conflicting

7    opinions, to explain why one side's evidence should be believed over the other.  Trial Tr. 2056:16-

8    20 ("In these kinds of cases every time you have a patent case you're going to have two experts,

9    both of them Ph.D.'s, and one is going to say A and the other one is going to say B, this is black

10   and white, and what do you want to call it?").  In closing argument, Finjan, in an appropriate

11   manner, argued to the jury why Dr. Bestavaros's opinions should not be believed.  *See, e.g.,*Trial

12   Tr. 2057:7-11 ("He didn't mark any exhibits.  He just got up there and said Dr. Cole is wrong, Dr.

13   Mitzenmacher is wrong, Dr. Medvidovic is wrong, Dr. Bims is wrong…")

14   In its briefing, Blue Coat principally relies on the ABA Model Rules of Professional

15   Conduct and two cases in support of its argument: *Whitserve, LLC v. Computer Packages, Inc*.,

16   694 F.3d 10, 34 n. 18 (Fed. Cir. 2012) *and Intellectual Ventures I, LLC v. Canon Inc.*, 104 F.

17   Supp. 3d 629, 659 (D. Del. May 18, 2015).  First, the ABA Model Rules of Professional Conduct

18   "impose no enforceable duties on lawyers until promulgated by state high courts or by federal

19   courts." *Childress v. Trans Union, LLC*, Case No. 12-cv-00184, 2013 WL 3071273, at *2 (S.D.

20   Ind. June 18, 2013).  Blue Coat has not provided the Court with any identical provisions under the

21   California Rules of Professional Conduct or this Court's local rules.  In *Whitserve*, counsel made

22   an emotional plea and inaccurately stated the law when counsel argued that "'according to the

23   law,' the jury could add $5–10 million to the award as 'compensation for the four years of hell'

24   resulting from the litigation. It is beyond debate that juries may not award litigation costs or

25   punish infringers." *Whitserve*, 694 F.3d at 34 n. 18.  In *Intellectual Ventures I*, the defendant

26   represented to the court and plaintiff that it would not offer evidence of non-infringement.

27   *Intellectual Ventures I*, 104 F. Supp. 3d at 659.  At trial, defendant offered the testimony of a fact

28   witness for what it repeatedly told the court and plaintiff was for the purpose of explaining how

United States District Court
Northern District of California

21

<div style="writing-mode: vertical">United States District Court<br>Northern District of California</div>

1   the accused devices work.  *Id.*  During closing arguments, however, defendant used its fact

2   witness's testimony "as the bedrock for its closing argument to the jury that the accused devices

3   do not [infringe.]"  *Id.*  The court found that Defendant's "counsel improperly played the role of

4   expert witness by inferring from factual testimony that the accused devices do not meet the claim

5   limitations."  *Id.*  Unlike *Whitserve*, Finjan did not make an improper emotional plea or misstate

6   the law to the jury and unlike *Intellectual Ventures I*, Finjan did not mislead the court and Blue

7   Coat about the nature of testimony and then use it for an improper purpose during closing

8   arguments.  Accordingly, the Court concludes that a new trial based on Finjan's closing arguments

9   is not warranted.

10      **J.    Amending Judgment**

11      Blue Coat argues that the judgment needs clarification because contrary to the instructions

12   on the verdict form, the jury, after finding several of the asserted patents were literally infringed,

13   also found those same patents were infringed under the doctrine of equivalents.  Mot. for New

14   Trial 21-22, ECF 499.  The verdict form instructed the jury to analyze infringement under the

15   doctrine of equivalents only if the patent was not literally infringed.  *Id.*  Blue Coat seeks to have

16   the judgment reflect that infringement under the doctrine of equivalents is moot for the '844, '968,

17   and '780 patents.  *Id.* at 22.  Finjan argues that the judgment should not be altered because the

18   jury's findings are not mutually exclusive.  Opp. to New Trial 23, ECF 518.

19      The Court agrees with Blue Coat that the judgment should be amended to reflect that

20   infringement under the doctrine of equivalents is moot for the '844, '968, '780 patents and Finjan

21   is not entitled to any relief under the doctrine of equivalents.  Pre-trial, the parties mutually agreed

22   that the jury would be instructed not to answer questions on infringement under the doctrine of

23   equivalents for any patents that were literally infringed.  The Court concurred and approved a jury

24   verdict form instructing the jury as such.  The jury clearly misread the instruction.  Before the jury

25   was released, the Court consulted counsel and both parties agreed that the mistake could be cured

26   in post-trial motions.  Trial Tr. 2192:16-2193:8.  Counsel expressly waived the opportunity to send

27   the jury back for further deliberations.  *Id.*  To be consistent with that agreement, the Court will

28   amend the judgment accordingly.

<div style="text-align: center">22</div>

United States District Court
Northern District of California

### III.    BLUE COAT'S MOTION TO AMEND FINDINGS AND JUDGMENT

#### A.    Legal Standard

Under Fed. R. Civ. P. 52(b), "the court may amend its findings—or make additional findings—and may amend the judgment accordingly."  Such motions may only be granted to "correct manifest errors of law or fact or to address newly discovered evidence or controlling case law."  *ATS Prods. Inc. v. Ghiorso*, Case No. 10-4880 BZ, 2012 WL 1067547, at *1 (N.D. Cal. Mar. 28, 2012) (citations omitted).  The moving party may not use a motion under Rule 52(b) "as a vehicle for a rehearing" nor as a way to "re-litigate facts and legal theories that have previously been rejected by the court." *Id*. (citations omitted).  Motions under rule 52(b) are "not [to] be granted if [they are] based on arguments that either were, or could have been, raised at any point prior to the entry of judgment."  *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, Case No. 02-1774-PJH, 2007 WL 1864780, at *2 (N.D. Cal. June 28, 2007) *aff'd*, 291 Fed. Appx. 40 (9th Cir. 2008).

#### B.    Discussion

Following the jury's verdict, the Court conducted a bench trial regarding the priority dates for the '844 and '731 patents, prosecution history estoppel, the patent eligibility of the '844 patent, and laches.   During the bench trial, the Court heard live testimony, received evidence and briefing, and found that (1) Finjan had not met its burden to show the priority date of the '844 patent is November 8, 1996 and therefore the presumptive invention date of the '844 patent is December 22, 1997; (2) the priority date of the '731 patent is November 6, 1997; (3) Finjan is not barred by prosecution history estoppel from asserting infringement under the doctrine of equivalents for the '633 patent and Blue Coat's prosecution history estoppel defense with respect to the '844, '863, and '780 patent is moot; and (4) Blue Coat had not met its burden to show that the '844 patent is invalid under 35 U.S.C. § 101.  Order Regarding Non-Jury Legal Issues, ECF 486.  Blue Coat moves to amend the Court's findings related to (1) the '731 patent's priority date, (2) whether there is patent prosecution history estoppel of the '633 patent, (3) whether the '844 patent is patent ineligible under 35 U.S.C. § 101, and (4) whether there is laches.  Mot. to Amend 1-10, ECF 500.

23

1     The Court has reviewed all of Blue Coat's arguments and finds Blue Coat has failed to

2  establish any factual or legal grounds to support amending those findings.  A motion to amend

3  findings should not be a means for re-litigating issues upon which the party did not prevail.  Blue

4  Coat's 11 page motion contains nothing more than a rehashing of its original arguments made

5  during the bench trial.   Accordingly, Blue Coat's motion to amend the Court's findings of fact

6  and conclusions of law is DENIED.

7  **IV.     FINJAN'S MOTION FOR ATTORNEYS' FEES**

8     Finjan argues that it is entitled to attorneys' fees based on Blue Coat's litigation conduct

9  and tactics.  Mot. for Fees 5, ECF 491-4.  Blue Coat argues that this is not an exceptional case that

10  warrants an award of attorneys' fees.  Under 35 U.S.C. § 285, a "court in exceptional cases may

11  award reasonable attorney[s'] fees to the prevailing party."  In *Octane Fitness, LLC v. ICON*

12  *Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), the Supreme Court held "an 'exceptional'

13  case is simply one that stands out from others with respect to the substantive strength of a party's

14  litigating position (considering both the governing law and the facts of the case) or the

15  unreasonable manner in which the case was litigated."  "'[T]here is no precise rule or formula for

16  making these determinations,' but instead equitable discretion should be exercised 'in light of the

17  considerations we have identified.'" *Id.*

18     The Court finds the circumstances of this case and Blue Coat's conduct do not warrant an

19  award of attorney's fees.  Blue Coat vigorously defended its position and the Court is not aware of

20  any conduct by Blue Coat that makes this case exceptional.  Moreover, as the accused infringer,

21  Blue Coat was obligated to defend against Finjan's numerous asserted patents and claims.  Blue

22  Coat did not choose to bring this lawsuit, but once sued, defended itself in a determined manner.

23  **V.     FINJAN'S MOTION AMEND THE JUDGMENT TO INCLUDE ENHANCED**
24  **     DAMAGES AND PRE- AND POSTJUDGMENT INTEREST**

25     Finjan seeks enhanced damages pursuant to 35 U.S.C. § 284 and pre- and post-judgment

26  interest.  Mot., ECF 504-4.  Finjan argues that it is entitled to enhanced damages because Blue

27  Coat intentionally copied its patents, did not have a good faith belief its patents were invalid or not

28  infringed, and engaged in a vexatious litigation strategy.  *Id.* at 3-20.  Finjan also seeks

United States District Court
Northern District of California

24

1  prejudgment interest at the prime rate compounded annually from the date it filed the complaint

2  and post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury

3  yield. *Id.* at 24-25. Blue Coat argues that Finjan is not entitled to enhanced damages because it

4  did not claim willful infringement. Opp. 2, ECF 513. Blue Coat also argues that Finjan is not

5  entitled to pre-judgment interest because Finjan delayed in filing this lawsuit, but if pre-judgment

6  interest is awarded, it should be limited to the amount of damages prior to the entry of judgment,

7  to the amount originally requested for the '731, '633, and '968 patents, and reduced for the '844

8  patent. *Id.* at 20-23. Blue Coat also argues that pre-judgment interest should be awarded at the T-

9  Bill rate instead of the prime rate. *Id.* at 24. Finally, Blue Coat agrees with Finjan on the award of

10 post-judgment interest. *Id.*

### A.    Enhanced Damages

12      Under 35 U.S.C. § 284, in a case of infringement, courts "may increase the damages up to

13 three times the amount found or assessed." The test for determining whether a case is exceptional

14 under § 284 previously came from the Federal Circuit's *en banc* decision in *In re Seagate*

15 *Technology, LLC*, 497 F.3d 1360 (2007). On June 13, 2016, the Supreme Court rejected the

16 Seagate test as being inconsistent with the language of § 284. *Halo Elecs., Inc. v. Pulse Elecs.,*

17 *Inc.*, --- U.S. ---, 2016 WL 3221515 (2016). The Court found that § 284 "contains no explicit

18 limit or condition [and] the [use of the] word 'may,' clearly connotes discretion," *id.* at 8, and that

19 the *Seagate* test was "unduly rigid, and it impermissibly encumbers the statutory grant of

20 discretion to district courts," *id.* at 9.

21      *Halo* overruled *Seagate* and held that "[t]he sort of conduct warranting enhanced damages

22 has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate,

23 consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 8. In other words,

24 while willfulness may support a finding of enhancement, *Halo* does not hold that willfulness is

25 necessary for enhanced damages. The Supreme Court also cautioned that an award of enhanced

26 damages is not mandatory following a finding of egregious misconduct and instead, "courts

27 should continue to take into account the particular circumstances of each case in deciding whether

28 to award damages, and in what amount. Section 284 permits district courts to exercise their

United States District Court
Northern District of California

25

1    discretion in a manner free from the inelastic constraints of the *Seagate* test." *Id*. at 11.  *Halo* also

2    established that enhanced damages are governed by a preponderance of the evidence standard.  *Id*.

3    at 12.

4          In determining whether this case presents egregious misconduct the Court must determine

5    whether Blue Coat acted in a "willful, wanton, malicious, bad-faith, deliberate, consciously

6    wrongful, or flagrant" manner. In *Read Corp. v. Portec, Inc.*, 970 F.3d 816, 826-27 (Fed. Cir.

7    1992), the Federal Circuit's enumerated eight factors that may guide an analysis of "the

8    egregiousness of the defendant's conduct based on all the facts and circumstances."  The *Read*

9    factors include:

> (1) whether the infringer deliberately copied the ideas or design of
> another; (2) whether the infringer, when he knew of the other's patent
> protection, investigated the scope of the patent and formed a good-faith
> belief that it was invalid or that it was not infringed; (3) the infringer's
> behavior as a party to the litigation; (4) defendant's size and financial
> condition; (5) closeness of the case; (6) duration of defendant's
> misconduct; (7) remedial action by the defendant; (8) defendant's
> motivation for harm.

15   *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006).  In light of *Halo*,

16   which clearly stated that district courts are not bound by any rigid formula or set of factors, the

17   *Read* factors are now one set of guidelines courts can use to evaluate alleged misconduct, but are

18   no longer the sole set of criteria.  This Court finds the *Read* factors present useful guideposts in

19   determining the egregious of the defendant's conduct, and will assess Blue Coat's conduct through

20   those factors.

21         The *Read* factors do not support a finding of egregiousness misconduct.  Factor 1—

22   deliberate copying—weighs against a finding of egregious misconduct.  Finjan argues that Blue

23   Coat intentially copied the covered technology.  Mot. 4, ECF 504-4.  According to Finjan, Blue

24   Coat shifted its corporate focus to security products in 2007 and began monitoring Finjan's

25   offerings and then started copying Finjan's products.  *Id*. at 4-6.  As evidence, Finjan relies on

26   documents showing that Blue Coat's employees discussed Finjan's products and capabilities.  *Id*.

27   Blue Coat argues that Finjan's evidence at most show there was competition between Finjan and

28   Blue Coat but is not evidence that Blue Coat copied Finjan's products.  Opp. 6-11, ECF 513.   The

26

1    Court agrees with Blue Coat and finds that Finjan's evidence is simply evidence of normal

2    business competition, perhaps fueled by the passion and the desire to beat the competition, and not

3    evidence of improper copying by Blue Coat.  In any competitive industry, businesses monitor and

4    discuss their competitors.  As a result, Finjan has not met its burden to show Blue Coat copied its

5    products and this factors weighs against a finding of misconduct.

6          Factors 2 and 3—any good faith belief that patents were invalid or not infringed and

7    infringer's behavior during litigation—weigh against enhancement.  Finjan argues that Blue Coat

8    engaged in a vexatious litigation strategy.  Mot. 7, ECF 504-4.  Blue Coat argues that it litigated

9    this case in compliance with all court scheduling orders and presented reasonable non-

10   infringement, invalidity, prosecution history estoppel, and laches defenses.  Opp. 11-17, ECF 513.

11   As the Court discussed in relation to Finjan's request for attorneys' fees, this was a hard fought

12   case but did not cross the line into improper conduct.  Although Finjan has presented some

13   evidence that Blue Coat generally knew of its patents, Finjan has not provided sufficient evidence

14   to show Blue Coat knew of the specific patents-in-suit prior to this lawsuit.  When this lawsuit was

15   filed, Blue Coat has reasonable good-faith non-infringement and invalidity defenses, they were not

16   rendered unreasonable because Finjan's prevailed at trial  As a result, Blue Coat had a good faith

17   belief that the patents were invalid or not infringed.

18         Factor 4—defendant's size and financial condition—is neutral.  Finjan argues that an

19   enhanced damages award of $120 million will not impact Blue Coat's financial condition because

20   Blue Coat grossed over $440 million in profit.  Mot. 21, ECF 504-4.  Blue Coat argues that an

21   award of $120 million would be disproportionate in light of its gross profit.  Opp. 17, ECF 513.

22   As framed by the parties, this factor is not relevant to determining the egregiousness of Blue

23   Coat's conduct.  Finjan is not relying on Blue Coat's size to argue that Blue Coat's large size

24   somehow enabled it to act egregiously.  Rather, Finjan's argument goes to the size of the enhanced

25   damages award should enhanced damages be appropriate in the first instance.  Since the Court

26   finds enhanced damages are not appropriate in this case, this factor not relevant and neutral.

27         Factor 5—closeness of the case—is neutral.  Both parties advanced reasonable positions

28   that were ultimately decided in Finjan's favor.  The fact the jury sided with Finjan over Blue Coat

United States District Court
Northern District of California

27

1   does not negate the fact Blue Coat's positions survived summary judgment and reached a jury.

2   Accordingly, this factor is neutral.

3       Factor 6—the duration of infringement—is neutral.  Finjan argues that Blue Coat's

4   infringement has been going on since 2008 and Blue Coat continues to sell infringing products

5   today.  Mot. 19, ECF  504-4.  Blue Coat argues that Finjan limited its damages to those acts

6   occurring after August 28, 2013, and cannot now argue it deserves enhanced damages for

7   infringement prior to that time.  Opp. 18-19, ECF 513.  The Court agrees with Blue Coat that

8   Finjan cannot seek to achieve enhanced damages for infringement for which did not even seek

9   regular damages.  As to Blue Coat's continuing infringement, Blue Coat has filed post-judgment

10  motions and continues to challenge the jury verdict.  Thus, this factor weighs slightly in Finjan's

11  direction.

12      Factor 7—remedial action by the defendant—is neutral.  Finjan argues that Blue Coat

13  continues to sell infringing products and did not attempt to design around Finjan's patents.  Mot.

14  19-20, ECF 504-4.  Blue Coat responds that it did not engage in any remedial action because it

15  developed good faith non-infringement and invalidity defenses.  Opp. 12, ECF 524-24.  The lack

16  of remedial measures by Blue Coat is concerning but as Blue Coat continues to challenge the jury

17  verdict, this factor is neutral.

18      Factor 8—motivation for infringement—weighs against a finding of egregious misconduct.

19  Finjan argues that Blue Coat was driven by financial gain to copy its technology and infringe its

20  patent rights.  Mot. 20-21, ECF 504-4.  Blue Coat argues there is no evidence that it had a bad

21  faith motivation to harm Finjan.  Opp. 19, ECF 513.  The Court agrees with Blue Coat and finds

22  Finjan has not provided sufficient evidence to show Blue Coat was motivated financially to

23  infringe Finjan's patents.  This factor weighs against a finding of egregious misconduct.

24      In reviewing the *Read* factors and reviewing Blue Coat's conduct, the Court finds Blue

25  Coat has not engaged in egregious misconduct as described by *Halo*.  Thus, enhanced damages are

26  not warranted.

27      **B.    Pre- and Post-Judgement Interest**

28      Since the Court found Finjan did not unreasonably delay in bringing suit, *see supra* II.B,

28

1    the Court finds an award of pre-judgment interest is appropriate in this case. Finjan's damages

2    award represents a lump-sum payment that would have been fully paid at the time of the

3    hypothetical negotiation. Thus, the Court does not find persuasive Blue Coat's argument that pre-

4    judgment interest should be limited to the portion of the award representing damages occurring

5    prior to entry of judgment. Opp. 20-21, ECF 513. The purpose of pre-judgment interest is "to

6    compensate for the delay a patentee experiences in obtaining money he would have received

7    sooner if no infringement had occurred." *Paper Converting Machine Co. v. Magna-Graphics

8    Corp.*, 745 F.2d 11, 23 (Fed. Cir. 1984).

9        As to the rate to be applied, Finjan asserts that it should be awarded pre-judgment interest

10    at the prime rate. "Typically, Courts permit this where there is evidence that the plaintiff would

11    have been spared from borrowing money at the prime rate during the infringement period had the

12    infringer been paying royalties, and thus, prejudgment interest at the prime rate is necessary to

13    compensate for 'the forgone use of the money.'" *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp.

14    2d 128, 133 (D. N.J. May 22, 2007) (citations omitted). Here, Finjan has not put forth evidence

15    that it borrowed any money during the infringement period at the prime rate. As a result, the

16    Court finds the more appropriate approach is to utilize the T-Bill rate. *See Laitram Corp. v. NEC*

17    *Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming use of T-Bill rate where patent owner did not

18    provide any evidence that it borrowed money at a higher rate). Whether to award simple or

19    compound interest is within the discretion of the district court. *Lam Inc. v. Johns-Manville Corp.*,

20    718 F.2d 1056, 1066 (Fed. Cir. 1983). According to *Chisum on* Patents, "most [courts] apply

21    some form of compounding." Chisum, *Patents*, § 20.03 (collecting cases. Thus, the Court will

22    allow compound prejudgment interest. Finally, Finjan asks that interest be compounded annually

23    and Blue Coat does not offer an alternative suggestion. The Federal Circuit has affirmed annual

24    compounding and the Court will adopt this approach. Accordingly, the Court will apply the 52-

25    week T-Bill rate, compounded annually for pre-judgment interest.

26        Under 28 U.S.C. § 1961, the award of post-judgment interest is automatic and at a rate

27    equal to the weekly average 1-year constant maturity Treasury yield compounded annually. 28

28    U.S.C. § 1961. Accordingly, the Court GRANTS Finjan's request for post-judgment interest.

29

**VI.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Blue Coat's motion for judgment as a matter of law is DENIED.

2.  Blue Coat's motion for a new trial and to amend the judgment is GRANTED IN PART AND DENIED IN PART.

3.  Blue Coat's motion to amend the findings of fact and conclusions of law is DENIED.

4.  Finjan's motion for attorney's fees is DENIED.

5.  Finjan's motion for enhanced damages, pre- and post-judgment interest is GRANTED IN PART AND DENIED IN PART.

6.  Finjan shall promptly submit a proposed amended/corrected judgment **on or before** July 25, 2016.  Finjan shall provide a copy to Blue Coat for review of the proposed amended/corrected judgment's adherence to this Order.

**IT IS SO ORDERED.**

Dated: July 18, 2016

BETH LABSON FREEMAN
United States District Judge

1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

| | |
|---|---|
| 7 FINJAN, INC., | Case No.  13-cv-03999-BLF |
| Plaintiff, | |
| 8 | |
| 9 v. | **ORDER REGARDING JUDGMENT** |
| | [Re:  ECF 549, 550] |
| 10 BLUE COAT SYSTEMS, INC., | |
| Defendant. | |
| 11 | |

12          Pending before the Court is the parties' dispute over whether the post-judgment interest

13 period begins on November 20, 2015, or the date of the corrected judgment.  Following a ten-day

14 jury trial, the jury returned a verdict finding that Defendant Blue Coat Systems, Inc. literally

15 infringed four of Plaintiff Finjan, Inc.'s patents involving computer and network security: U.S.

16 Patent Nos. 6,804,780 (the "'780 patent"), 6,154,844 (the "'844 patent"), 7,418,731 (the "'731

17 patent"), and 6,965,968 (the "'968 patent"). Verdict 2-3, ECF 438.  *Id.*

18          The verdict form instructed the jury that for each asserted claim that it did not find to be

19 literally infringed, to answer whether that claim was infringed under the doctrine of equivalents.

20 *Id*.  The jury answered this question for each claim, even those it that it found to be literally

21 infringed.  *Id*. at 3.  Before the jury was excused, the Court held a side-bar with counsel to discuss

22 the jury's verdict.  Transcript 2192:16-2193:8, ECF 441.  Counsel expressly waived the

23 opportunity to send the jury back for further deliberations and agreed that the jury could be

24 discharged and that this could be "resolve[d] on post-trial motions."  *Id*. at 2192:22-23 (counsel

25 for Blue Coat).

26          In ruling upon the parties' bench trial issues, the Court found that Blue Coat's "prosecution

27 history estoppel defense with respect to the '844, '968, and '780 patents [wa]s moot" because the

28 jury found that these patents were literally infringed and were instructed not to consider whether

1  these patents were also infringed under the doctrine of equivalents. Order on Non-Jury Legal

2  Issues 12, ECF 486. On November 20, 2015, the Court, in accordance with the jury's verdict and

3  the Court's order on non-jury legal issues, entered judgment in favor of Finjan. ECF 487.

4      In its post-judgment motions, Blue Coat sought to amend the judgment to clarify that for

5  any claims that the jury found were literally infringed, the jury's findings as to whether those

6  claims were infringed under the doctrine of equivalents was moot. In essence, to memorialize on

7  the face of the judgment the ruling the Court made in its order on non jury issues which had been

8  incorporated into the November 20, 2015, judgment. Mot. for New Trial 21-22, ECF 499. To be

9  consistent with counsels' agreement at side-bar before dismissing the jury, the Court granted Blue

10 Coat's request to clarify the judgment that infringement under the doctrine of equivalents was

11 moot for the '844, '968, '780 patents. Order Regarding Post-Judgment Motions 22, ECF 543.

12 The corrected judgment filed concurrently with this order reflects that order. Blue Coat now

13 argues that the date for post-judgment interest should begin from the date of the corrected

14 judgment, and not November 20, 2015. ECF 550. Finjan opposes and argues that post-judgment

15 interest began from November 20, 2015. ECF 549.

16     The Court agrees with Finjan that post-judgment interest commences beginning on the date

17 of the final judgment entered on November 20, 2015. As of that date, damages were meaningfully

18 ascertained and there has been no subsequent modification of the amount of the money judgment

19 stated on November 20, 2015. *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of*

20 *Life Activities*, 518 F.3d 1013, 1017–18 (9th Cir. 2008). The corrected judgment merely reflects

21 the parties' agreed resolution of an apparent inconsistency in the jury verdict that was resolved by

22 counsels' agreement before the Court released the jury and reflected in this Court's order dated

23 November 20, 2015 which was incorporated in the November 20, 2015, Judgment. Transcript

24 2192:16-2193:8, ECF 441. The standard post-trial motions filed in this case did not result in any

25 modification to the jury's monetary award that is reflected in the November 20, 2015, Judgment.

26 Although these motions tolled the deadline for filing any appeal, the motions did not abrogate the

27 November 20, 2015, Judgment.

28     This conclusion is further supported by Blue Coat's own actions. First, it expressly

United States District Court
Northern District of California

2

1    represented to the Court that a corrected judgment would relate back to the November 20, 2015,

2    Judgment.  April 28, 2016 Hearing Transcript 79:6-11, ECF 540.  Second, Blue Coat filed its

3    Notice of Appeal on August 17, 2016, which relates to the November 20, 2015, Judgment, the

4    time for appeal having been tolled during the pendency of post-trial motions.

5          Thus, this Court concludes that the judgment entered on November 20, 2015, was a final

6    appealable judgment and post-judgment interest commenced on that date.  The Court will issue a

7    separate corrected judgment.[1]

8          **IT IS SO ORDERED.**

9    Dated: August 19, 2016

10    

11   BETH LABSON FREEMAN
     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

---

[1] The Court notes that Finjan's proposed judgment includes a reference to the Court's order regarding post-judgment motions.  ECF 545-1.  The Court does not find it necessary to reference that order in a judgment and removes this reference.

3

1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

7 FINJAN, INC.,                                                   Case No.   13-cv-03999-BLF

         Plaintiff,

8

9      v.                                                          **CORRECTED JUDGMENT**

10 BLUE COAT SYSTEMS, INC.,

         Defendant.

11

12

13     **IT IS ORDERED AND ADJUDGED** that pursuant to the jury verdict filed on August 4,

14 2015 (ECF No. 438) attached and the Court's order regarding non-jury legal issues filed on

15 November 20, 2015 (ECF No. 486), judgment is entered in favor of Plaintiff, and infringement

16 under the doctrine of equivalents is moot for U.S. Patent No. 6,154,844, U.S. Patent No.

17 6,965,968, and U.S. Patent No. 6,804,780.  Plaintiff is awarded prejudgment interest in the amount

18 of $114,684.71.

19

20 Dated:  August 19, 2016

21                                                          _____

22                                                          BETH LABSON FREEMAN
                                                           United States District Judge
23

24

25

26

27

28

United States District Court
Northern District of California

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation, | Case No.: 13-CV-03999-BLF |
| Plaintiff, | **VERDICT FORM** |
| v. | |
| BLUE COAT SYSTEMS, INC., a Delaware Corporation, | |
| Defendant. | |

### VERDICT FORM

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout this Verdict Form.  Your answer to each question must be unanimous.  Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions.  Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

1

VERDICT FORM

CASE NO. 13-CV-03999-BLF

**QUESTION 1**: Did Finjan prove by a preponderance of the evidence that Blue Coat's product or combination of products as identified below literally infringes any of the following claims of the Asserted Patents?  **Answer "Yes" or "No" for each claim.**

| '844 Patent<br>**WebPulse** | Claim 1  Yes | Claim 15  Yes |
| | Claim 7  Yes | Claim 41  Yes |
| | Claim 11  Yes | |
| '822 Patent<br>**ProxySG** | Claim 9  No | Claim 10  No |
| '633 Patent<br>**ProxySG + CAS +<br>MAA** | Claim 14  No | |
| '731 Patent<br>**ProxySG + WebPulse** | Claim 1  Yes | Claim 17  Yes |
| '968 Patent<br>**ProxySG + WebPulse** | Claim 1  Yes | |
| '780 Patent<br>**ProxySG + ProxyAV** | Claim 9  Yes | Claim 13  Yes |

For each claim you did not find to be literally infringed, answer Question 2.

2

VERDICT FORM                                                            CASE NO. 13-CV-03999-BLF

**QUESTION 2:** Did Finjan prove by a preponderance of the evidence that Blue Coat's product or combination of products as identified below infringe under the doctrine of equivalents? **Answer "Yes" or "No" for each claim.**

| '844 Patent<br>WebPulse | Claim 1 _Yes_ | Claim 7 _Yes_ |
| | Claim 11 _Yes_ | |
| '822 Patent<br>ProxySG | Claim 9 _No_ | Claim 10 _No_ |
| '633 Patent<br>ProxySG + CAS +<br>MAA | Claim 14 _Yes_ | |
| '968 Patent<br>ProxySG + WebPulse | Claim 1 _Yes_ | |
| '780 Patent<br>ProxySG + ProxyAV | Claim 9 _Yes_ | Claim 13 _Yes_ |

3

**QUESTION 3:**  What are the dates of invention for the '844 Patent and the '731 Patent?

'844 Patent:    November 8, 1996

'731 Patent    November 6, 1997

Regardless of the dates you find, please answer Question 4 with respect to each patent.

4

**QUESTION 4:**  Did Blue Coat prove by clear and convincing evidence that any of the following claims of the Asserted Patents are invalid because they are anticipated?  **Answer "Yes" or "No" for each claim.**

| | | |
|---|---|---|
| **'844 Patent**<br><br>U.S. Patent No. 6,253,370 ("Abadi") | Claim 1   No<br><br>Claim 7   No<br><br>Claim 11   No | Claim 15   No<br><br>Claim 41   No |
| **'822 Patent**<br><br>U.S. Patent No. 5,983,348 ("Ji") | Claim 9   No | Claim 10   No |
| **'633 Patent**<br><br>U.S. Patent No. 5,983,348 ("Ji") | Claim 14   No | |
| **'731 Patent**<br><br>IBM WebSphere Edge Server: New Features and Function in Version 2, IBM Redbooks ("Braswell") | Claim 1   No | Claim 17   No |
| **'968 Patent**<br><br>U.S. Patent No. 6,722,214 ("McClain") | Claim 1   No | |
| **'780 Patent**<br><br>U.S. Patent No. 5,815,709 ("Waldo") | Claim 9   No | Claim 13   No |

5

VERDICT FORM

CASE NO. 13-CV-03999-BLF

**Answer Question 5(a)-(f) only if you have found one or more claims of the Asserted Patents to be infringed and not invalid from Questions 1, 2 and 4.**

**QUESTION 5(a):** If you found any of the asserted claims of the '844 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 24,000,000

**QUESTION 5(b):** If you found any of the asserted claims of the '822 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 0

**QUESTION 5(c):** If you found the asserted claim of the '633 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 1,666,700

**QUESTION 5(d):** If you found any of the asserted claims of the '731 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 6,000,000

[continued to the next page]

6

VERDICT FORM                                   CASE NO. 13-CV-03999-BLF

**QUESTION 5(e):**  If you found the asserted claim of the '968 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 7,750,000

**QUESTION 5(f):**  If you found any of the asserted claims of the '780 Patent to be infringed and not invalid, what amount of damages has Finjan proven it is entitled to that would fairly and reasonably compensate it for Blue Coat's infringement for the life of the patent?

$ 111,787

7

VERDICT FORM                                                      CASE NO. 13-CV-03999-BLF

1    You have now reached the end of the verdict form and should review it to ensure it accurately

2  reflects your unanimous determinations.  The Presiding Juror should then sign and date the verdict

3  form in the spaces below and notify the Security Guard that you have reached a verdict.  The Presiding

4  Juror should retain possession of the verdict form and bring it when the jury is brought back into the

5  courtroom.

6

7

8    DATED: _August 4th_, 20_15_                    By: _____
                                                        Presiding Juror

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERDICT FORM                                      CASE NO. 13-CV-03999-BLF

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served the Non-Confidential Brief of Appellants by the appellate CM/ECF system. I further certify that on this date the Confidential Brief of Appellants will be served by First-Class Mail, postage prepaid, or dispatched to a third party commercial carrier for delivery to the following:

PAUL J. ANDRE
pandre@kramerlevin.com
LISA KOBIALKA
lkobialka@kramerlevin.com
JAMES HANNAH
jhannah@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
990 Marsh Road
Menlo Park, CA 94401
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

*Counsel for Appellee,*
*Finjan, Inc.*

Upon acceptance by the Court of the e-filed documents, six paper copies of the Corrected Confidential Brief of Appellants will be shipped via overnight delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

DATED: December 20, 2016          DURIE TANGRI LLP

By    */s/ Mark A. Lemley*
      *Attorneys for Defendant-Appellant*
      *Blue Coat Systems, Inc*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 12,674 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 point font.

DATED:  December 20, 2016              DURIE TANGRI LLP


                                       By   */s/ Mark A. Lemley*
                                       _____

                                       *Attorneys for Defendant-Appellant*
                                       *Blue Coat Systems, Inc*